**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **KEN PAXTON, in his official capacity as** | § | |
| **Attorney General of Texas,** | § | |
| **DAVID SCHNITZ,** | § | |
| **TRACY MARTIN, and** | § | |
| **FLOICE ALLEN,** | § | |
| *Plaintiffs,* | § | |
| | § | |
| **vs.** | § | **Civil Action No. _____** |
| | § | |
| **MARVIN RICHARDSON, in his official** | § | **COMPLAINT** |
| **Capacity as Acting Director, Bureau of** | § | |
| **Alcohol, Tobacco, Firearms and Explosives,** | § | |
| *Defendant.* | § | |

## INTRODUCTION

1.     Federal law has heavily taxed and regulated firearm suppressors since 1934. Since 1968, it has been illegal to make a firearm suppressor for personal use without first paying a $200 tax, marking the suppressor with a serial number, getting the approval of the federal government, and registering the firearm suppressor.

2.     Heavy federal taxation and regulation of firearm suppressors made in Texas for personal use in Texas does not survive *Heller*'s recognition that the right to keep and bear arms is an individual, fundamental right. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008).

3.     There has never been a public-safety justification for the taxation and regulation of firearm suppressors.

4.     Moreover, federal regulation of firearm suppressors made in Texas for personal use in Texas cannot be justified as regulations of interstate commerce, or as laws necessary and proper for the carrying into execution such regulations of interstate commerce.

5.     David Schnitz, Tracy Martin, and Floice Allen are Texas citizens, have informed the Attorney General of Texas that they intend to make a firearm suppressor for personal use in Texas that will remain in Texas. Moreover, Schnitz, Martin, and Allen intend to make the firearm suppressor out of basic materials that are not firearm suppressors and that would not be subject to federal regulation if they possessed them for other reasons. Therefore, Texas law states that the firearm suppressor they intend to make will not be subject to federal law or federal regulation, including registration, under the authority of the United States Congress to regulate interstate commerce. *See* TEX. GOV'T CODE §§ 2.052(a).

6.     Upon such notification, Texas law requires the Attorney General of Texas, Ken Paxton, to file suit against the federal government. TEX. GOV'T CODE § 2.054.

7.     Consequently, Plaintiffs seek an injunction against enforcing federal firearms statutes and regulations as applied to persons who make firearm suppressors in Texas for personal use that will remain in Texas.

8.     Plaintiffs also seek declaration that firearms suppressors made in Texas for personal use in Texas may not be regulated under the Interstate Commerce Clause or the Necessary and Proper Clause.

## I. PARTIES

9.     Plaintiff Ken Paxton is the Attorney General of Texas who, under the circumstances herein presented, is charged by state law with a duty to seek a declaratory judgment in federal

district court that Section 2.052 of the Texas Government Code is consistent with the United States Constitution. TEX. GOV'T CODE § 2.054.

10.    The Attorney General represents the State of Texas.

11.    The State of Texas is a sovereign state, subject only to the Constitution of the United States. TEX. CONST. art. I, § 1.

12.    The State of Texas has standing to assert its sovereign interest in regulating the making of firearm suppressors within Texas that will stay in Texas.

13.    Plaintiff David Schnitz is a United States Citizen who resides in the State of Texas. Schnitz is a resident of Jim Wells County, which is located in the Southern District of Texas, Corpus Christi Division. Schnitz intends to manufacture a firearm suppressor to which section 2.052 of the Texas Government Code applies, and has notified the attorney general of that fact in writing. **Exhibit 1**.

14.    Plaintiff Tracy Martin is a United States Citizen who resides in the State of Texas. Martin is a resident of Rockwall County, which is located in the Northern District of Texas, Dallas Division. Martin intends to manufacture a firearm suppressor to which section 2.052 of the Texas Government Code applies and has notified the attorney general of that fact in writing. **Exhibit 1**.

15.    Plaintiff Floice Allen is a United States Citizen who resides in the State of Texas. Allen is a resident of Tarrant County, which is located in the Northern District of Texas, Fort Worth Division. Allen intends to manufacture a firearm suppressor to which section 2.052 of the Texas Government Code applies and has notified the attorney general of that fact in writing. **Exhibit 1**.

16.     Marvin Richardson is the Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATFE"). That agency is responsible for the enforcement of the challenged federal laws.

## II. JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), because this action arises under the United States Constitution and under 28 U.S.C. § 1346(a)(2), because this suit constitutes a civil action against an executive department of the United States.

18.     The Court is authorized to award the requested injunctive relief under 28 U.S.C. § 1361.

19.     The Court is authorized to award the requested declaratory relief under 28 U.S.C. § 2201.

20.     The Anti-Injunction Act, 26 U.S.C. § 7421, does not bar this case because under no circumstances can the government ultimately prevail, and Texas sovereign interests are harmed. *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7 (1962).

21.     Among the purposes of this lawsuit is to enjoin enforcement of statutes and regulations that impose duties other than paying a tax. The Anti-Injunction Act does not apply to those challenges. *CIC Services, LLC v. Internal Revenue Service*, 141 S.Ct. 1582, 1592 (2021).

22.     Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to the claim occurred, and § 1391(e)(1)(C) because a plaintiff resides in this venue and no real property is involved in the action.

