**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **KEN PAXTON, in his official capacity as** | § | |
| **Attorney General of Texas,** | § | |
| **DAVID SCHNITZ,** | § | |
| **TRACY MARTIN, and** | § | |
| **FLOICE ALLEN,** | § | |
| *Plaintiffs,* | § | |
| | § | |
| **vs.** | § | **Civil Action No. 4:22-cv-00143-P** |
| | § | |
| **GARY M. RESTAINO, in his official** | § | **FIRST AMENDED COMPLAINT** |
| **Capacity as Acting Director, Bureau of** | § | |
| **Alcohol, Tobacco, Firearms and Explosives,** | § | |
| *Defendant.* | § | |

## INTRODUCTION

1.    Federal law has regulated firearm suppressors under the Taxing Power since 1934. Since 1968, it has been illegal to make a firearm suppressor for personal use without first applying for permission, and, if granted, paying a $200 tax, marking the suppressor with a serial number, and registering the firearm suppressor.

2.    Those regulations on the making of a firearm suppressor in Texas for personal use in Texas do not survive the recognition in *Heller* that the right to keep and bear arms is a fundamental and individual right. *See District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) ("There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms.").

3.    "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. The government may not tax the exercise of a constitutional right. *Murdock v. Com. of Pennsylvania*, 319 U.S. 105, 113 (1943).

4.     To the extent that the regulations at issue are not *per se* prohibited, they instead must survive intermediate scrutiny. They cannot because there has never been a public-safety justification or any other legitimate justification for those regulations. Firearm suppressors are not dangerous and are very rarely used in crimes.

5.     David Schnitz, Tracy Martin, and Floice Allen are Texas citizens, have informed the Attorney General of Texas that they intend to make a firearm suppressor for personal use in Texas that will remain in Texas. Moreover, Schnitz, Martin, and Allen intend to make the firearm suppressor out of basic materials that are not firearm suppressors and that would not be subject to federal regulation if they possessed them for other reasons.

6.     Upon such notification, Texas law requires the Attorney General of Texas, Ken Paxton, to file suit against the federal government. TEX. GOV'T CODE § 2.054.

7.     Consequently, Plaintiffs seek an injunction against enforcing federal firearms statutes and regulations as applied to persons who make firearm suppressors in Texas for personal use that will remain in Texas.

## I. PARTIES

8.     Plaintiff Ken Paxton is the Attorney General of Texas who, under the circumstances herein presented, is charged by state law with a duty to seek a declaratory judgment in federal district court that Section 2.052 of the Texas Government Code is consistent with the United States Constitution. TEX. GOV'T CODE § 2.054.

9.     The Attorney General represents the State of Texas.

10.    The State of Texas is a sovereign state, subject only to the Constitution of the United States. TEX. CONST. art. I, § 1.

11.   The State of Texas has standing to assert its sovereign interest in regulating the making of firearm suppressors in Texas for personal use that will stay in Texas and in promoting he availability of firearm suppressors in Texas.

12.   The State of Texas has quasi-sovereign interests in the health and safety of its citizens. Suppressors combat hearing loss and promote self-defense.

13.   Plaintiff David Schnitz is a United States Citizen who resides in the State of Texas. Schnitz is a resident of Jim Wells County, which is located in the Southern District of Texas, Corpus Christi Division. Schnitz intends to manufacture a firearm suppressor to which section 2.052 of the Texas Government Code applies, and has notified the attorney general of that fact in writing. **Exhibit 1**.

14.   Plaintiff Tracy Martin is a United States Citizen who resides in the State of Texas. Martin is a resident of Rockwall County, which is located in the Northern District of Texas, Dallas Division. Martin intends to manufacture a firearm suppressor to which section 2.052 of the Texas Government Code applies and has notified the attorney general of that fact in writing. **Exhibit 1**.

15.   Plaintiff Floice Allen is a United States Citizen who resides in the State of Texas. Allen is a resident of Tarrant County, which is located in the Northern District of Texas, Fort Worth Division. Allen intends to manufacture a firearm suppressor to which section 2.052 of the Texas Government Code applies and has notified the attorney general of that fact in writing. **Exhibit 1**.

16.   Defendant Gary M. Restaino is the Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATFE"). That agency is responsible for the enforcement of the challenged federal laws.

## II. JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), because this action arises under the United States Constitution and under 28 U.S.C. § 1346(a)(2), because this suit constitutes a civil action against an executive department of the United States.

18.    The Court is authorized to award the requested injunctive relief under 28 U.S.C. § 1361.

19.    The Anti-Injunction Act, 26 U.S.C. § 7421, does not bar this case because Plaintiffs are irreparably harmed and because under no circumstances can the government ultimately prevail. *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7 (1962).

20.    The Anti-Injunction Act does not apply to requirements that Texans apply for and receive permission to make firearm suppressors for personal use in Texas, or to requirements that citizens register and place serial numbers on firearm suppressors made in Texas for personal use in Texas, because those are neither the assessment nor the collection of taxes. *CIC Services, LLC v. Internal Revenue Service*, 141 S. Ct. 1582, 1592 (2021).

21.    Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to the claim occurred in this district, and because a plaintiff resides in this venue and no real property is involved in the action. § 1391(e)(1)(C).

## III. FACTUAL BACKGROUND

### A. Firearm Suppressors

22.    Under federal law, "[t]he terms 'firearm silencer' and 'firearm muffler' mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer

4

or firearm muffler, and any part intended only for use in such assembly or fabrication." 18 U.S.C. § 921(a)(24).

23.    To "diminish[] the report of a portable firearm" is to make it quieter when fired. *See United States v. Syverson*, 90 F.3d 227, 229 (7th Cir. 1996) (the government "introduced evidence showing that Syverson had knowingly possessed the cylinder and that it could be used to reduce the report of a pistol from 151 decibels to 144.5.").

