**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **KEN PAXTON, in his official capacity as** | § | |
| **Attorney General of Texas,** | § | |
| **DAVID SCHNITZ,** | § | |
| **TRACY MARTIN, and** | § | |
| **FLOICE ALLEN,** | § | |
| *Plaintiffs,* | § | |
| | § | |
| vs. | § | **Civil Action No. 4:22-cv-00143-P** |
| | § | |
| **STEVEN M. DETTELBACH, in his** | § | |
| **Official Capacity as Director, Bureau of** | § | |
| **Alcohol, Tobacco, Firearms and Explosives,** | § | |
| **and** | § | |
| **MERRICK B. GARLAND, in his** | § | |
| **Official Capacity as Attorney General** | § | |
| **of the United States,** | § | |
| *Defendants.* | § | |

---

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR
RESPONSE TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT**

---

# TABLE OF CONTENTS

Procedural History ........................................................................................................ 1

Legal Standard ............................................................................................................. 2

Response ...................................................................................................................... 3

I.     The AIA does not apply to this case under the *Enochs* exception. ........................... 4

    A.  Enforcement of the challenged regulations causes irreparable injury ................................ 5

    B.  On this record, Defendants have no chance of ultimately prevailing. ................................ 8

        1.     Regulation of firearm suppressors is regulation of conduct covered by the Second Amendment. ........................................................................................................ 9

        2.     Defendants have not even attempted to demonstrate that the challenged regulations are consistent with the Nation's historical tradition of firearm regulation ................. 12

        3.     Defendants' non-*Bruen* arguments fail. ................................................................ 12

        4.     Defendants misapply *Enochs*'s second prong ....................................................... 18

        5.     In addition to *Bruen*, other precedent supports Plaintiffs' case ............................. 19

II.    The AIA does not apply to Counts I, III, and IV. It also does not apply to Count II in the case of a denied application. ...................................................................................... 21

III.   Texas has standing, but whether Texas does or does not have standing does not matter because the other Plaintiffs have standing. .................................................................. 24

    A.  The other Plaintiffs have standing, do the Court need not determine whether Texas has standing. ................................................................................................................. 24

    B.  Texas has standing. ........................................................................................... 24

Conclusion ................................................................................................................... 25

Certificate of Service .................................................................................................... 27

Appendix

National Firearms Act of 1934 (48 Stat. 1236 (1934)) ................................................. Tab 1

Gun Control Act of 1968 (82 Stat. 1213 (1968)) ......................................................... Tab 2

## TABLE OF AUTHORITIES

**Cases**

*Ala. Ass'n of Realtors v. Dep't of Health & Human Services*,
141 S. Ct. 2485 (2021) ............................................................................15

*Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
458 U.S. 592 (1982)...........................................................................24, 25

*Bob Jones Univ. v. Simon*,
416 U.S. 725 (1974) ................................................................................19

*CIC Services, LLC v. Internal Revenue Serv.*,
141 S. Ct.1582 (2021) ......................................................................*passim*

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
661 F.2d 328 (5th Cir. 1981).................................................................... 6

*Den Norske Stats Oljeselkap As v. HeerMac Vof*,
241 F.3d 420 (5th Cir. 2001)....................................................................3

*District of Columbia v. Heller*,
554 U.S. 570 (2008).............................................................11, 12, 13, 17

*Enochs v. Williams Packing & Nav. Co.*,
370 U.S. 1 (1962).............................................................................*passim*

*Ezell v. City of Chi.*,
651 F.3d 684 (7th Cir. 2011)..................................................................10

*Jackson v. City of S.F.*,
746 F.3d 953 (9th Cir. 2014) .................................................................10

*Kemlon Products & Dev. Co. v. United States*,
638 F.2d 1315 (5th Cir. 1981) ...........................................................5, 19

*Life Partners Inc. v. Unites States*,
650 F.3d 1026 (5th Cir. 2011)................................................................. 2

*Massachusetts v. Mellon*,
262 U.S. 447 (1923)................................................................................25

*McAllen Grace Brethren Church v. Salazar*,
764 F.3d 465 (5th Cir. 2014) ................................................................ 24

*Minneapolis Star & Tribune v. Minnesota Comm'r of Revenue*,
460 U.S. 575 (1983) ...................................................................10, 19, 20

*Murdock v. Com. of Pennsylvania*,
319 U.S. 105 (1943) .........................................................................19, 20

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012)...........................................................................4, 15

*N. Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S. Ct. 2111 (2022) .....................................................................*passim*

*N. Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
804 F.3d 242 (2d Cir. 2015) ..................................................................10

*Paterson v. Weinberger*,
644 F.2d 521 (5th Cir. 1981).............................................................3, 12

*Sonzinsky v. United States*,
   300 U.S. 506 (1937)..................................................................................................17

**Statutes**

9 U.S.C. § 921(a)(25) ............................................................................................. 22
26 U.S.C. § 5822 ........................................................................................13, 14, 15
26 U.S.C. § 5845(a)(7) ........................................................................................ 9, 22
26 U.S.C. § 7421 ("Anti-Injunction Act" or "AIA") .......................................... *passim*

**Regulations**

27 C.F.R. § 479.64 ............................................................................................ 14, 16

**Rules**

Tex. R. Fed. P. 25(d)...............................................................................................1

**Other**

Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second
   Amendment*, 46 CUMB. L. REV. 35 (2016) ....................................................... 9

TO THE HONORABLE MARK T. PITMAN, U.S. DISTRICT JUDGE:

Plaintiffs, Ken Paxton, in his official capacity as Attorney General of Texas, David Schnitz, Tracy Martin, and Floice Allen, file this Brief in Support of their Response to Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint, and will respectfully show the Court as follows:

## PROCEDURAL HISTORY

Plaintiffs sued Defendant Dettelbach,[1] the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("BATFE"), and Merrick B. Garland, Attorney General of the United States, in their official capacities. BATFE is responsible for enforcing those parts of the National Firearms Act of 1934, as amended ("NFA"), that apply to Texans who make firearm suppressors (also known as "silencers") for non-commercial, personal use in Texas, including the requirements that they apply for and receive permission to make a firearm suppressor for non-commercial, personal use in Texas (Count I), pay a $200 tax on making firearm suppressors for non-commercial, personal use in Texas (Count II), and register and place a serial number on firearm suppressors made in Texas for non-commercial, personal use in Texas (Counts III and IV). The Attorney General is responsible for prosecuting criminal violations of those requirements. But those requirements violate the Second Amendment. Plaintiffs seek injunctive relief against enforcement of those requirements. *See* Plaintiff's Second Amended Complaint (Dkt. #21).