## III. FACTUAL BACKGROUND

### A. Firearm Suppressors

23.    Under federal law, "[t]he terms 'firearm silencer' and 'firearm muffler' mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." 18 U.S.C. § 921(a)(24).

24.    To "diminish the report of a portable firearm" is to make it quieter when fired. *See United States v. Syverson*, 90 F.3d 227, 229 (7th Cir. 1996) (the government "introduced evidence showing that Syverson had knowingly possessed the cylinder and that it could be used to reduce the report of a pistol from 151 decibels to 144.5.").

25.    "[T]he term 'silencer' is a misnomer, in that—despite movie fantasies—a noise suppressor reduces decibels, but does not actually 'silence' that discharge of a firearm. Noise may be muffled or diminished, and maybe only by a few decibels at that, but it can still be heard." Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendme*nt, 46 CUMB. L. REV. 35, 36 (2016) ("Halbrook").

26.    "Firearm silencers" or "Firearm mufflers" are also commonly known as "firearm suppressors," or simply "suppressors," "silencers," or "mufflers." *See United States v. Bolatete*, 977 F.3d 1022, 1028 (11th Cir. 2020) (referring to "suppressors or silencers (which are the same thing)"); *United States v. Taylor*, 100 Fed. Appx. 305, 307 (5th Cir. 2004) (irrelevant subsequent history omitted) ("Taylor admitted that he had tried to make silencers with the help of a book entitled 'How to Build Practical Firearms Suppressors: an Illustrated Step-by-Step Guide.'"). At

least one scholar has also referred to them as "sound moderators" and "noise suppressors." Halbrook, *supra*.

27.   In this Complaint, the term "firearm suppressor" has the same meaning as "suppressor," "noise suppressor," "firearm silencer," "silencer," "firearm muffler," "muffler," and "sound moderator," unless otherwise specified or a different meaning is apparent from the context.

28.   Firearm suppressors were invented by Hiram Percy Maxim in the first decade of the 20th century. He also invented the car engine muffler and mufflers for loud factory equipment around the same time. Firearm suppressors and car engine mufflers operate on similar principles. Noise is caused by hot gasses exiting the muzzle of a gun or the exhaust pipe of an automobile. Firearm suppressors and car engine mufflers cause the escaping hot gas to swirl and cool, lowering the volume of the noise. Halbrook, *supra*, at 41–42; FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY, NICHOLAS J. JOHNSON, ET AL. at 557–58 (3rd ed. 2021) ("*Firearms Law and the Second Amendment*"); HIRAM PERCY MAXIM, ALICE CLINK SCHUMACHER (1998) at 48–53.

29.   On information and belief, firearm suppressors may be made out of commonly and legally available products, many of which are sold by firearms dealers and Amazon.com.[1]

30.   Firearm suppressors should not be regulated at all because they are widely accepted and very infrequently used in criminal activity. As Ronald Turk, former second in command of BAFTE, stated in 2017:

---

[1] See, e.g., https://www.theverge.com/2019/8/26/20828900/silencer-suppressor-online-sales-gun-accesories-atf-rules (accessed February 24, 2022).

In the past several years, opinions about silencers have changed across the United States. Their use to reduce noise at shooting ranges and applications within the sporting and hunting industry are now well recognized. At present, 42 states generally allow silencers to be used for sporting purposes….

While DOJ and ATF have historically not supported removal of items from the [National Firearms Act of 1934], the change in public acceptance of silencers arguably indicates that the reason for their inclusion in the [National Firearms Act of 1934] is archaic and historical reluctance to removing them from the [National Firearms Act of 1934] should be reevaluated. ATF's experience with the criminal use of silencers also supports reassessing their inclusion in the [National Firearms Act of 1934]. On average in the past 10 years, ATF has only recommended 44 defendants a year for prosecution on silencer-related violations; of those, only approximately 6 of the defendants had prior felony convictions. Moreover, consistent with this low number of prosecution referrals, silencers are very rarely used in criminal shootings. Given the lack of criminality associated with silencers, it is reasonable to conclude that they should not be viewed as a threat to public safety necessitating [National Firearms Act of 1934] classification, and should be considered for reclassification under the [Gun Control Act of 1968].

**Exhibit 2**, Options to Reduce or Modify Firearms Regulations, White Paper (Not for public distribution), Ronald Turk, Associate Deputy Director (Chief Operating Officer), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), January 20, 2017, at 6–7.

31.    Moreover, on information and belief, the tax on firearms suppressors does not raise significant revenue, and does not even pay the costs to enforce the tax. As Ronald Turk stated in 2017:

The wide acceptance of silencers and corresponding changes in state laws have created substantial demand across the country. This surge in demand has caused ATF to have a significant backlog on silencer applications. ATF's processing time is now approximately 8 months. ATF has devoted substantial resources in attempts to reduce processing times, spending over $1 million annually in overtime and temporary duty expenses, and dedicating over 33 additional full-time and contract positions since 2011 to support NFA processing. Despite these efforts, [National Firearms Act of 1934] processing times are widely viewed by applicants and the industry as far too long, resulting in numerous complaints to Congress. Since silencers account for the vast majority of [National Firearms Act of 1934] applications, the most direct way to reduce processing times is to reduce the number of silencer applications.