24.    "[T]he term 'silencer' is a misnomer, in that—despite movie fantasies—a noise suppressor reduces decibels, but does not actually 'silence' that discharge of a firearm. Noise may be muffled or diminished, and maybe only by a few decibels at that, but it can still be heard." Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendme*nt, 46 CUMB. L. REV. 35, 36 (2016) ("Halbrook").

25.    "Firearm silencers" or "Firearm mufflers" are also commonly known as "firearm suppressors," or simply "suppressors," "silencers," or "mufflers." *See United States v. Bolatete*, 977 F.3d 1022, 1028 (11th Cir. 2020) (referring to "suppressors or silencers (which are the same thing)"); *United States v. Taylor*, 100 Fed. Appx. 305, 307 (5th Cir. 2004) (irrelevant subsequent history omitted) ("Taylor admitted that he had tried to make silencers with the help of a book entitled 'How to Build Practical Firearms Suppressors: an Illustrated Step-by-Step Guide.'"). At least one scholar has also referred to them as "sound moderators" and "noise suppressors." Halbrook, *supra*.

26.    In this Complaint, the term "firearm suppressor" has the same meaning as "suppressor," "noise suppressor," "firearm silencer," "silencer," "firearm muffler,"

"muffler," and "sound moderator," unless otherwise specified or a different meaning is apparent from the context.

27.    Firearm suppressors were invented by Hiram Percy Maxim in the first decade of the 20th century. He also invented the car engine muffler and mufflers for loud factory equipment around the same time. Firearm suppressors and car engine mufflers operate on similar principles. Noise is caused by hot gasses exiting the muzzle of a gun or the exhaust pipe of an automobile. Firearm suppressors and car engine mufflers cause the escaping hot gas to swirl and cool, lowering the volume of the noise. Halbrook, *supra*, at 41–42; FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY, NICHOLAS J. JOHNSON, ET AL. at 557–58 (3rd ed. 2021) ("*Firearms Law and the Second Amendment*"); HIRAM PERCY MAXIM, ALICE CLINK SCHUMACHER (1998) at 48–53.

28.    On information and belief, firearm suppressors may be made out of commonly and legally available products, many of which are sold by firearms dealers and Amazon.com.[1]

29.    Firearm suppressors should not be regulated at all because they are widely accepted and very infrequently used in criminal activity. As Ronald Turk, former second in command of BATFE, stated in 2017:

> In the past several years, opinions about silencers have changed across the United States. Their use to reduce noise at shooting ranges and applications within the sporting and hunting industry are now well recognized. At present, 42 states generally allow silencers to be used for sporting purposes….
>
> While DOJ and ATF have historically not supported removal of items from the [National Firearms Act of 1934], the change in public acceptance of silencers arguably indicates that the reason for their inclusion in the [National Firearms Act of 1934] is archaic and historical reluctance to removing them from the [National Firearms Act of 1934] should be

---

[1] See, e.g., https://www.theverge.com/2019/8/26/20828900/silencer-suppressor-online-sales-gun-accesories-atf-rules (accessed February 24, 2022).

reevaluated. ATF's experience with the criminal use of silencers also supports reassessing their inclusion in the [National Firearms Act of 1934]. On average in the past 10 years, ATF has only recommended 44 defendants a year for prosecution on silencer-related violations; of those, only approximately 6 of the defendants had prior felony convictions. Moreover, consistent with this low number of prosecution referrals, silencers are very rarely used in criminal shootings. Given the lack of criminality associated with silencers, it is reasonable to conclude that they should not be viewed as a threat to public safety necessitating [National Firearms Act of 1934] classification, and should be considered for reclassification under the [Gun Control Act of 1968].

**Exhibit 2**, Options to Reduce or Modify Firearms Regulations, White Paper (Not for public distribution), Ronald Turk, Associate Deputy Director (Chief Operating Officer), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), January 20, 2017, at 6–7.

30.     Firearm suppressors are not dangerous. On the contrary, National Hearing Conservation Association (NHCA) Task Force on Prevention of Noise-Induced Hearing Loss from Firearm Noise recommend the use of firearm suppressors as a strategy to reduce the risk of acquiring noise induced hearing loss.[2] The CDC agrees, stating: "The only potentially effective noise control method to reduce …noise exposure from gunfire is through the use of noise suppressors that can be attached to the end of the gun barrel."[3] In addition to reducing noise, firearm suppressors also reduce recoil, allowing shooters better control over their weapon and leading to improved accuracy and better shot placement.

---

[2] Michael Stewart et al, *NHCA Position Statement Recreational Firearm Noise* (2017), *available at* https://www.hearingconservation.org/assets/docs/NHCA_position_paper_on_firea.pdf (accessed May 16, 2022).

[3] Lilia Chen & Scott E. Brueck, Cender for Disease Control and Prevention National Institute for Occupational Safety and Health, *Noise and Lead Exposures at an Outdoor Firing Range—California* (2011), *available at:* https://americansuppressorassociation.com/wp_asa/wp-content/uploads/2017/01/CDC-Study-California-Firing-Ranges.pdf (accessed May 16, 2022).

31.     On information and belief, use of firearms suppressors by police and the military has become increasingly common as a means to increase safety.[4]

32.     Moreover, on information and belief, the tax on firearms suppressors does not raise significant revenue, and does not even pay the costs to enforce the tax. As Ronald Turk stated in 2017:

> The wide acceptance of silencers and corresponding changes in state laws have created substantial demand across the country. This surge in demand has caused ATF to have a significant backlog on silencer applications. ATF's processing time is now approximately 8 months. ATF has devoted substantial resources in attempts to reduce processing times, spending over $1 million annually in overtime and temporary duty expenses, and dedicating over 33 additional full-time and contract positions since 2011 to support NFA processing. Despite these efforts, [National Firearms Act of 1934] processing times are widely viewed by applicants and the industry as far too long, resulting in numerous complaints to Congress. Since silencers account for the vast majority of [National Firearms Act of 1934] applications, the most direct way to reduce processing times is to reduce the number of silencer applications.