Plaintiffs are not challenging other parts of the NFA or the Gun Control Act of 1968 ("GCA"). For instance, Plaintiffs are not challenging regulations of rifles or handguns not regulated by the NFA, and are not challenging regulation of weapons regulated by the NFA other

---

[1] Steven M. Dettelbach has recently been confirmed as director of BAFTE. He is substituted as a Defendant in his official capacity under Fed. R. Civ. P. 25(d).

1

than firearm suppressors. Plaintiffs are also not challenging commercial regulations, such as regulations of transferring weapons in or manufacturing weapons for interstate commerce, or licensing regulations.

In lieu of an answer, Defendants filed a motion to dismiss under Rule 12(b)(1). Dkt. #26 at 8. Defendants argue:

A.1.    The Anti-Injunction Act (26 U.S.C. § 7421) ("AIA") bars Plaintiffs' claims because the object of this case is to enjoin the collection or assessment of a tax. *Id.* at 10–13.

A.2.    The *Enochs* exception (*Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1 (1962)) to the AIA does not apply because Plaintiffs are not irreparably harmed, and there is no Second Amendment right to make a firearm suppressor for non-commercial, personal use. *Id.* at 13–18.

A.3.    The AIA can apply to Texas. *Id.* at 18–21. (But Plaintiffs do not argue that the AIA cannot apply to Texas.)

B.      Plaintiff the State of Texas (but not Plaintiffs Schnitz, Martin, and Allen) lacks standing. *Id.* at 21–25.

C.      Plaintiffs have failed to state a claim under the Second Amendment. *Id.* at 25. (But this argument is a repeat of arguments made in Part A.2.)

## LEGAL STANDARD

The party asserting jurisdiction bears the burden of proof on a 12(b)(1) motion to dismiss. *Life Partners Inc. v. United States*, 650 F.3d 1026, 1029 (5th Cir. 2011).

But "if the defense merely files a Rule 12(b)(1) motion, the trial court is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true. If

those jurisdictional allegations are sufficient the complaint stands. If a defendant makes a 'factual attack' upon the court's subject matter jurisdiction over the lawsuit, the defendant submits affidavits, testimony, or other evidentiary materials. In the latter case a plaintiff is also required to submit facts through some evidentiary method and has the burden of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction. [When there is] only a 'facial attack' and not a 'factual attack,' [judicial] review is limited to whether the complaint is sufficient to allege the jurisdiction." *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

In ruling on a motion to dismiss for lack of subject matter jurisdiction, a court may evaluate (1) the complaint alone, (2) the complaint supplemented by undisputed facts evidenced in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. Nevertheless, courts must accept all factual allegations in the plaintiff's complaint as true. *Den Norske Stats Oljeselskap As v. HeereMac Vof*, 241 F.3d 420, 424 (5th Cir. 2001).

## RESPONSE

The Court should deny Defendants' motion to dismiss because (I) the Court has jurisdiction under the *Enochs* exception to the AIA because the challenged requirements cause irreparable harm and violate the Second Amendment under *Bruen* (responding to Defendants' argument A.2.); (II) Defendants' AIA defense does not apply to Counts I, III, or IV, or to Count II in the case of a rejected application, because those counts do not challenge the assessment or collection of taxes (responding to Defendants' argument A.1.); and (III) Texas has standing, but the Court need not decide that issue because Defendants do not dispute that the other Plaintiffs have standing.

Plaintiffs respond to Defendants' second argument (*Enochs* exception) first because it is dispositive of all claims. Plaintiffs respond to Defendants' first argument (AIA bar) second because

they agree that the AIA applies to the $200 tax payment that successful applicants must pay, but not to any other requirement (but Plaintiffs maintain that the *Enochs* exception applies to the $200 tax payment). Plaintiffs need not respond to Defendants' argument A.III because Plaintiffs do not argue that the AIA cannot apply to states, so this argument is not at issue in this matter. Similarly, Plaintiffs do not respond separately to Plaintiffs' argument C because the Second Amendment argument is fully addressed in Plaintiffs' response to Defendants' *Enochs*-exception argument.

Defendants also note several times, "the Supreme Court has repeatedly made clear that the constitutional nature of a taxpayer's claim has no bearing under the AIA." Dkt. #26 at 2; *see also id*. at 8, 9, 17. However, this misses the point of Plaintiffs' claims.  Plaintiffs do not argue that the AIA does not apply simply because Plaintiffs' claims arise under the Constitution. Accordingly, Plaintiffs need not respond to that point either.

## I.   The AIA does not apply to this case under the *Enochs* exception.

The AIA reads, "[With inapplicable exceptions,] no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421. The AIA "protects the Government's ability to collect a consistent stream of revenue, by barring litigation to enjoin or otherwise obstruct the collection of taxes. Because of the Anti–Injunction Act, taxes can ordinarily be challenged only after they are paid, by suing for a refund." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 543 (2012).