**Exhibit 2**.

32.   There are over 2.6 million firearm suppressors registered in the United States, including over 500,000 registered in Texas. BATFE, *Firearms Commerce in the United States*, Annual Statistical Update 2021, at 16. They are legal to possess in 42 states, including Texas. *Firearms Law and the Second Amendment* at 600.

**B.  Complainants**

33.   Schnitz, Martin, and Allen each intend to personally manufacture a firearm suppressor for their own personal use. The firearm suppressors will be manufactured in their homes from basic materials without the inclusion of any part imported from another state other than a generic and insignificant part, such as a spring, screw, nut, or pin. Schnitz, Martin, and Allen have notified the attorney general in writing of these facts. **Exhibit 1**.

34.   Schnitz, Martin, and Allen intend to own the firearm suppressors in perpetuity, to never transport them outside the boundaries of the State of Texas, and to never transfer them to another person. Schnitz, Martin, and Allen intend to use the firearm suppressors with a personal firearm, exclusively for the purpose of home defense. **Exhibit 1**.

35.   Use of a firearm suppressor with a personal firearm for home defense will empower Schnitz, Martin, and Allen to better defend their homes in the event of a home invasion. Use of a firearm suppressor will allow Schnitz, Martin, and Allen to diminish the need to obtain and use hearing protection during a home invasion. Use of a firearm suppressor in lieu of use of hearing protection will allow Schnitz, Martin, and Allen the ability to react more quickly, to fully use their sense of hearing to evaluate the danger, and to make proper decisions about their actions, including when to initiate and cease the use of lethal force. **Exhibit 1**.

## IV. FEDERAL LAW

36.   As one scholar has written, "Devices to reduce noise at its source are ubiquitous in modern society. But imagine if you had to register with the government, obtain permission of law enforcement, submit fingerprints, and pay a $200 tax in order to have a muffler on your automobile or lawn mower. You have to do exactly that to obtain a device to muffle the noise from your firearm, and if you fail to do so, you can be imprisoned for ten years." Halbrook, *supra*, at 35 (footnotes omitted).

**A.  Federal law defines firearm suppressors as "firearms."**

37.   Most firearms are regulated under Gun Control Act of 1968 as amended, 18 U.S.C. § 921 *et seq*. The Gun Control Act of 1968 is a commerce regulation.

38.   Firearm suppressors are also regulated under the Gun Control Act of 1968, which defines firearm suppressors as "firearms." "The term 'firearm' means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." 18 U.S.C. § 921(a)(3). "The terms 'firearm silencer' and 'firearm muffler' mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." 18 U.S.C. § 921(a)(24).

39.   But the Gun Control Act does not prohibit the making of standard firearms and firearm suppressors for personal use. 18 U.S.C. § 922 lists many prohibitions, but there is no prohibition on making firearm suppressors for personal use.

40.   BAFTE confirms that there is no legal prohibition on making firearms (including firearm suppressors) for personal use, but that "the making of an NFA firearm [i.e. firearms covered by the National Firearms Act of 1934, including firearm suppressors] requires a tax payment and advance approval by ATF."[2]

41.   Firearm suppressors are also regulated under the National Firearms Act of 1934 as amended, 26 U.S.C. § 5801 *et seq*. The National Firearms Act of 1934 is a tax statute, located in the United States Code at Title 26 ("Internal Revenue Code"), Subtitle E ("Alcohol, Tobacco, and Certain Other Excise Taxes"), Chapter 53 ("Machine Guns, Destructive Devices, and Certain other Firearms").

42.   "While the National Firearms Act of 1934 is based on Congress's tax power and only covered [a] small fraction of the American gun supply [including firearm suppressors], the Gun Control Act of 1968 applies to all firearms manufactured after 1898 and is based on the interstate commerce power." *Firearms Law and the Second Amendment*, *supra*, at 660.

43.   The National Firearms Act of 1934 defines "firearms" as eight categories of things, including, generally, short-barreled shotguns., short-barreled rifles, machine guns, "destructive devices" (such as explosives, artillery, and missiles), and firearm suppressors. 26 U.S.C. § 5845(a) (listing the eight categories); 5845(a)(7) (listing "any silencer (as defined in section 921 of title 18, United States Code [the Gun Control Act of 1968, quoted above]").

44.   "Note this unusual definition of 'firearm.' As used in the [National Firearms Act of 1934], a 'firearm' does not include most weapons that are normally called firearms, such as most

---

[2] https://www.atf.gov/firearms/qa/does-individual-need-license-make-firearm-personal-use (last accessed February 24, 2022).

rifles, shotguns, and handguns. Instead, the category of [National Firearms Act 1934] 'firearms' includes only some particular weapons that were thought to be gangster weapons. By [National Firearms Act of 1934] definition, 'firearm' also includes accessories such as sound suppressors ('silencers')." *Firearms Law and the Second Amendment*, *supra*, at 574 n.58.

45.    "By being defined as a 'firearm' in the [National Firearms Act of 1934], a [firearm] suppressor is subject to the same strict requirements involving registration, taxation, and approval by the government that apply to machines guns and artillery." Halbrook, *supra*, at 39.