**Exhibit 2**.

33.     There are over 2.6 million firearm suppressors registered in the United States, including over 500,000 registered in Texas. BATFE, *Firearms Commerce in the United States*, Annual Statistical Update 2021, at 16. They are legal to possess in 42 states, including Texas. *Firearms Law and the Second Amendment* at 600.

---

[4] See, e.g., Kip Hill, The Spokesman-Review, *Spokane Police will add suppressors to rifles, citing concerns about hearing damage* (October 7, 2017), https://www.spokesman.com/stories/2017/oct/07/Spokane-police-will-add-suppressors-to-rifles-citi/ (accessed May 16, 2022); Matthew Cox, Military.com, *The Marine Corps Has Started Fielding 30,000 Rifle Suppressors to Combat Units* (December 29, 2020), https://www.military.com/daily-news/2020/12/29/marine-corps-has-started-fielding-30000-rifle-suppressors-combat-units.html (accessed May 16, 2022)

**B.  Complainants**

34.    Schnitz, Martin, and Allen each intend to personally manufacture a firearm suppressor for their own personal use. The firearm suppressors will be manufactured in their homes from basic materials without the inclusion of any part imported from another state other than a generic and insignificant part, such as a spring, screw, nut, or pin. Schnitz, Martin, and Allen have notified the attorney general in writing of these facts. **Exhibit 1**.

35.    Schnitz, Martin, and Allen intend to own the firearm suppressors in perpetuity, to never transport them outside the boundaries of the State of Texas, and to never transfer them to another person. Schnitz, Martin, and Allen intend to use the firearm suppressors with a personal firearm, exclusively for the purpose of home defense. **Exhibit 1**.

36.    Use of a firearm suppressor with a personal firearm for home defense will empower Schnitz, Martin, and Allen to better defend their homes in the event of a home invasion. Use of a firearm suppressor will allow Schnitz, Martin, and Allen to diminish the need to obtain and use hearing protection during a home invasion. Use of a firearm suppressor in lieu of use of hearing protection will allow Schnitz, Martin, and Allen the ability to react more quickly, to fully use their sense of hearing to evaluate the danger, and to make proper decisions about their actions, including when to initiate and cease the use of lethal force. **Exhibit 1**.

### IV. FEDERAL LAW

37.    As one scholar has written, "Devices to reduce noise at its source are ubiquitous in modern society. But imagine if you had to register with the government, obtain permission of law enforcement, submit fingerprints, and pay a $200 tax in order to have a muffler on your automobile or lawn mower. You have to do exactly that to obtain a device to muffle the noise from your firearm,

and if you fail to do so, you can be imprisoned for ten years." Halbrook, *supra*, at 35 (footnotes omitted).

**A. Federal law defines firearm suppressors as "firearms."**

38.     Most firearms are regulated under Gun Control Act of 1968 as amended, 18 U.S.C. § 921 *et seq*. The Gun Control Act of 1968 is a commerce regulation.

39.     Firearm suppressors are also regulated under the Gun Control Act of 1968, which defines firearm suppressors as "firearms." "The term 'firearm' means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." 18 U.S.C. § 921(a)(3). "The terms 'firearm silencer' and 'firearm muffler' mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." 18 U.S.C. § 921(a)(24).

40.     But the Gun Control Act does not prohibit the making of standard firearms and firearm suppressors for personal use. 18 U.S.C. § 922 lists many prohibitions, but there is no prohibition on making firearm suppressors for personal use.

41.     BATFE confirms that there is no legal prohibition on making firearms (including firearm suppressors) for personal use, but that "the making of an NFA firearm [i.e. firearms covered by the National Firearms Act of 1934, including firearm suppressors] requires a tax payment and advance approval by ATF."[5]

---

[5] https://www.atf.gov/firearms/qa/does-individual-need-license-make-firearm-personal-use (last accessed May 17, 2022).

42.   Firearm suppressors are also regulated under the National Firearms Act of 1934 as amended, 26 U.S.C. § 5801 *et seq*. The National Firearms Act of 1934 is a tax statute, located in the United States Code at Title 26 ("Internal Revenue Code"), Subtitle E ("Alcohol, Tobacco, and Certain Other Excise Taxes"), Chapter 53 ("Machine Guns, Destructive Devices, and Certain other Firearms").

43.   "While the National Firearms Act of 1934 is based on Congress's tax power and only covered [a] small fraction of the American gun supply [including firearm suppressors], the Gun Control Act of 1968 applies to all firearms manufactured after 1898 and is based on the interstate commerce power." *Firearms Law and the Second Amendment*, *supra*, at 660.

44.   The National Firearms Act of 1934 defines "firearms" as eight categories of things, including, generally, short-barreled shotguns., short-barreled rifles, machine guns, "destructive devices" (such as explosives, artillery, and missiles), and firearm suppressors. 26 U.S.C. § 5845(a) (listing the eight categories); 5845(a)(7) (listing "any silencer (as defined in section 921 of title 18, United States Code [the Gun Control Act of 1968, quoted above]").

45.   "Note this unusual definition of 'firearm.' As used in the [National Firearms Act of 1934], a 'firearm' does not include most weapons that are normally called firearms, such as most rifles, shotguns, and handguns. Instead, the category of [National Firearms Act 1934] 'firearms' includes only some particular weapons that were thought to be gangster weapons. By [National Firearms Act of 1934] definition, 'firearm' also includes accessories such as sound suppressors ('silencers')." *Firearms Law and the Second Amendment*, *supra*, at 574 n.58.

46.   The fact that the National Firearms Act of 1934 regulates firearm suppressors at all is merely a historical accident. The initial draft of the bill would have regulated only firearm

suppressors used in connection with other firearms regulated by the National Firearms Act of 1934, such as machine guns and short-barreled shotguns. However, with nearly no comment or attention by Congress on the need for regulation or taxation of firearm suppressors generally, the text was rewritten to apply the National Firearms Act of 1934's regulations to all suppressors, as if they themselves were similar to machine guns or short barreled shotguns. Halbrook, *supra*, at 46–52 (reciting the relevant legislative history).