Despite the seemingly clear language of the AIA, courts recognize the *Enochs* exception. "[I]f it is clear that under no circumstances could the Government ultimately prevail, the central purpose of the [AIA] is inapplicable and the attempted collection may be enjoined if equity

jurisdiction otherwise exists. In such a situation the exaction is merely in the guise of a tax." *Enochs*, 370 U.S. at 7 (internal citation and quotation omitted). "*Enochs* establishes two prongs, both of which must be satisfied, before an injunction may issue pursuant to [the AIA]. The first prong is that normal equity jurisdiction must obtain, i. e., irreparable injury and inadequacy of legal remedy must exist. The second independent criterion is that it must be clear that under 'no circumstances' could the government ultimately prevail. Only if the government does not have 'a chance of ultimately prevailing' and only if under the 'most liberal view of the law and the facts' the United States cannot win, may a district court issue an injunction." *Kemlon Products & Dev. Co. v. United States*, 638 F.2d 1315, 1321 (5th Cir. 1981), modified, 646 F.2d 223 (5th Cir. 1981) (quoting *Enochs*).

Even if the AIA applied to all the challenged regulations (it does not; see part II, *infra*), the exception to the AIA recognized in *Enochs* applies because (1) the challenged regulations cause irreparable harm, that cannot be cured with damages, by causing delay—sometimes indefinite delay—and requiring registration and serial numbers (and permission is sometimes denied), and (2) Defendants cannot ultimately prevail at this stage because they have not even attempted to overcome their burden to prove that the challenged requirements are "consistent with the Nation's historical tradition of firearm regulation," which they must do to justify the regulations under the Second Amendment. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022).

## A. Enforcement of the challenged regulations causes irreparable injury.

For most taxes, the taxpayer pays a tax when the taxpayer performs a taxable activity, such as purchasing a product subject to an excise tax, or when taxes are due, such as when the taxpayer

pays the income tax on April 15 and submits paperwork showing the amount due. In these cases, if the tax was illegally or even unconstitutionally collected, the taxpayer is not irreparably harmed because the taxpayer can sue for a refund and get his or her money back, with interest. That makes the taxpayer whole under the law of irreparable injury, *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981), so the taxpayer has an adequate remedy at law for illegal or even unconstitutional tax assessment and collection, and accordingly is not entitled to prepayment injunctive relief under the AIA.

This case is very different. Plaintiffs allege that BATFE currently takes two to four weeks—or, more recently, an indefinite period of time while it illegally collects "more information"—to decide whether to approve an application to make a firearm suppressor. Dkt. #21 at ¶ 78–84. Even if BATFE eventually approves a Texan's application, the Texan has suffered irreparable harm in the form of time lost that cannot be repaired by recovering the $200 back with interest. In the First Amendment context, requiring a would-be speaker to submit $200 along with an application for permission to speak, and waiting two to four weeks for permission, or longer if the evaluating agency illegally demands "additional information," cannot be repaired by giving the $200 back with interest because the applicant was not allowed to speak for two to four weeks—or for however long the agency keeps illegally demanding "additional information" before deciding. That is a harm that cannot be repaired with money. "It is well settled that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury." *Deerfield Med. Ctr.*, 661 F.2d at 338. So too for delays in exercising Second Amendment rights.

Additionally, approved applicants must register their firearm suppressor with BATFE and place a serial number on it. Those harms also cannot be repaired in a tax refund action that results in returning the $200 with interest.

Disapproved applicants more obviously suffer an irreparable injury. They are not allowed to make a firearm suppressor and never are even allowed to pay the tax. There is no way to repair their injury by giving their money back (they still have their money) or with any other amount of money.

Defendants assert that "Plaintiffs do not lack alternative means to litigate their claims," and that they can "file a claim for refund *after* submitting an application and paying the applicable tax within the applicable limitation period, and thereafter challenge the result in District Court, if necessary." Dkt. #26 at 18. But even for successful applicants, the refund procedure is not available to return lost time or to undo serial number and registration requirements.

Moreover, the refund procedure is obviously not available to unsuccessful applicants or to applicants in indefinite limbo while BATFE refuses to approve or deny their applications and demands more information. Defendants write, "Alternatively, in the event Plaintiffs' application were denied, they could file a lawsuit challenging the denial at that time." *Id*. at 18 n.14. But Plaintiffs are unaware of any authority allowing a citizen to challenge BATFE's denial of an application to make a firearm suppressor in court.

Thus, the challenged regulations cause irreparable injury—injuries that cannot be repaired by a post-collection tax refund suit. Plaintiffs pass the first part of *Enochs*'s two-part test.

**B. On this record, Defendants have no chance of ultimately prevailing.**

Under the Supreme Court's "text, as informed by history" test, the "standard for applying the Second Amendment is as follows":

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Bruen*, 142 S. Ct. at 2129–30 (quotation omitted).

Thus, there are two questions under *Bruen*. First, does the Second Amendment's plain text cover making a firearm suppressor for non-commercial, personal use? It does. Second, has the government demonstrated that the regulation is consistent with this Nation's historical tradition of firearm regulation? They have not even tried in their motion to dismiss (although they may try later). Thus, on this record, Defendants have no chance of ultimately prevailing. Accordingly, Plaintiffs pass the second part in *Enochs*'s two-part test.

By requiring citizens to apply for permission to make a firearm suppressor for non-commercial, personal use, pay a $200 tax on that privilege, and register and place a serial number on the firearm suppressor, federal law burdens "[t]he right of the people to keep . . . Arms," which the Second Amendment's plain text covers. U.S. CONST. amend. II. Defendants therefore must prove that each regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. "*Only then* may a court" uphold the law. *Id.* (emphasis added).