46.    Moreover, an item that does not itself silence, muffle, or diminish the report of a portable firearm is also a "firearm" if it is "intended for use in assembling or fabricating a [firearm suppressor], and any part intended only for use in such assembly or fabrication." 18 U.S.C. § 921(a)(24). Thus, a metal pipe is a "firearm" subject to taxation and regulation under the National Firearms Act of 1934 if the owner of the metal pipe intends to incorporate it into a firearm suppressor. Other metal pipes are not defined as "firearms" in the statute.

**B.  Federal law prohibits Texans from making firearm suppressors for personal use in Texas without the approval of BAFTE.**

47.    Under the National Firearms Act of 1934, as amended by the Gun Control Act of 1968, "[t]he term 'make', and the various derivatives of such word, shall include manufacturing (other than by one qualified to engage in such business under this chapter), putting together, altering, any combination of these, or otherwise producing a [firearm suppressor]." 26 U.S.C. § 5845(i); *Compare to* 26 U.S.C. § 5845 ("The term "manufacturer" means any person who is engaged in the business of manufacturing [firearm suppressors].)"

48.    Thus, under federal law, a person "makes" a firearm suppressor if it is intended for personal use, but "manufactures" a firearm suppressor if it is intended for sale.

49.    "No person shall make a [firearm suppressor] unless he has (a) filed with the Secretary a written application, in duplicate, to make and register the [firearm suppressor] on the form prescribed by the Secretary; (b) paid any tax payable on the making and such payment is evidenced by the proper stamp affixed to the original application form; (c) identified the [firearm suppressor] to be made in the application form in such manner as the Secretary may by regulations prescribe; (d) identified himself in the application form in such manner as the Secretary may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; and (e) obtained the approval of the Secretary to make and register the [firearm suppressor] and the application form shows such approval. Applications shall be denied if the making or possession of the [firearm suppressor] would place the person making the [firearm suppressor] in violation of law." 26 U.S.C. § 5822.

50.    "The term 'Secretary' means the Secretary of the Treasury or his delegate." 26 U.S.C. § 7701(a)(11)(B). But the term "Secretary" or "Secretary of the Treasury" in Chapter 53 means the Attorney General. 26 U.S.C. § 7801(a)(2)(A)(i).

51.    Before the enactment of the Homeland Security Act, the Bureau of Alcohol, Tobacco, and Firearms, a part of the Treasury Department, enforced the National Firearms Act of 1934. The Homeland Security Act transferred those responsibilities to BATFE, a part of the Department of Justice. 28 U.S.C. § 599A. BAFTE continues to enforce the National Firearms Act of 1934.

52.    "The application to make a firearm, Form 1 (Firearms), must be forwarded directly, in duplicate, by the maker of the firearm to the Director in accordance with the instructions on the form." 27 C.F.R. § 479.64. A copy of Form 1 is attached as **Exhibit 3**.

53.    The Form 1 must be "executed under the penalties of perjury," and submitted along with $200. 27 C.F.R. § 479.62(b)(1).

54.    "[On the Form 1,] the applicant shall provide the applicant's name, address, and date of birth, and also comply with the identification requirements prescribed in § 479.63(a)." 27 C.F.R. § 479.62(b)(2).

55.    "If the applicant is an individual, the applicant shall [on the Form 1] (1) Securely attach to each copy of the Form 1, in the space provided on the form, a 2 x 2-inch photograph of the applicant, clearly showing a full front view of the features of the applicant with head bare, with the distance from the top of the head to the point of the chin approximately 1 1/4 inches, and which shall have been taken within 1 year prior to the date of the application; and (2) Attach to the application two properly completed FBI Forms FD-258 (Fingerprint Card). The fingerprints must be clear for accurate classification and should be taken by someone properly equipped to take them." 27 C.F.R. § 479.63(a).

56.    An applicant who wishes to make a firearm suppressor for personal use must also include on the Form 1 "[a] description of the [firearm suppressor] to be made by type; caliber, gauge, or size; model; length of barrel; serial number; other marks of identification." 27 C.F.R. § 479.62(b)(3).

57.    The applicant must also provide "[t]he applicant's Federal firearms license number (if any)" and "special (occupational) tax stamp (if applicable)." 27 C.F.R. § 479.62(b)(4), (5).

58.    "If the applicant … is an alien admitted under a nonimmigrant visa, applicable documentation demonstrating that the nonimmigrant alien" is allowed to possess a firearm suppressor. 27 C.F.R.§ 479.62(b)(6).

59.   Although not required by statute, "Prior to the submission of the application to the Director, all applicants … shall forward a completed copy of Form 1 … to the chief law enforcement officer of the locality in which the applicant … is located. The chief law enforcement officer is the local chief of police, county sheriff, head of the State police, or State or local district attorney or prosecutor." 27 C.F.R. § 479.62(c).

60.   Although not required by statute or rule, the ATF Form 1 also requires the applicant to submit his or her social security number. **Exhibit 3**.

61.   Although not required by statute or rule, the ATF Form 1 also requires the applicant to identify his or her race and ethnicity. **Exhibit 3**.

62.   "If the application is approved, the Director will affix a National Firearms Act stamp to the original application in the space provided therefor and properly cancel the stamp. The approved application will then be returned to the applicant." 27 C.F.R. § 479.62(d).