47.    "By being defined as a 'firearm' in the [National Firearms Act of 1934], a [firearm] suppressor is subject to the same strict requirements involving registration, taxation, and approval by the government that apply to machines guns and artillery." Halbrook, *supra*, at 39.

48.    Moreover, an item that does not itself silence, muffle, or diminish the report of a portable firearm is also a "firearm" if it is "intended for use in assembling or fabricating a [firearm suppressor], and any part intended only for use in such assembly or fabrication." 18 U.S.C. § 921(a)(24). Thus, a metal pipe is a "firearm" subject to taxation and regulation under the National Firearms Act of 1934 if the owner of the metal pipe intends to incorporate it into a firearm suppressor. Other metal pipes are not defined as "firearms" in the statute.

**B. Federal law prohibits Texans from making firearm suppressors for personal use in Texas without the approval of BATFE.**

49.    Under the National Firearms Act of 1934, as amended by the Gun Control Act of 1968, "[t]he term 'make', and the various derivatives of such word, shall include manufacturing (other than by one qualified to engage in such business under this chapter), putting together, altering, any combination of these, or otherwise producing a [firearm suppressor]." 26 U.S.C. § 5845(i); *Compare to* 26 U.S.C. § 5845(m) ("The term "manufacturer" means any person who is engaged in the business of manufacturing [firearm suppressors].)"

50.    Thus, under federal law, a person "makes" a firearm suppressor if it is intended for personal use, but "manufactures" a firearm suppressor if it is intended for sale.

51.    "No person shall make a [firearm suppressor] unless he has (a) filed with the Secretary a written application, in duplicate, to make and register the [firearm suppressor] on the form prescribed by the Secretary; (b) paid any tax payable on the making and such payment is evidenced by the proper stamp affixed to the original application form; (c) identified the [firearm suppressor] to be made in the application form in such manner as the Secretary may by regulations prescribe; (d) identified himself in the application form in such manner as the Secretary may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; and (e) obtained the approval of the Secretary to make and register the [firearm suppressor] and the application form shows such approval. Applications shall be denied if the making or possession of the [firearm suppressor] would place the person making the [firearm suppressor] in violation of law." 26 U.S.C. § 5822.

52.    "The term 'Secretary' means the Secretary of the Treasury or his delegate." 26 U.S.C. § 7701(a)(11)(B). But the term "Secretary" or "Secretary of the Treasury" in Chapter 53 means the Attorney General. 26 U.S.C. § 7801(a)(2)(A)(i).

53.    Before the enactment of the Homeland Security Act, the Bureau of Alcohol, Tobacco, and Firearms, a part of the Treasury Department, enforced the National Firearms Act of 1934. The Homeland Security Act transferred those responsibilities to BATFE, a part of the Department of Justice. 28 U.S.C. § 599A. BATFE continues to enforce the National Firearms Act of 1934.

54.   "The application to make a firearm, Form 1 (Firearms), must be forwarded directly, in duplicate, by the maker of the firearm to the Director in accordance with the instructions on the form." 27 C.F.R. § 479.64. A copy of Form 1 is attached as **Exhibit 3**.

55.   The Form 1 must be "executed under the penalties of perjury," and submitted along with $200. 27 C.F.R. § 479.62(b)(1).

56.   "[On the Form 1,] the applicant shall provide the applicant's name, address, and date of birth, and also comply with the identification requirements prescribed in § 479.63(a)." 27 C.F.R. § 479.62(b)(2).

57.   "If the applicant is an individual, the applicant shall [on the Form 1] (1) Securely attach to each copy of the Form 1, in the space provided on the form, a 2 x 2-inch photograph of the applicant, clearly showing a full front view of the features of the applicant with head bare, with the distance from the top of the head to the point of the chin approximately 1 1/4 inches, and which shall have been taken within 1 year prior to the date of the application; and (2) Attach to the application two properly completed FBI Forms FD-258 (Fingerprint Card). The fingerprints must be clear for accurate classification and should be taken by someone properly equipped to take them." 27 C.F.R. § 479.63(a).

58.   An applicant who wishes to make a firearm suppressor for personal use must also include on the Form 1 "[a] description of the [firearm suppressor] to be made by type; caliber, gauge, or size; model; length of barrel; serial number; other marks of identification." 27 C.F.R. § 479.62(b)(3).

59.   The applicant must also provide "[t]he applicant's Federal firearms license number (if any)" and "special (occupational) tax stamp (if applicable)." 27 C.F.R. § 479.62(b)(4), (5).

60.   "If the applicant … is an alien admitted under a nonimmigrant visa, applicable documentation demonstrating that the nonimmigrant alien" is allowed to possess a firearm suppressor. 27 C.F.R.§ 479.62(b)(6).

61.   Although not required by statute, "Prior to the submission of the application to the Director, all applicants … shall forward a completed copy of Form 1 … to the chief law enforcement officer of the locality in which the applicant … is located. The chief law enforcement officer is the local chief of police, county sheriff, head of the State police, or State or local district attorney or prosecutor." 27 C.F.R. § 479.62(c).

62.    Although not required by statute or rule, the ATF Form 1 also requires the applicant to submit his or her social security number. **Exhibit 3**.

63.   Although not required by statute or rule, the ATF Form 1 also requires the applicant to identify his or her race and ethnicity. **Exhibit 3**.

64.   "If the application is approved, the Director will affix a National Firearms Act stamp to the original application in the space provided therefor and properly cancel the stamp. The approved application will then be returned to the applicant." 27 C.F.R. § 479.62(d).

65.   "The Director will consider the application for approval or disapproval. If the application is approved, the Director will return the original thereof to the maker of the firearm and retain the duplicate. Upon receipt of the approved application, the maker is authorized to make the firearm described therein. The maker of the firearm shall not, under any circumstances, make the firearm until the application, satisfactorily executed, has been forwarded to the Director and has been approved and returned by the Director with the National Firearms Act stamp affixed." 27 C.F.R. § 479.64.