To be sure, establishing a "historical tradition of firearm regulation" is a tall order. *Bruen* held that "the historical record compiled by respondents [did] not demonstrate a tradition," *id.* at 2138, where the respondents produced three colonial statutes (1686 East New Jersey, 1692

8

Massachusetts, 1699 New Hampshire), *id.* at 2142–44, three late18th-century and early-19th-century state laws that "parallel[] the colonial statutes" (1786 Virginia, 1795 Massachusetts, 1801 Tennessee), *id.* at 2144–45, three additional 19th-century state laws (1821 Tennessee, 1871 Texas, 1887 West Virginia), *id.* at 2147, 2153, five late-19th-century regulations from the Western Territories (1869 New Mexico, 1875 Wyoming, 1889 Idaho, 1889 Arizona, 1890 Oklahoma), *id.* at 2154–55, and one late-19th-century Western State law (1881 Kansas), *id.* at 2155–56.[2]

Thus, there are two questions under *Bruen*. First, does the Second Amendment's plain text cover making a firearm suppressor for non-commercial, personal use? It does. Second, has the government demonstrated that the regulation is consistent with this Nation's historical tradition of firearm regulation? Defendants have not even tried to do so in their motion to dismiss (although they may try later). Thus, on this record, Defendants have no chance of ultimately prevailing. Accordingly, Plaintiffs also pass the second part in *Enochs*'s two-part test.

### 1. Regulation of firearm suppressors is regulation of conduct covered by the Second Amendment.

Making a firearm suppressor for non-commercial, personal use is conduct covered by the Second Amendment. Although the NFA itself *defines* firearm suppressors as "firearms," 26 U.S.C. § 5845(a)(7), that definition is "only for regulatory purposes. In ordinary language, a noise suppressor is not a firearm. Although silencers are defined as 'firearms,' they are not actual weapons. They cannot be fired or discharge projectiles." Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendme*nt, 46 CUMB. L. REV. 35, 36 (2016) (cleaned up).

---

[2] The Court did not necessarily agree with the government's reading of the colonial laws or the early state laws, but the Court stated that "even if" the government's reading were correct, the record would not justify the challenged regulation. *Bruen*, 142 S. Ct. at 2144.

But whether a firearm suppressor is itself a "arm," or whether it is statutorily defined as a "arm," is not the real issue. Firearm suppressors are attached to arms. When one keeps or bears arms with a firearm suppressor, one is exercising Second Amendment rights, just as when one keeps or bears arms with a trigger, or a detachable magazine, or a scope, one is exercising Second Amendment rights. Regulating firearm suppressors, triggers, detachable magazines, or scopes is regulating conduct falling within the scope of the Second Amendment's guarantee.

Likewise, when one goes to a firing range, they are exercising Second Amendment rights, *see Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011), even though a firing range is not an arm. And when one uses ammunition and firearms accessories, such as large-capacity magazines, they are exercising Second Amendment rights. *See*, *e.g.*, *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 967-68 (9th Cir. 2014); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015).

Regulating firearm parts, accessories, and things like firing ranges is regulating conduct covered by the Second Amendment's plain text. The Second Amendment covers more than regulations of arms themselves. Similarly, the First Amendment covers more than speech and press themselves. For instance, neither paper nor ink are themselves "speech" or "press," but newspapers use paper and ink to exercise their rights of freedom of speech and freedom of press, just as citizens may use firearm suppressors, triggers, sights, detachable magazines, ammunition, and firing ranges to exercise their right to keep and bear arms. That is why newspapers cannot be constitutionally taxed on their purchases of paper and ink, except as part of a general sales tax on all goods purchased. *Minneapolis Star & Tribune Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575, 591 (1983). Regulating paper and ink used to exercise freedoms of speech and press is subject to

constitutional constraints. So is regulating firearm accessories used to exercise the right to keep and bear arms.

Defendants cite some pre-*Bruen* opinions, arguing: "No court has ever held that a firearm suppressor is an 'arm' within the meaning of the Second Amendment." Dkt. #26 at 14. But in *Bruen*, the Court defined "arms" under the Second Amendment broadly to include "modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132. Previously, it recognized the historical inclusion of "armour of defence" within the definition of arms, showing the definition is not limited to completed weapons. *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008).

But more importantly, *Bruen* clarifies that the Second Amendment covers "conduct falling within the scope of the Second Amendment's guarantee," not just arms. *Bruen*, 142 S. Ct. at 2126. Opinions discussing whether firearm suppressors are themselves "arms" are now irrelevant. So, asking whether firearm suppressors are "arms" is the wrong question after *Bruen*, and the cases cited by Defendants do not advance their argument.

Defendants also incorrectly argue that *Heller* supports their position, stating: "Under *District of Columbia v. Heller*, the Second Amendment extends only to 'instruments that constitute bearable arms.' 554 U.S. 570, 582 (2008)." Dkt. #26 at 14. But the cited portion of *Heller* does not say that "the Second Amendment extends *only* to 'instruments that constitute bearable arms.'" Instead, it says, "Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second

11

Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582 (citations omitted). *Heller* thus says that the Second Amendment covers all "arms," including modern arms, but does not say that it *only* covers "arms." And *Bruen* instructs that the Second Amendment indeed covers conduct.

>    2. **Defendants have not even attempted to demonstrate that the challenged regulations are consistent with the Nation's historical tradition of firearm regulation.**

Because the Second Amendment applies to the challenged regulations, the next question is whether "the government [has] demonstrate[d] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. At this phase of the case, Defendants have not attempted to do so. Thus, with respect to the historical-tradition standard, Defendants' 12(b)(1) motion is a facial attack, not a factual attack. "[When there is] only a 'facial attack' and not a 'factual attack,' [judicial] review is limited to whether the complaint is sufficient to allege the jurisdiction." *Paterson*, 644 F.2d at 523. Plaintiffs' Second Amended Complaint is sufficient unless and until Defendants "demonstrate[] that the regulation is consistent with this Nation's historical tradition of firearm regulation." Although Defendants assert that "no court has yet had the opportunity to examine the NFA based on *Bruen*'s 'historical tradition' standard." Dkt. #26 at 15 n.12, that is what this Court is required to do in this case.