63.   "The Director will consider the application for approval or disapproval. If the application is approved, the Director will return the original thereof to the maker of the firearm and retain the duplicate. Upon receipt of the approved application, the maker is authorized to make the firearm described therein. The maker of the firearm shall not, under any circumstances, make the firearm until the application, satisfactorily executed, has been forwarded to the Director and has been approved and returned by the Director with the National Firearms Act stamp affixed." 27 C.F.R. § 479.64.

64.   "An application to make a firearm shall not be approved by the Director if the making or possession of the firearm would place the person making the firearm in violation of law." 27 C.F.R. § 479.65. "If the application is disapproved, the original Form 1 (Firearms) and the remittance

submitted by the applicant for the purchase of the stamp [$200] will be returned to the applicant with the reason for disapproval stated on the form." 27 C.F.R. § 479.64.

65.   On information and belief, BAFTE approves or denies Form 1 applications in two to four weeks.

## C. All newly made firearm suppressors must be registered—including those made by Texans for personal use in Texas.

66.   Firearm suppressors are registered in the National Firearms Registration and Transfer Record. 26 U.S.C. § 5841(a). "The registry shall include (1) identification of the [firearm suppressor]; (2) date of registration; and (3) identification and address of person entitled to possession of the [firearm suppressor]." *Id.*

67.   "Each … maker shall register each [firearm suppressor] he … makes." 26 U.S.C. § 5841(b).

68.   "Each … maker … of a [firearm suppressor] shall, prior … making a [firearm suppressor], obtain authorization in such manner as required by this chapter or regulations issued thereunder to … make … the [firearm suppressor], and such authorization shall effect the registration of the [firearm suppressor] required by this section." 26 U.S.C. § 5841(c). "The approval by the Director of an application, Form 1 (Firearms), to make a firearm under this subpart shall effectuate registration of the firearm described in the Form 1 (Firearms) to the person making the firearm." 27 C.F.R. § 479.71.

69.   "A person possessing a [firearm suppressor] registered as required by this section shall retain proof of registration which shall be made available to the Secretary upon request." 26 U.S.C. § 5841(e). "The original Form 1 (Firearms) showing approval by the Director shall be retained by

the maker to establish proof of his registration of the firearm described therein, and shall be made available to any ATF officer on request." 27 C.F.R. § 479.71.

**D. All firearm suppressors must be marked with an individual serial number and other information—including those made by Texans for personal use in Texas.**

70.    "[A]nyone making a [firearm suppressor] shall identify each [firearm suppressor] … by a serial number which may not be readily removed, obliterated, or altered, the name of the … maker, and such other identification as the Secretary may by regulations prescribe." 26 U.S.C. § 5842(a).

71.    A maker of a firearm suppressor "must legibly identify the [firearm suppressor] [b]y engraving, casting, stamping (impressing), or otherwise conspicuously placing or causing to be engraved, cast, stamped (impressed) or placed on the frame or receiver thereof an individual serial number. The serial number must be placed in a manner not susceptible of being readily obliterated, altered, or removed, and must not duplicate any serial number placed by you on any other firearm. For firearms manufactured, imported, or made on and after January 30, 2002, the engraving, casting, or stamping (impressing) of the serial number must be to a minimum depth of .003 inch and in a print size no smaller than 1/16 inch; and also] certain additional information … [including]: (i) The model, if such designation has been made; (ii) The caliber or gauge; (iii) Your name (or recognized abbreviation) … (iv) In the case of a domestically made firearm, the city and State (or recognized abbreviation thereof) where you … as the maker, made the firearm." 27 C.F.R. § 479.102(a).

72.    "The depth of all markings required by this section will be measured from the flat surface of the metal and not the peaks or ridges. The height of serial numbers required by paragraph (a)(1)

of this section will be measured as the distance between the latitudinal ends of the character impression bottoms (bases)." 27 C.F.R. § 479.102(b).

**E.   Everyone who makes a suppressor in Texas for personal use in Texas must pay a tax of $200.**

73.    There is a federal excise tax of 10% or 11% on the sale of most firearms. 26 U.S.C. § 4181. However, there is an exemption entitled "Machine guns and short barrelled [sic] firearms": "The tax imposed by section 4181 shall not apply to any firearm on which the tax provided by section 5811 has been paid." 26 U.S.C. § 4182(a). Despite the exemption's title, it applies to all "firearms" regulated under the National Firearms Act of 1934, including firearm suppressors.

74.    The tax on making firearms suppressors and other "firearms" regulated under the National Firearms Act of 1934 is $200. "There shall be levied, collected, and paid upon the making of a [firearm suppressor] a tax at the rate of $200 for each firearm made." 26 U.S.C. § 5821(a). "The tax imposed by subsection (a) of this section shall be paid by the person making the [firearm suppressor]." 26 U.S.C. § 5821(b). "The tax imposed by subsection (a) of this section shall be payable by the stamp prescribed for payment by the Secretary." 26 U.S.C. § 5821(c). "Payment of the tax on the making of a firearm shall be represented by a $200 adhesive stamp bearing the words 'National Firearms Act.' The stamps are maintained by the Director." 27 C.F.R. § 479.61.

75.    In 1934, the $200 amount "was decided because that was the average cost of a machine gun, and a 100% tax would thereby be imposed." Halbrook, *supra*, at 50; *Firearms Law and the Second Amendment* at 571.