66.    "An application to make a firearm shall not be approved by the Director if the making or possession of the firearm would place the person making the firearm in violation of law." 27 C.F.R. § 479.65. "If the application is disapproved, the original Form 1 (Firearms) and the remittance submitted by the applicant for the purchase of the stamp [$200] will be returned to the applicant with the reason for disapproval stated on the form." 27 C.F.R. § 479.64.

67.    On information and belief, BATFE approves or denies Form 1 applications in two to four weeks.

68.    Plaintiffs filed this lawsuit on February 24, 2022.

69.    On information and belief, BATFE denied 850 Form 1 applications to make firearms suppressors on February 28, 2022.[6]

70.    On information and belief, on March 3, 2022, ATF sent the following message to thousands of persons with pending Form 1 applications:

Dear eForm applicant:

The National Firearms Act (NFA) Division received your ATF eForm 1, *Application to Make and Register a Firearm*. As part of the application process, NFA Division must confirm that the making or possession of a firearm would not place the applicant in violation of the law [footnote omitted].

NFA Division requires that you provide certain additional information so that it may determine whether your eForm 1 application to make a silencer may lawfully be approved. Specifically, please submit to NFA Division the following:

- Pictures of the parts that you will use to make the silencer (the pictures should be clear and allow identification of the parts photographed);

---

[6] *See*, *e.g.*, "ATF Mass Denial of Suppressor Form 1 Applications" (March 7, 2022) https://www.nraila.org/articles/20220307/atf-mass-denial-of-suppressor-form-1-applications; "ATF Form 1 Update: Take Action Now!" (March 4, 2022) https://americansuppressorassociation.com/atf-form-1-update-take-action-now/; March 16, 2022 letter from 26 Senators to ATF (**Exhibit 5**); March 18, 2022 Letter from 141 Representatives to ATF (**Exhibit 6**).

- A description of the process you will use to assemble or fabricate the silencer;

- The product, model or kit name, if any, of each device and/or part that you will use to make the silencer; and

- The source from which the parts were obtained, i.e. the name of the store, website, etc.

… Without the additional descriptive information, NFA Division will be unable to determined whether the eForm 1 application to make a silencer may lawfully be approved. Therefore, failure to submit the requested information by ***March 25, 2022*** will result in your application being disapproved and your $200 making tax refunded [emphasis in original].

71.    No statute, regulation, or instruction on the Form 1 requires that applicants provide this "additional information."

72.    Moreover, because the NFA at 18 U.S.C. § 921(a)(24) defines "any part intended only for use in" "assembling or fabricating a [firearm suppressor]" as a firearm suppressor, Plaintiffs are concerned that compliance with BATFE's request for "additional information" would require them to incriminate themselves by disclosing possession of parts intended to be used in making the firearm suppressor that is the subject of the application.

73.    BATFE apparently believes that it can extend the application process indefinitely and ask for any "additional information" it wants. This includes additional information which could be used by BATFE to prosecute Form 1 applicants under the provision of the NFA declaring parts intended to be used to make a firearm suppressor are regulated as if they are already firearm suppressors.

**C. Everyone who makes a suppressor in Texas for personal use in Texas must pay a tax of $200.**

74.     There is a federal excise tax of 10% or 11% on the sale of most firearms. 26 U.S.C. § 4181. However, there is an exemption entitled "Machine guns and short barrelled [sic] firearms": "The tax imposed by section 4181 shall not apply to any firearm on which the tax provided by section 5811 has been paid." 26 U.S.C. § 4182(a). Despite the exemption's title, it applies to all "firearms" regulated under the National Firearms Act of 1934, including firearm suppressors.

75.     The tax on making firearms suppressors and other "firearms" regulated under the National Firearms Act of 1934 is $200. "There shall be levied, collected, and paid upon the making of a [firearm suppressor] a tax at the rate of $200 for each firearm made." 26 U.S.C. § 5821(a). "The tax imposed by subsection (a) of this section shall be paid by the person making the [firearm suppressor]." 26 U.S.C. § 5821(b). "The tax imposed by subsection (a) of this section shall be payable by the stamp prescribed for payment by the Secretary." 26 U.S.C. § 5821(c). "Payment of the tax on the making of a firearm shall be represented by a $200 adhesive stamp bearing the words 'National Firearms Act.' The stamps are maintained by the Director." 27 C.F.R. § 479.61.

76.     In 1934, the $200 amount "was decided because that was the average cost of a machine gun, and a 100% tax would thereby be imposed." Halbrook, *supra*, at 50; *Firearms Law and the Second Amendment* at 571.

77.     Before the enactment of the Firearms Act of 1934, a firearm suppressor cost about five dollars. Halbrook, *supra*, at 50.

78.     The amount of the tax—$200—has not changed since 1934. *Firearms Law and the Second Amendment* at 578; 26 U.S.C. § 5821(a). According to the online inflation calculator maintained by the United States Bureau of Labor Statistics, $200 in 1934 is equivalent to over $4,000 today.[7]

79.     The regular firearms sales tax has an exemption: "The tax imposed by section 4181 shall not apply to any pistol, revolver, or firearm described in such section if manufactured, produced, or imported by a person who manufactures, produces, and imports less than an aggregate of 50 of such articles during the calendar year." 26 U.S.C. § 4182(c)(1). There is no such exemption for makers of "firearms" regulated by the National Firearms Act of 1934, including firearm suppressors.

**D.   All newly made firearm suppressors must be registered—including those made by Texans for personal use in Texas.**

80.     Once BATFE approves an application, the firearm suppressor must be registered.

81.     Firearm suppressors are registered in the National Firearms Registration and Transfer Record. 26 U.S.C. § 5841(a). "The registry shall include (1) identification of the [firearm suppressor]; (2) date of registration; and (3) identification and address of person entitled to possession of the [firearm suppressor]." *Id.*

82.     "Each … maker shall register each [firearm suppressor] he … makes." 26 U.S.C. § 5841(b).