>    3. **Defendants' non-*Bruen* arguments fail.**

Defendants argue that making firearm suppressors for non-commercial, personal use is not conduct covered by the Second Amendment, but argue in the alternative that even if it is, the challenged regulations are nevertheless constitutional for three reasons, all of which fail.

*First*, Defendants state, "The NFA does not "require applicants to 'show an atypical need' for a suppressor, nor does it otherwise 'prevent "law abiding, respectable citizens"' from making a suppressor" (citing *Bruen* at 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). Dkt. #26 at 15. The beginning of the cited footnote reads, "To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, under which a general desire for self-defense is sufficient to obtain a permit." *Id*. (cleaned up). Defendants appear to be suggesting that the challenged regulations are as constitutional as a "shall-issue" licensing regime. But *Bruen* did not say that such regimes are constitutional. It only said that finding New York's "may-issue" regime unconstitutional did not suggest that the "shall-issue" regimes are unconstitutional.

Yet Defendants themselves admit that they do not see the challenged regulations as setting up a "shall-issue" regime. Plaintiffs allege that, since February, BATFE is currently intentionally delaying evaluations for thousands of applicants on the grounds that it needs more information that it has no statutory authority to request. Dkt. #21 at ¶¶ 80–84. Moreover, BATFE is requesting information that would require applicants to disclose possession of parts intended to be assembled into a firearm suppressor, thus risking incriminating themselves in the process. *Id*. "On information and belief, Defendants are currently putting its application approval process for making firearm suppressors for non-commercial, personal use to abusive ends by failing to approve or deny thousands of applications, and by requiring (without any authority) applicants to submit '[p]ictures of the parts that you will use make the silencer,' even though applicants may not legally possess silencer parts until after BATFE grants permission to possess them." *Id*. at ¶ 122.[3]

---

[3] Defendants' response contains the following mysterious paragraph:

The Court must accept those allegations as true for the purpose of deciding Defendant's Motion to Dismiss.

Defendants' response to this allegation is:

> Contrary to Plaintiffs' assertions, ATF is not "failing to approve applications" or arbitrarily requiring additional information in response to some applications. *Id.* Rather, ATF merely seeks additional information when necessary to complete the requisite NFA process—*i.e.*, when a particular application leaves unclear whether making the proposed suppressor would "place the person making the firearm in violation of the law." 26 U.S.C. § 5822; see also *supra* Part II.A [Defendants' description of the NFA].

Dkt. #26 at 15 n.15. This is no response at all. First of all, it is unsworn, and cannot overcome Plaintiffs' allegation at this phase.

Moreover, Defendants misquote Plaintiffs' allegation. Plaintiffs do not allege that Defendants are "failing to approve applications." Rather, Plaintiffs allege that Defendants are "failing to approve *or deny* applications." Dkt. #21 at ¶ 122. Defendants may not simply refuse to act on an application. The regulations require action: "The Director will consider the application for approval or disapproval." 27 C.F.R. § 479.64.

---

In any event, Plaintiffs' possession of unlawful parts would not prevent them from filing an application, paying the tax, and getting approval to make a suppressor. NFA applications are granted so long as the making of that suppressor would not "place the person making the firearm in violation of law." 26 U.S.C. § 5822. Plaintiffs remain free to file an application and pay the tax to make a firearm suppressor using lawful parts. No step in that process requires Plaintiffs to disclose their separate possession of other firearms or parts not related to that suppressor.

Dkt. #26 at 18. But parts are not lawful to possess until BATFE approves the application to make the firearm suppressor. There is no way to "make a firearm suppressor using lawful parts" until *after* BATFE approves the application. The paragraph appears to nonsensically contrast "possession of unlawful parts … not related to that suppressor" with possession of "lawful parts" related to that suppressor, but fails to acknowledge that "lawful parts" do not exist before an application is approved.

"[B]ecause any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, *lengthy wait times in processing license applications* or exorbitant fees deny ordinary citizens their right to public carry." *Bruen*, 142 S. Ct. at 2138 n.9 [emphasis added]. An indeterminate wait time—unauthorized by statute or rule—is unconstitutional.

Additionally, the statute that Defendants cite prohibits them from indefinitely delaying approval or disapproval or asking for unspecified "additional information." "Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Sebelius*, 142 S. Ct. at 665. "[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2490 (2021). The statute limits what Defendants can do. It reads:

> No person shall make a firearm unless he has (a) filed with the Secretary a written application, in duplicate, to make and register the firearm on the form prescribed by the Secretary; (b) paid any tax payable on the making and such payment is evidenced by the proper stamp affixed to the original application form; (c) identified the firearm to be made in the application form in such manner as the Secretary may by regulations prescribe; (d) identified himself in the application form in such manner as the Secretary may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; and (e) obtained the approval of the Secretary to make and register the firearm and the application form shows such approval. Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law.

26 U.S.C. § 5822. But BATFE is demanding "additional information" that is not "on the form provided by the Secretary," contrary to the statute. Nor does any rule allow BATFE to demand "additional information." The regulations concerning the application process for individuals are described in detail in Dkt. #21 at ¶¶ 62-77. They spell out everything an applicant must provide. Defendants have no statutory or regulatory authority to demand more information.

15

Under the regulations, "The Director will consider the application for approval or disapproval. If the application is approved, the Director will return the original thereof to the maker of the firearm and retain the duplicate. … If the application is disapproved, the original Form 1 (Firearms) and the remittance submitted by the applicant for the purchase of the stamp will be returned to the applicant with the reason for disapproval stated on the form." 27 C.F.R. § 479.64. The options are "approve" or "deny." There is no third option. There certainly is no option for "neither approve nor deny and demand 'additional information.'"

Yet Defendants assert that "ATF merely seeks additional information when necessary to complete the requisite NFA process." But the "process" is established by the statute and the rules which bind Defendants. Defendants may not just make up a "process" of indeterminate length. The process established by statute and regulation is a "shall-issue" process—if the applicant provides all information, the applicant gets permission to make the firearm suppressor, period. Otherwise, BATFE denies the application.