76.    Before the enactment of the Firearms Act of 1934, a firearm suppressor cost about five dollars. Halbrook, *supra*, at 50.

77.     The amount of the tax—$200—has not changed since 1934. *Firearms Law and the Second Amendment* at 578; 26 U.S.C. § 5821(a). According to the online inflation calculator maintained by the United States Bureau of Labor Statistics, $200 in 1934 is equivalent to over $4,000 today.[3]

78.     The regular firearms sales tax has an exemption: "The tax imposed by section 4181 shall not apply to any pistol, revolver, or firearm described in such section if manufactured, produced, or imported by a person who manufactures, produces, and imports less than an aggregate of 50 of such articles during the calendar year." 26 U.S.C. § 4182(c)(1). There is no such exemption for makers of "firearms" regulated by the National Firearms Act of 1934, including firearms suppressors.

### F.  Prohibited Acts and Penalties for Makers of Firearm Suppressors

79.     It is unlawful for any person to

- "possess a [firearm suppressor] made in violation of the provisions of this chapter;"

- "possess a [firearm suppressor] which is not registered to him in the National Firearms Registration and Transfer Record;"

- "make a [firearm suppressor] in violation of the provisions of this chapter;" or

- "possess a [firearm suppressor] which is not identified by a serial number as required by this chapter."

26 U.S.C. § 5861(c), (d), (f), (i).

---

[3] https://www.bls.gov/data/inflation_calculator.htm

80.    The penalties for any of the above violations are as follows:

- "Any person who violates or fails to comply with any provision of this chapter shall, upon conviction, be fined not more than $10,000, or be imprisoned not more than ten years, or both."

- "Any [firearm suppressor] involved in any violation of the provisions of this chapter shall be subject to seizure and forfeiture."

26 U.S.C. §§ 5871, 5872.

81.    Thus, a person a person who makes a firearm suppressor in Texas for personal use in Texas without obtaining BATFE's permission, without paying the $200 tax, without registering it, and without engraving a unique serial number and other information on the suppressor faces ten years imprisonment, or a fine of not more than $10,000, or both.

## V. TEXAS LAW

82.    Under Texas law, "'Firearm suppressor' means any device designed, made, or adapted to muffle the report of a firearm." TEX. GOV'T CODE § 2.001(2).

83.    "'Manufacture' includes forging, casting, machining, or another process for working a material." TEX. GOV'T CODE § 2.001(4).

84.    Under the National Firearms Act of 1934, "[t]he term 'make', and the various derivatives of such word, shall include manufacturing (other than by one qualified to engage in such business under this chapter), putting together, altering, any combination of these, or otherwise producing a [firearm suppressor]." 26 U.S.C. § 5845(i); *Compare to* 26 U.S.C. § 5845 ("The term "manufacturer" means any person who is engaged in the business of manufacturing [firearm suppressors].)" Federal law thus distinguishes between (1) persons who "make" a

firearm and who are not in the business of manufacturing firearms and (2) persons who are in the business of manufacturing firearms. Chapter 2 of the Texas Government Code does not make this same distinction.

85.    "For the purposes of this subchapter, a firearm suppressor is manufactured in this state if the item is manufactured: (1) in this state from basic materials; and (2) without the inclusion of any part imported from another state other than a generic and insignificant part." TEX. GOV'T CODE § 2.051.

86.    "'Generic and insignificant part' means an item that has manufacturing or consumer product applications other than inclusion in a firearm suppressor. The term includes a spring, screw, nut, and pin." TEX. GOV'T CODE § 2.001(3).

87.    Under Texas law, "A firearm suppressor that is manufactured in this state and remains in this state is not subject to federal law or federal regulation, including registration, under the authority of the United States Congress to regulate interstate commerce." TEX. GOV'T CODE § 2.052(a).

88.    "A basic material from which a firearm suppressor is manufactured in this state, including unmachined steel, is not a firearm suppressor and is not subject to federal regulation under the authority of the United States Congress to regulate interstate commerce as if it actually were a firearm suppressor." TEX. GOV'T CODE § 2.052(b).

89.    "A firearm suppressor manufactured and sold in this state must have the words 'Made in Texas' clearly stamped on it." TEX. GOV'T CODE § 2.053.

90.    "On written notification to the attorney general by a United States citizen who resides in this state of the citizen's intent to manufacture a firearm suppressor to which Section 2.052

applies, the attorney general shall seek a declaratory judgment from a federal district court in this state that Section 2.052 is consistent with the United States Constitution." TEX. GOV'T CODE § 2.054.

91.     On July 28, 2021, BAFTE issued an "open letter" stating that "because [Chapter 2 of the Texas Government Code] directly conflicts with federal firearms laws and regulations, federal law supersedes [Chapter 2]. In summary, all provisions of the Gun Control Act (GCA) and the National Firearms Act [of 1934] (NFA), including their corresponding regulations, continue to apply to [federal firearms licensees] and *all other persons*." **Exhibit 4**.

## VI. CLAIMS

### COUNT I

**The Court should enjoin federal law as applied to taxing and regulating firearm suppressors made in Texas for personal use in Texas because that law violates the Second Amendment.**

92.     Plaintiffs incorporate by reference all preceding paragraphs.

93.     The National Firearms Act of 1934, as amended, and the regulations made pursuant thereto are unconstitutional as applied to the making of firearm suppressors in Texas for personal use in Texas.