83.     "Each … maker … of a [firearm suppressor] shall, prior to … making a [firearm suppressor], obtain authorization in such manner as required by this chapter or regulations issued thereunder to … make … the [firearm suppressor], and such authorization shall effect the registration of the [firearm suppressor] required by this section." 26 U.S.C. § 5841(c). "The

---

[7] https://www.bls.gov/data/inflation_calculator.htm

approval by the Director of an application, Form 1 (Firearms), to make a firearm under this subpart shall effectuate registration of the firearm described in the Form 1 (Firearms) to the person making the firearm." 27 C.F.R. § 479.71.

84.    "A person possessing a [firearm suppressor] registered as required by this section shall retain proof of registration which shall be made available to the Secretary upon request." 26 U.S.C. § 5841(e). "The original Form 1 (Firearms) showing approval by the Director shall be retained by the maker to establish proof of his registration of the firearm described therein, and shall be made available to any ATF officer on request." 27 C.F.R. § 479.71.

**E. All firearm suppressors must be marked with an individual serial number and other information—including those made by Texans for personal use in Texas.**

85.    Once BATFE approves an application, the firearm suppressor must have a serial number.

86.    "[A]nyone making a [firearm suppressor] shall identify each [firearm suppressor] … by a serial number which may not be readily removed, obliterated, or altered, the name of the … maker, and such other identification as the Secretary may by regulations prescribe." 26 U.S.C. § 5842(a).

87.    A maker of a firearm suppressor "must legibly identify the [firearm suppressor] [b]y engraving, casting, stamping (impressing), or otherwise conspicuously placing or causing to be engraved, cast, stamped (impressed) or placed on the frame or receiver thereof an individual serial number. The serial number must be placed in a manner not susceptible of being readily obliterated, altered, or removed, and must not duplicate any serial number placed by you on any other firearm. For firearms manufactured, imported, or made on and after January 30, 2002, the engraving, casting, or stamping (impressing) of the serial number must be to a minimum depth of .003 inch and in a print size no smaller than 1/16 inch; and also] certain additional information … [including]:

(i) The model, if such designation has been made; (ii) The caliber or gauge; (iii) Your name (or recognized abbreviation) … (iv) In the case of a domestically made firearm, the city and State (or recognized abbreviation thereof) where you … as the maker, made the firearm." 27 C.F.R. § 479.102(a).

88.    "The depth of all markings required by this section will be measured from the flat surface of the metal and not the peaks or ridges. The height of serial numbers required by paragraph (a)(1) of this section will be measured as the distance between the latitudinal ends of the character impression bottoms (bases)." 27 C.F.R. § 479.102(b).

**F. Prohibited Acts and Penalties for Makers of Firearm Suppressors**

89.    It is unlawful for any person to

- "possess a [firearm suppressor] made in violation of the provisions of this chapter;"

- "possess a [firearm suppressor] which is not registered to him in the National Firearms Registration and Transfer Record;"

- "make a [firearm suppressor] in violation of the provisions of this chapter;" or

- "possess a [firearm suppressor] which is not identified by a serial number as required by this chapter."

26 U.S.C. § 5861(c), (d), (f), (i).

90.    The penalties for any of the above violations are as follows:

- "Any person who violates or fails to comply with any provision of this chapter shall, upon conviction, be fined not more than $10,000, or be imprisoned not more than ten years, or both."

- "Any [firearm suppressor] involved in any violation of the provisions of this chapter shall be subject to seizure and forfeiture."

26 U.S.C. §§ 5871, 5872.

91.    Thus, a person who makes a firearm suppressor in Texas for personal use in Texas without obtaining BATFE's advance permission, without paying the $200 tax, without registering it, and without engraving a unique serial number on the suppressor faces ten years imprisonment, or a fine of not more than $10,000, or both.

## V. TEXAS LAW

92.    Under Texas law, "'Firearm suppressor' means any device designed, made, or adapted to muffle the report of a firearm." TEX. GOV'T CODE § 2.001(2).

93.    "'Manufacture' includes forging, casting, machining, or another process for working a material." TEX. GOV'T CODE § 2.001(4).

94.    Under the National Firearms Act of 1934, "[t]he term 'make', and the various derivatives of such word, shall include manufacturing (other than by one qualified to engage in such business under this chapter), putting together, altering, any combination of these, or otherwise producing a [firearm suppressor]." 26 U.S.C. § 5845(i); *Compare to* 26 U.S.C. § 5845 ("The term "manufacturer" means any person who is engaged in the business of manufacturing [firearm suppressors].)" Federal law thus distinguishes between (1) persons who "make" a firearm and who are not in the business of manufacturing firearms and (2) persons who are in the business of manufacturing firearms. Chapter 2 of the Texas Government Code does not make this same distinction.

22

95.   "For the purposes of this subchapter, a firearm suppressor is manufactured in this state if the item is manufactured: (1) in this state from basic materials; and (2) without the inclusion of any part imported from another state other than a generic and insignificant part." TEX. GOV'T CODE § 2.051.

96.   "'Generic and insignificant part' means an item that has manufacturing or consumer product applications other than inclusion in a firearm suppressor. The term includes a spring, screw, nut, and pin." TEX. GOV'T CODE § 2.001(3).

97.   Under Texas law, "A firearm suppressor that is manufactured in this state and remains in this state is not subject to federal law or federal regulation, including registration, under the authority of the United States Congress to regulate interstate commerce." TEX. GOV'T CODE § 2.052(a).

98.   "A basic material from which a firearm suppressor is manufactured in this state, including unmachined steel, is not a firearm suppressor and is not subject to federal regulation under the authority of the United States Congress to regulate interstate commerce as if it actually were a firearm suppressor." TEX. GOV'T CODE § 2.052(b).

99.   "A firearm suppressor manufactured and sold in this state must have the words 'Made in Texas' clearly stamped on it." TEX. GOV'T CODE § 2.053.

100.   "On written notification to the attorney general by a United States citizen who resides in this state of the citizen's intent to manufacture a firearm suppressor to which Section 2.052 applies, the attorney general shall seek a declaratory judgment from a federal district court in this state that Section 2.052 is consistent with the United States Constitution." TEX. GOV'T CODE § 2.054.