Defendants' refusal to "approv[e] or disapprov[e]" applications, 27 C.F.R. § 479.64, and demand for "more information," illegally turns the process into more of a "may-issue" regime like the one found unconstitutional in *Bruen*. "[T]he vast majority of States—43 by our count— are 'shall issue' jurisdictions, where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability. Meanwhile, only six States and the District of Columbia have 'may issue' licensing laws, under which authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria, usually because the applicant has not demonstrated cause or suitability for the relevant license. [Those six

16

States] have analogues to [New York's] 'proper-cause' standard." *Bruen*, 142 S. Ct. at 2123–24 (footnotes omitted). Defendants made-up, unexplained reasons for not approving or disapproving applications might be an illegal application of a proper-cause requirement, or it might not. Discovery is necessary to explore what is going on.

On this record, Defendants have failed to overcome Plaintiffs' allegations that the application process is being "put towards abusive ends," *Bruen*, 142 S. Ct. at 2138 n.9, let alone overcome their burden to demonstrate that the application process is consistent with this Nation's historical tradition.

***Second***, Defendants also argue, "[T]he NFA is a longstanding tax statute that has been in place for nearly a century. As both the Supreme Court and the Fifth Circuit have recognized, longstanding, presumptively regulatory measures likely implicate no Second Amendment rights." Dkt. #26 at 15 (citing *Heller* and a 2017 Fifth Circuit opinion). But the regulations struck down in *Bruen* date from the "early 1900s." *Bruen*, 142 S. Ct. at 2122. And while the NFA was adopted in 1934, decades after the unconstitutional statute at issue in *Bruen*, the tax on making firearm suppressors for non-commercial, personal use dates from 1968, still decades after that. In any event, whether or not one characterizes the regulations at issue as "longstanding" is not relevant after *Bruen*. The proper question is whether the government demonstrated that the regulation is consistent with this Nation's historical tradition of firearm regulation. Defendants have not (yet) attempted to do so.

***Third***, Defendants also cite *Sonzinsky v. United States*, 300 U.S. 506, 514 (1937) for the proposition that "the Supreme Court has already upheld other analogous sections of the NFA as a valid exercise of the taxing powers." Dkt. #21 at 15. But *Sonzinsky* is inapposite for three reasons.

17

1. The issue in *Sonzinsky* was whether the NFA's $200 annual license tax on dealers in firearms was a constitutional exercise of the legislative power of Congress. *Sonzinsky* at 511. It was not about the tax on making a firearm suppressor for non-commercial, personal use, a matter which was not taxed in 1937, and was not taxed until 1968.[4]

2. The case had nothing to do with the AIA. It was a prosecution for failure to pay the tax. *Id*. Even so, The AIA does not apply to any exercise of the taxing powers, but only to collection and enforcement of tax, which can include things like tax returns, but cannot include things like applications to make a product and registration and serialization requirements. See Part II, *infra*.

3. As a pre-*Heller*, pre-*Bruen* opinion, the *Sonzinsky* Court did not consider whether the tax might violate the Second Amendment, did not even mention the right to keep and bear arms, and did not review the tax under the historical-tradition standard.

   **4. Defendants misapply *Enochs*'s second prong.**

Under the second prong of the *Enochs* exception, the AIA does not deprive the Court of jurisdiction "if it is clear that under no circumstances could the Government ultimately prevail." *Enochs*, 370 U.S. at 7. Defendants suggest that the second prong cannot apply to this case because "no court has yet had the opportunity to examine the NFA based on *Bruen*'s 'historical tradition'

---

[4] A copy of the original version of the National Firearms Act (48 Stat. 1236 (1934)) is included in the Appendix. It contains no prohibition on making firearms governed by the NFA (including firearm suppressors). The tax on making firearms (including firearm suppressors) was added in 1968 as Title II to Public Law 90-618 (82 Stat. 1213 (1968)), a copy of which is also in the Appendix. The making tax (26 U.S.C. §§ 5821–22) is on page 1228–29. Title I of Public Law 90-618 was the Gun Control Act of 1968, 18 U.S.C. §§ 921–28. Title II was the 1968 amendments to the NFA.

standard. The absence of any such precedent, in and of itself, leaves open the possibility that Defendants can succeed in this case." Dkt. #26 at 15 n.12.

But the fact that there is no precedent under *Bruen* does not relieve Defendants from their burden under that very recent case to demonstrate that the challenged regulations are consistent with this Nation's historical tradition of firearm regulation. Until they do that, they cannot ultimately prevail. The Court should reevaluate Defendants' argument that they might ultimately prevail if and when Defendants try to meet their burden. They have not done so yet.

Defendants also argue:

> Plaintiffs have not established that the United States is unable, under any circumstances, to ultimately prevail in this suit. In making this determination for purposes of the *Enochs* exception, the Court must give the United States the benefit of the "most liberal view of the law and the facts." *Kemlon Prod.*, 638 F.2d at 1321. In other words, Plaintiffs' Second Amendment claims need only be "sufficiently debatable to foreclose any notion that 'under no circumstances could the [United States] ultimately prevail.'" *Bob Jones* [*University v. Simon*], 416 U.S. [725] at 749. They do not meet this high threshold.

Dkt. #26 at 13. But it is not currently "sufficiently debatable" whether Defendants can win. They cannot possibly win unless they try to overcome their burden to demonstrate that the challenged regulations are consistent with this Nation's historical tradition of firearm regulation. They have not even attempted to do so. Accordingly, on this record, they cannot possibly prevail.