94.     Post-*Heller*, most courts review taxation and regulation of firearms under a two-part test. "[T]he first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee; the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, &*

*Explosives*, 700 F.3d 185, 194 (5th Cir. 2012) (*NRA v. BATFE*) (collecting cases); *see also Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) (*Helle*r II).

95.    "A regulation that threatens a right at the core of the Second Amendment—for example, the right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and family—triggers strict scrutiny. A less severe regulation—a regulation that does not encroach on the core of the Second Amendment—requires a less demanding means-ends showing." *NRA v. BATFE*, 700 F.3d at 195 (citations omitted).

96.    "This more lenient level of scrutiny could be called 'intermediate' scrutiny, but regardless of the label, this level requires the government to demonstrate a 'reasonable fit' between the challenged regulation and an 'important' government objective." *Id.*

97.    Post-*Heller*, courts may not review firearms regulation under a rational-basis standard of review. *Id.* at 195–96.

98.    Federal laws and regulations which tax and regulate the making of firearm suppressors in Texas for personal use in Texas impinge upon a right protected by the Second Amendment.

99.    Taxation and regulation of firearm suppressors made in Texas for personal use in Texas do not survive intermediate scrutiny (much less the more stringent strict scrutiny standard of review)

100.   Under the intermediate-scrutiny test courts ask whether the State's interests in proscribing a regulation are substantial, whether the challenged regulation advances these interests in a direct and material way, and whether the extent of the restriction on the exercise of a constitutional right is in reasonable proportion to the interests served. *Edenfield v. Fane*, 507 U.S. 761, 767 (1993).

101.  In undertaking the first inquiry under intermediate scrutiny, courts must identify with care the interests the State itself asserts. Unlike rational-basis review, the intermediate-scrutiny standard does not permit us to supplant the precise interests put forward by the State with other suppositions. And courts must judge whether the stated interests are the actual interests served by the restriction. *Edenfield*, 507 U.S. at 768.

102.  Under intermediate scrutiny, the government carries the burden of justifying the regulation.

103.  Thus, applying intermediate scrutiny, the government most produce substantial evidence to justify its taxation and regulation of firearm suppressors built in Texas for personal use in Texas. It cannot do so.

104.  Raising revenue is not a sufficient justification for specifically taxing the exercise of a constitutional right. *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 586–90 (1983).

105.  The government cannot demonstrate that taxation and regulation of firearm suppressors (unlike dangerous items like hand grenades) is necessary for public health and safety. *See United States v. Freed*, 401 U.S. 601, 609 (1971) (upholding the National Firearms Act of 1934 with respect to hand grenades because "possession of hand grenades is not an innocent act. They are highly dangerous offensive weapons."). The government cannot point to any harm that taxing and regulating firearm suppressors alleviates.

106.  Moreover, the government's burden is not satisfied by mere speculation or conjecture. Instead, it "must demonstrate that the harms it recites are real and that the restriction will in fact alleviate them." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001).

107.   Possessing firearm suppressors is legal, but the barriers to making firearm suppressors in Texas for personal use in Texas are excessive and oppressive and have no valid purpose.

108.   Under these standards, federal taxation and regulation of firearm suppressors is unconstitutional.

109.   Firearm suppressors are not dangerous and were not regulated at all for the first several decades after their invention.

110.   Firearm suppressors are widely accepted and very infrequently used in criminal activity.

111.   The fact that the National Firearms Act of 1934 regulates firearm suppressors at all is merely a historical accident. The initial draft of the bill would have regulated only firearm suppressors used in connection with other firearms regulated by the National Firearms Act of 1934, such as machine guns and short-barreled shotguns. However, with nearly no comment or attention by Congress on the need for regulation or taxation of firearm suppressors generally, the text was rewritten to apply the National firearms Act of 1934's regulations to all suppressors, as if they themselves were similar to machine guns or short barreled shotguns. Halbrook, *supra*, at 46–52 (reciting the relevant legislative history).

112.   Until 2008, courts did not view taxation of firearms as a tax on the exercise of a constitutional right. But now it is.

113.   There are no other examples of direct federal taxes on the exercise of a constitutional right.

114.   The tax at issue is not a general tax on making goods that incidentally taxes the making of firearm suppressors.

115.    Schnitz, Martin, and Allen's making of a firearm suppressor in Texas, that will only be used for their own home defense in Texas, cannot be taxed or regulated under the Taxing Clause, U.S. CONST. art. I, § 8, cl. 1.

## COUNT II

**The Court should grant a declaratory judgment that neither the Commerce Clause nor the Necessary and Proper Clause authorize federal regulation of the making of a firearm suppressor for personal use in Texas.**

116.    Plaintiffs incorporate by reference all preceding paragraphs.

117.    The National Firearms Act of 1934 is a taxing statute, not a regulation of interstate commerce.

118.    The Gun Control Act of 1968 is a commerce regulation, but does not prohibit the making of firearm suppressors for personal use.

119.    Even if the federal government regulated the making of firearm suppressors under its power to regulate interstate commerce, that would be unconstitutional as applied to firearm suppressors made in Texas for personal use in Texas.