101.   On July 28, 2021, BATFE issued an "open letter" stating that "because [Chapter 2 of the Texas Government Code] directly conflicts with federal firearms laws and regulations, federal law supersedes [Chapter 2]. In summary, all provisions of the Gun Control Act (GCA) and the National Firearms Act [of 1934] (NFA), including their corresponding regulations, continue to apply to [federal firearms licensees] and *other persons in Texas*." **Exhibit 4**.

## VI. REVIEW OF LAWS THAT IMPINGE
## ON SECOND AMENDMENT RIGHTS

102.   The government cannot tax the exercise of Second Amendment rights. *Murdock v. Com. of Pennsylvania*, 319 U.S. 105, 113 (1943). Post-*Heller*, taxing the making of firearms in Texas for personal use in Texas is taxing the exercise of a constitutional right, and is prohibited.

103.   Post-*Heller*, most courts review regulation of the right to keep and bear arms under a two-part test. "[T]he first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee; the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012) ("*NRA v. BATFE*") (collecting cases); *see also Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) (*Helle*r II).

104.   "A regulation that threatens a right at the core of the Second Amendment—for example, the right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and family—triggers strict scrutiny. A less severe regulation—a regulation that does not encroach on the core of the Second Amendment—requires a less demanding means-ends showing." *NRA v. BATFE*, 700 F.3d at 195 (citations omitted).

105. "This more lenient level of scrutiny could be called 'intermediate' scrutiny, but regardless of the label, this level requires the government to demonstrate a 'reasonable fit' between the challenged regulation and an 'important' government objective." *Id.*

106. Post-*Heller*, courts may not review firearms regulation under a rational-basis standard of review. *Id.* at 195–96.

107. Federal laws and regulations which require Texans to apply for and receive permission to make firearm suppressors for personal use in Texas impinge upon a right protected by the Second Amendment.

108. Those laws and regulations do not survive intermediate scrutiny (much less the more stringent strict scrutiny standard of review)

109. Under the intermediate-scrutiny test courts ask whether the State's interests in proscribing a regulation are substantial, whether the challenged regulation advances these interests in a direct and material way, and whether the extent of the restriction on the exercise of a constitutional right is in reasonable proportion to the interests served. *Edenfield v. Fane*, 507 U.S. 761, 767 (1993).

110. In undertaking the first inquiry under intermediate scrutiny, courts must identify with care the interests the State itself asserts. Unlike rational-basis review, the intermediate-scrutiny standard does not permit courts to supplant the precise interests put forward by the State with other suppositions. And courts must judge whether the stated interests are the actual interests served by the restriction. *Edenfield*, 507 U.S. at 768.

25

111.   Under an intermediate scrutiny standard of review, the government bears the burden of justifying (i.e., both the burden of production and persuasion) the challenged statute. *J & B Entm't, Inc. v. City of Jackson, Miss.*, 152 F.3d 362, 370 (5th Cir. 1998).

112.   Raising revenue is not a sufficient justification for specifically taxing the exercise of a constitutional right. *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 586–90 (1983).

113.   The government cannot demonstrate that taxing or regulating the making of firearm suppressors (unlike hand grenades) for personal use in Texas is necessary for public health and safety. *See United States v. Freed*, 401 U.S. 601, 609 (1971) (upholding the National Firearms Act of 1934 with respect to hand grenades because "possession of hand grenades is not an innocent act. They are highly dangerous offensive weapons."). The government cannot point to any harm that taxing or regulating that making of firearm suppressors for personal use in Texas alleviates.

114.   Moreover, the government's burden is not satisfied by mere speculation or conjecture. Instead, it "must demonstrate that the harms it recites are real and that the restriction will in fact alleviate them." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001).

115.   Possessing firearm suppressors is legal, but taxing and regulating of making firearm suppressors in Texas for personal use in Texas is excessive and oppressive and have no valid purpose.

116.   Firearm suppressors are not dangerous and were not regulated at all for the first several decades after their invention.

117.   Firearm suppressors are widely accepted and very infrequently used in criminal activity. They are commonly used by law enforcement, the military, and citizens.

# VII. CLAIMS

## COUNT I

**The Court should enjoin federal law requiring Texans to apply for and receive permission to make firearm suppressors for personal use in Texas because that law violates the Second Amendment.**

118.  Plaintiffs incorporate by reference all preceding paragraphs.

119.  The National Firearms Act of 1934, as amended, and the regulations made pursuant thereto requiring Texans to apply for and receive permission to make firearm suppressors in Texas for personal use in Texas are unconstitutional.

120.  Federal laws and regulations which require Texans to apply for and receive permission to make firearm suppressors for personal use in Texas impinge upon a right protected by the Second Amendment.

121.  Those laws and regulations do not survive intermediate scrutiny (much less the more stringent strict scrutiny standard of review).

122.  Applying intermediate scrutiny, the government must produce substantial evidence to justify its requirement that Texans apply for and receive permission to make firearm suppressors for personal use in Texas. It cannot do so.

123.  The government cannot point to any harm that requiring Texans to apply for and receive permission to make firearm suppressors for personal use in Texas alleviates.

124.  Requiring Texans to apply for and receive permission to make firearm suppressors in Texas for personal use in Texas is excessive and oppressive and has no valid purpose.

125.   Other than time-manner-place restrictions, which the firearm application process is not, the Constitution prohibits the federal government from requiring permission to exercise constitutional rights.

126.   The Constitution prohibits the federal government from requiring that Texans apply for and receive permission before making of a firearm suppressor in Texas that will only be used in Texas.

127.   The Constitution prohibits the federal government from requiring that Schnitz, Martin, and Allen apply for and receive permission before making of a firearm suppressor in Texas that will only be used for their own home defense in Texas.