### 5. In addition to *Bruen*, other precedent supports Plaintiffs' case.

It is a *per se* violation to tax the exercise of a constitutional right. *Murdock v. Com. of Pennsylvania*, 319 U.S. 105, 113 (1943). As the Supreme Court said in the First Amendment context:

> A power to tax differentially, as opposed to a power to tax generally, gives a government a powerful weapon against the taxpayer selected. When the State imposes a generally applicable tax, there is little cause for concern. We need not fear that a government will destroy a selected group of taxpayers by burdensome taxation if it must impose the same burden on the rest of its constituency. When the State singles out the press, though, the political constraints that prevent a legislature from passing crippling taxes of general

19

applicability are weakened, and the threat of burdensome taxes becomes acute. That threat can operate as effectively as a censor to check critical comment by the press, undercutting the basic assumption of our political system that the press will often serve as an important restraint on government.

*Minneapolis Star & Tribune Co.*, 460 U.S. at 585 (1983) (citation omitted). The NFA singles out

Texans who exercise their Second Amendment rights. It is not a general tax that happens to also

apply to the exercise of Second Amendment rights:

A tax that burdens rights protected by the First Amendment cannot stand unless the burden is necessary to achieve an overriding governmental interest. Any tax that the press must pay, of course, imposes some "burden." But, as we have observed, this Court has long upheld economic regulation of the press. The cases approving such economic regulation, however, emphasized the general applicability of the challenged regulation to all businesses, [and] suggest[ed] that a regulation that singled out the press might place a heavier burden of justification on the State, and we now conclude that the special problems created by differential treatment do indeed impose such a burden.

*Minneapolis Star & Tribune Co.*, 460 U.S. at 582–83.

Defendants complain that no court has extended *Murdock* to the Second Amendment context.

Dkt. #26 at 16. But it is equally true that no court has considered firearm taxes under *Bruen*. The

question, as with all other firearm regulations, is whether the government has overcome its burden

to demonstrate that the challenged taxes are consistent with this Nation's historical tradition of

firearm regulation. Pre-*Bruen* precedent does not address that question. There is no obvious reason

why *Murdock* cannot apply to the Second Amendment after *Bruen*.

\* \* \*

The *Enochs* exception applies to this case, so the AIA does not bar this case.

20

**II. The AIA does not apply to Counts I, III, and IV. It also does not apply to Count II in the case of a denied application.**

Plaintiffs concede that the text of the AIA applies to the collection of the $200 tax from citizens whose applications are approved (although Plaintiffs maintain that the *Enochs* exception and *Murdock* apply to that collection; see Part I *supra*).

But the AIA simply does not apply to Counts I, III, or IV under *CIC Services, LLC v. Internal Revenue Serv.*, 141 S. Ct. 1582 (2021) because those counts do not challenge the "assessment or collection" of tax. It also does not apply to Count II when BATFE denies an application because no tax is assessed or collected.

As detailed in Plaintiffs' Complaint, a Texan who wants to make a firearm suppressor for non-commercial, personal use does not simply pay a tax on that activity. Instead, the Texan must send BATFE $200 and apply for permission to make the firearm suppressor. If BATFE grants permission, it keeps the $200, registers the suppressor, and sends the Texan a tax stamp, who can then make the suppressor, so long as he or she registers it and puts a serial number on it. Plaintiffs' Amended Complaint at ¶¶ 48–99. Permission has typically been granted, or not, in two to four weeks. *Id.* at ¶ 78. Recently, BATFE has begun holding applications and indefinitely refusing to approve or deny them, while illegally demanding "additional information" that no statute or rule allows them to demand. *Id.* at ¶¶ 80–84.

But BATFE may also (rightly or wrongly) *disapprove* the application and return the $200. This demonstrates that the AIA does not apply to the application process. The AIA only bars injunctions against the "assessment or collection" of taxes. The approval process is neither. BATFE neither assesses an amount due nor collects taxes when it approves or disapproves an application to make

21

a firearm suppressor. The collection happens (or not) *after* BATFE evaluates the application, but the evaluation itself is neither tax assessment nor tax collection.

The application process is similar to a reporting requirement, and challenges to reporting requirements are not barred by the AIA. "[I]t [does] not matter that the reporting requirements would facilitate collection of taxes." *CIC Services*, 141 S. Ct. at 1589 (internal quotations omitted). "The [AIA's] limit on injunctions is not keyed to all activities that may improve a State's ability to assess and collect taxes. It is instead keyed to the acts of assessment and collection themselves. That means a suit directed at ordinary reporting duties can go forward, unimpeded by the Anti-Injunction Act." *Id*. (cleaned up, internal citations and quotations omitted).

Moreover, BATFE can withhold or delay permission even to applicants for whom there is no reason to withhold permission. In fact, four days after Plaintiffs filed their Original Complaint, BATFE denied permission to 850 applicants. Three days later, on March 3, it sent 3,000 pending applicants a notice that unless they sent in pictures and descriptions of all parts and components that will be used to make the suppressor, their applications will not be approved. Plaintiffs' Amended Complaint at ¶¶ 80–84. No statute, rule, or application form requires the submission of pictures or descriptions of parts. And because "any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler" constitute a "suppressor" under federal law, *see* 26 U.S.C. § 5845(a)(7), 18 U.S.C. § 921(a)(25), this appears to be a trap. If a person submits pictures of the parts that he or she intends to use in order to build a suppressor, BATFE may take the position that the person has provided photographic proof that he or she is illegally in possession of a suppressor. Denying an application and demanding more

information without statutory authority (and information that is arguably self-incriminating) is not assessing or collecting taxes. It is in fact an effort to deny applications and *not* collect taxes.

The AIA might apply if the law simply required citizens to pay a tax whenever they make a firearm suppressor and to submit relevant information on a tax return. "[T]he Internal Revenue Service (IRS) has broad power to require the submission of tax-related information that it believes helpful in assessing and collecting taxes." *CIC Services*, 141 S. Ct. at 1586–87. But the challenged regulations are very different. Deciding whether a citizen can make a firearm suppressor is not assessing or collecting taxes. And BATFE demonstrates that it is not merely assessing or collecting taxes when it denies applications unless the applicant provides information not required by any authority whatsoever. The AIA does not bar injunctive relief against such decisions.