120.    The Constitution authorizes the federal government "[t]o regulate Commerce … among the several states." U.S. CONST. art. I, § 8, cl. 3 (the Commerce Clause). Power under the Commerce Clause "does not extend to the regulation of the internal commerce of any State." *Gibbons v. Ogden*, 22 U.S. 1, 64 (1824) The federal government may not regulate intrastate commerce or non-commerce (such as making a firearm suppressor in Texas that will remain in Texas) under the Commerce Clause.

121.    Although it is common to refer to constitutional cases involving congressional economic regulation as "commerce clause cases," this is inaccurate when applied to cases concerning intrastate commerce and to non-economic activity. Those cases involve not the core Commerce

Clause alone, but rather the Necessary and Proper Clause. U. S. CONST. art. I, § 8, cl. 18. Thus, in *Gonzales v. Raich*, 545 U.S. 1 (2005), the Court upheld a congressional law regulating activity that was intrastate and not commerce because the law was within "the power vested in Congress by Article I, § 8, of the Constitution '[t]o make all Laws which shall be necessary and proper for carrying into Execution' its authority to 'regulate Commerce with foreign Nations, and among the several States.' " *Id.* at 5.

122.  "[A]ctivities that substantially affect interstate commerce are not themselves part of interstate commerce, and thus the power to regulate them cannot come from the Commerce Clause alone. Rather, … Congress's regulatory authority over intrastate activities that are not themselves part of interstate commerce (including activities that have a substantial effect on interstate commerce) derives from the Necessary and Proper Clause." *Id.* at 34 (concurring opinion of Scalia, J.)

123.  The Necessary and Proper Clause authorizes regulation of economic activities outside the core meaning of "commerce among the several states" (such as intrastate commerce and non-commerce) when such regulation is incidental to or implied by the power to regulate commerce among the several states. *M'Culloch v. Maryland*, 17 U.S. 316, 406 (1819) (discussing "incidental or implied powers"); *United States v. Lopez*, 514 U.S. 549, 554 (1995) (describing earlier cases regulating activities outside a strict reading of the Commerce Clause as "incidental regulation").

124.  The Necessary and Proper Clause allows the exercise of incidental powers, but does not allow the federal government to exercise "a great substantive and independent power, which cannot be implied as incidental to other powers, or used as a means of executing them." *M'Culloch*, 17 U.S. at 411. The only "means" authorized by the Necessary and Proper Clause are "means not

less usual, not of higher dignity, not more requiring a particular specification than other means." *Id*. at 421. The Constitution "wisely omit[s] … all the means for carrying into execution the great powers vested in government," and only lists "distinct and independent" powers "among the enumerated powers of the government." *Id*. at 421–22.

125.  The power to regulate intrastate commerce, and the power to regulate non-commerce, are "great substantive and independent power[s]" and are "distinct and independent" powers than the power to regulate interstate commerce. As such, the power must be enumerated before the federal government may exercise it. It is not. Therefore, the federal government may not regulate intrastate commerce or non-commerce under either the Commerce Clause or the Necessary and Proper Clause—even intrastate commerce and non-commerce that "exert a substantial economic effect on interstate commerce."

126.  Additionally, the Necessary and Proper Clause has less power when used against the States. "It is of fundamental importance to consider whether essential attributes of state sovereignty are compromised by the assertion of federal power under the Necessary and Proper Clause." *United States v. Comstock*, 560 U.S. 126, 153 (2010) (Kennedy, J., concurring).

127.  Schnitz, Martin, and Allen's making of a firearm suppressor in Texas, that will only be used for their own home defense in Texas, cannot be regulated under either the Commerce Clause, U.S. CONST. art. I, § 8, cl. 3, or the Necessary and Proper Clause, U.S. CONST. art. I, § 8, cl. 18.

## VII. PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

a.  Issue permanent injunctive relief enjoining Defendant from assessing and collecting the $200 tax on the making of firearm suppressors for personal use in Texas;

b.  Issue permanent injunctive relief enjoining Defendants from enforcing federal statutes and regulations that impose duties other than paying a tax as applied to the making of firearm suppressors in Texas for personal use in Texas;

c.  Declare that federal statutes and regulations that tax and regulate the making of firearm suppressors are not valid exercises of powers delegated to the federal government under either the Commerce Clause or the Necessary and Proper Clause; and

d.  Award other and further relief as the Court deems equitable and just.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Special Counsel to the First Assistant
Texas Bar No. 24116780

*/s/ Charles K. Eldred*
CHARLES K. ELDRED
Special Litigation Counsel
Texas Bar No. 00793681

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Administrative Law Division
P. O. Box 12548
Austin, Texas 78711-2548
(512) 936-1706 • fax (512) 320-0167
charles.eldred@oag.texas.gov

***Attorneys for Ken Paxton,***
***Attorney General of Texas***

*/s/ Tony K. McDonald*
TONY K. McDONALD
State Bar No. 24083477

THE LAW OFFICES OF TONY MCDONALD
1501 Leander Dr., Suite B2
Leander, Texas 78641
(512) 200-3608 • fax (815) 550-1292
tony@tonymcdonald.com

***Attorney for David Schnitz.***
***Tracy Martin, and Floice Allen***