128.   Moreover, 18 U.S.C. § 921(a)(24) defines parts intended solely to be used in making a firearm suppressor as themselves being firearms suppressors and subject to all the requirements of the NFA. In light of BATFE's current process of requesting pictures of such parts in the process of seeking permission to make a firearm suppressor, Schnitz, Martin, and Allen cannot even begin the process of applying for and receiving permission to make a firearm suppressor without exposing themselves to potential criminal prosecution on account of their possession of the parts disclosed in the application. The Constitution prohibits the federal government from imposing such a Catch 22 on Texans prior to exercising their constitutional rights.

129.   The purpose of Count I is not to "restrain[ ] the assessment or collection of [a] tax," so the AIA does not apply. *CIC Services*, 141 S. Ct. at 1592.

## COUNT II

**The Court should enjoin federal law requiring Texans to pay a $200 tax on making firearm suppressors for personal use in Texas because that law violates the Second Amendment.**

130.   Plaintiffs incorporate by reference all preceding paragraphs.

28

131.   The National Firearms Act of 1934, as amended, and the regulations made pursuant thereto requiring Texans to pay a $200 tax on the making of firearm suppressors in Texas for personal use in Texas are unconstitutional.

132.   The $200 tax is an unconstitutional tax on the exercise of a constitutional right. *Murdock*, 319 U.S. at 113.

133.   In the alternative, federal laws and regulations which require Texans to pay a $200 tax on making firearm suppressors for personal use in Texas impinge upon a right protected by the Second Amendment.

134.   Those laws and regulations do not survive intermediate scrutiny (much less the more stringent strict scrutiny standard of review).

135.   Applying intermediate scrutiny, the government must produce substantial evidence to justify its requirement that Texans pay a $200 tax on making firearm suppressors for personal use in Texas. It cannot do so.

136.   The government cannot point to any harm that requiring Texans to pay a $200 tax on making firearm suppressors for personal use in Texas alleviates.

137.   Requiring Texans to pay a $200 tax on making firearm suppressors in Texas for personal use in Texas is excessive and oppressive and has no valid purpose.

138.   There are no other examples of direct federal taxes on the exercise of a constitutional right.

139.   The tax at issue is not a general tax on making goods that incidentally taxes the making of firearm suppressors.

140.  The Constitution prohibits the federal government from requiring that Texans pay a $200 tax on making a firearm suppressor in Texas that will only be used in Texas.

141.  The Constitution prohibits the federal government from requiring that Schnitz, Martin, and Allen pay a $200 tax on making of a firearm suppressor in Texas that will only be used for their own home defense in Texas.

## COUNT III

**The Court should enjoin federal law requiring Texans to register and place a serial number on firearm suppressors made for personal use in Texas because that law violates the Second Amendment.**

142.  Plaintiffs incorporate by reference all preceding paragraphs.

143.  The National Firearms Act of 1934, as amended, and the regulations made pursuant thereto requiring Texans to register and place serial number on firearm suppressors made in Texas for personal use in Texas are unconstitutional.

144.  Federal laws and regulations which require Texans to register and place serial number on firearm suppressors made in Texas impinge upon a right protected by the Second Amendment.

145.  Those laws and regulations do not survive intermediate scrutiny (much less the more stringent strict scrutiny standard of review).

146.  Applying intermediate scrutiny, the government most produce substantial evidence to justify its requirement that Texans register and place serial number on firearm suppressors made in Texas for personal use in Texas. It cannot do so.

147.  The government cannot point to any harm that requiring Texans to register and place serial number on firearm suppressors made in Texas for personal use in Texas alleviates.

148.  Requiring Texans to register and place serial number on firearm suppressors made in Texas for personal use in Texas is excessive and oppressive and has no valid purpose.

149.  The Constitution prohibits the federal government from requiring that Texans register and place serial number on firearm suppressors made in Texas will only be used in Texas.

150.  The Constitution prohibits the federal government from requiring that Schnitz, Martin, and Allen register and place serial number on firearm suppressors made in Texas that will only be used for their own home defense in Texas.

151.  The purpose of Count IIII is not to "restrain[ ] the assessment or collection of [a] tax," so the AIA does not apply. *CIC Services*, 141 S. Ct. at 1592.

## VIII. PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

a.  Issue permanent injunctive relief enjoining Defendant from requiring Texans to apply for and receive permission to make firearm suppressors in Texas for personal use in Texas;

b.  Issue permanent injunctive relief enjoining Defendant from requiring Texans to pay a $200 tax on the making of firearm suppressors in Texas for personal use in Texas;

c.  Issue permanent injunctive relief enjoining Defendant from requiring Texans to register and place serial number on firearm suppressors made in Texas; and

d.  Award other and further relief as the Court deems equitable and just.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Special Counsel to the First Assistant
Texas Bar No. 24116780

*/s/ Charles K. Eldred*
CHARLES K. ELDRED
Special Litigation Counsel
Texas Bar No. 00793681

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Administrative Law Division
P. O. Box 12548
Austin, Texas 78711-2548
(512) 936-1706 • fax (512) 320-0167
charles.eldred@oag.texas.gov

**Attorneys for Ken Paxton,**
**Attorney General of Texas**

*/s/ Tony K. McDonald*
TONY K. McDONALD
State Bar No. 24083477

GARRETT MCMILLAN
State Bar No. 24116747

THE LAW OFFICES OF TONY MCDONALD
1501 Leander Dr., Suite B2
Leander, Texas 78641
(512) 200-3608 • fax (815) 550-1292
tony@tonymcdonald.com

WARREN V. NORRED
State Bar No. 24045094

NORRED LAW, PLLC
515 E. Border Street
Arlington, Texas 76010
(817) 704-3984 • fax (817) 524-6686
warren@norredlaw.com

**Attorneys for David Schnitz,**
**Tracy Martin, and Floice Allen**

## CERTIFICATE OF SERVICE

We certify that a true and accurate copy of the foregoing document was filed electronically

(via CM/ECF) on May 17, 2022.

Emily B. Nestler
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20005
emily.b.nestler@usdoj.gov

Attorney for Defendants

*/s/ Charles K. Eldred*   */s/ Tony K. McDonald*
Charles K. Eldred    Tony K. McDonald