"[T]he Anti-Injunction Act provides, with exceptions not relevant here, that 'no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person.' If [a] suit is not for that purpose, it can go forward. If the suit is for that purpose, it must be dismissed." *CIC Services*, 141 S. Ct. at 1588.

> In considering a suit['s] purpose, we inquire not into a taxpayer's subjective motive, but into the action's objective aim—essentially, the relief the suit requests.... The purpose of a measure is "the end or aim to which [it] is directed." N. Webster, An American Dictionary of the English Language (rev. ed. 1844); see Webster's Third New International Dictionary 1847 (1976). And in this context, that aim is not best assessed by probing an individual taxpayer's innermost reasons for suing. Down that path lies too much potential for circumventing the Act. Instead, this Court has looked to the face of the taxpayer's complaint. We have asked about what the Government here calls "the substance of the suit"—the claims brought and injuries alleged—to determine the suit's object. And most especially, we have looked to the "relief requested"—the thing sought to be enjoined. The Anti-Injunction Act kicks in when the target of a requested injunction is a tax obligation—or stated in the Act's language, when that injunction runs against the "collection or assessment of [a] tax."

*CIC Services*, 141 S. Ct. at 1589–90.

Count I's purpose is to enjoin the application process, not the assessment or collection of taxes. Count III's purpose is to enjoin the registration requirement, not the assessment or collection of taxes. Count IV's purpose is to enjoin the serial-number requirement, not the assessment or collection of taxes. The AIA does not apply to those Counts under *CIC Services*.

Defendants simply fail to engage with *CIC Services*. Instead, they cite pre-*CIC Services* cases which do not address Plaintiffs' arguments in this case. They incorrectly cite pages 1593–94 of *CIC Services* for the proposition that "the AIA extends to other obligations that serve the collection and assessment of a tax, particularly when they are part of an integrated tax scheme." Dkt. #26 at 1. The cited pages say no such thing. The phrase "integrated tax scheme" does not appear in *CIC Services*. After *CIC Services*, the AIA does not bar injunctions against firearm suppressor application, registration, and serial-number requirements because they are not "tax obligations" or "the collection or assessment of [a] tax." *CIC Services*, 141 S. Ct. at 1590.

## III. Texas has standing, but whether Texas does or does not have standing does not matter because the other Plaintiffs have standing.

### A. The other Plaintiffs have standing, so the Court need not determine whether Texas has standing.

BATFE does not challenge the standing of Plaintiffs Schnitz, Martin, and Allen. That means that the Court does not need to consider whether Texas also has standing. "It is well settled that once we determine that at least one plaintiff has standing, we need not consider whether the remaining plaintiffs have standing to maintain the suit." *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014).

### B. Texas has standing.

"[A] State has a quasi-sovereign interest in the health and well-being—both physical and economic of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607

24

(1982). The unconstitutional regulation of firearm suppressors adversely affects Texans' health and well-being by delaying or prohibiting Texans' ability to use firearm suppressors for the purpose of home defense. Dkt. #21, Exhibit 1. Therefore, Texas has standing to vindicate its quasi-sovereign interests in its citizens health and well-being.

BATFE argues that "Texas cannot manufacture its own standing to challenge a federal law by simply passing a statute purporting to nullify it." *Id.* at 22–24. But the Texas's quasi-sovereign interests in the health and safety of its citizens exist independently of the statute directing the Attorney General to file this lawsuit. The statute does not manufacture a lawsuit. Instead, it sets out the State's policy in favor of the use of firearms suppressors and directs the Attorney General to vindicate Texas's independently existing quasi-sovereign interests in promoting that policy in federal court.

BATFE also notes that Texas may not simply sue the federal government on behalf of its citizens, citing *Massachusetts v. Mellon*, 262 U.S. 447 (1923). Dkt. #26 at 24–25. But Texas does not assert such standing. Texas is not trying to protect its citizens from the operation of federal law or the Constitution. "[T]here is a critical difference between allowing a State to protect her citizens from the operation of federal statutes (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." *Massachusetts v. E.P.A.*, 549 U.S. 497, 520 n.17 (2007) (internal quotation marks omitted). Texas is asserting its right to vindicate its quasi-sovereign interests in the health and well-being of its citizens.

## CONCLUSION

Plaintiffs request that the Court deny Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

AARON F. REITZ
Deputy Attorney General for Legal Strategy
State Bar No. 24105704

/s/ Charles K. Eldred
CHARLES K. ELDRED
Special Counsel for Legal Strategy
State Bar No. 00793681

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P. O. Box 12548
Austin, Texas 78711-2548
(512) 936-1706 • fax (512) 320-0167
charles.eldred@oag.texas.gov

**Attorneys for Ken Paxton,**
**Attorney General of Texas**

/s/ Tony K. McDonald
TONY K. MCDONALD
State Bar No. 24083477

GARRETT MCMILLAN
State Bar No. 24116747

THE LAW OFFICES OF TONY MCDONALD
1501 Leander Dr., Suite B2
Leander, Texas 78641
(512) 200-3608 • fax (815) 550-1292
tony@tonymcdonald.com

WARREN V. NORRED
State Bar No. 24045094

NORRED LAW, PLLC
515 E. Border Street
Arlington, Texas 76010
(817) 704-3984 • fax (817) 524-6686
warren@norredlaw.com

**Attorneys for David Schnitz,**
**Tracy Martin, and Floice Allen**

26

## CERTIFICATE OF SERVICE

We certify that a true and accurate copy of the foregoing document was filed electronically

(via CM/ECF) on August 16, 2022.

Emily B. Nestler
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20005
emily.b.nestler@usdoj.gov

Attorney for Defendants

*/s/ Charles K. Eldred*   */s/ Tony K. McDonald*
Charles K. Eldred      Tony K. McDonald

27