**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **KEN PAXTON, in his official capacity as** | ) | |
| **Attorney General of Texas,** | ) | |
| **DAVID SCHNITZ,** | ) | |
| **TRACY MARTIN, and** | ) | |
| **FLOICE ALLEN,** | ) | |
| *Plaintiffs,* | ) | Civil Action No. 4:22-cv-00143-P |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **STEVEN M. DETTELBACH, in his** | ) | |
| **official Capacity as Director, Bureau of** | ) | |
| **Alcohol, Tobacco, Firearms and Explosives,** | ) | |
| **and** | ) | |
| **MERRICK B. GARLAND, in his official** | ) | |
| **Capacity as Attorney General of the** | ) | |
| **United States,** | ) | |
| *Defendants.* | ) | |

<u>**DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND**</u>

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

LESLEY FARBY
Assistant Branch Director

EMILY B. NESTLER (D.C. Bar # 973886)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 305-0167
Email: emily.b.nestler@usdoj.gov

*Counsel for Defendants*

## TABLE OF CONTENTS

SUMMARY .................................................................................................................. 1

FACTUAL BACKGROUND .......................................................................................... 3

I.   National Firearms Act Tax Scheme .................................................................. 3

II.  Definition of Making Silencers for Purposes of the National Firearms Act ......................... 7

III. ATF Response to Largescale Manufacture of Unlawful Silencer Parts Kits ......................... 8

IV.  Texas House Bill 957 Purports to Exempt Suppressors Made for Personal Use in
     Texas from Some Federal Laws ...................................................................... 10

V.   Individual Plaintiffs' Stated Intention to Make Suppressors for Personal Use ................... 11

PROCEDURAL HISTORY ............................................................................................ 11

LEGAL STANDARD ..................................................................................................... 12

ARGUMENT .................................................................................................................. 12

I.   Summary Judgment Should be Granted for Defendants Because Plaintiffs Have
     Failed to Establish Standing ........................................................................... 12

     A.   Individual Plaintiffs Lack Standing Because They Have Failed to
          Demonstrate a Cognizable Injury. ........................................................ 13

     B.   Texas Lacks Standing Because it has Failed to Demonstrate a Cognizable
          Injury. .................................................................................................... 15

     C.   The Court Must Consider Whether Each Plaintiff Has Standing. ........... 17

II.  This Court Lacks Jurisdiction Because the Anti-Injunction Act Bars All of
     Plaintiffs' Claims. ........................................................................................... 19

     A.   The AIA Bars This Case Because its Object is to Enjoin the Collection or
          Assessment of a Tax. ............................................................................. 20

     B.   The *Enochs* Exception to the AIA Is Narrow and Does Not Apply ......... 24

          1.   Equity Jurisdiction Is Not Implicated ......................................... 24

          2.   Plaintiffs Cannot Establish that the Government Is Unable to
               Prevail Under Any Circumstances. ............................................. 27

III. Summary Judgment Should Be Granted for Defendants Because the Challenged
     Laws Are Constitutional. ................................................................................ 28

A.      Firearm Silencers are Not Bearable Arms, So Their Use Is Not Protected by the Second Amendment. ............................................................. 28

B.      Suppressors are Not Protected by the Second Amendment Because They Are Dangerous and Unusual ............................................................. 32

C.      The NFA's Tax Scheme Does Not Infringe the Second Amendment ................. 37

D.      Regulating the Possession of Silencers is Consistent with the Nation's Historical Tradition of Firearm Regulation. ......................................... 42

CONCLUSION ..................................................................................................... 45

## TABLE OF AUTHORITIES

**Cases**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
    458 U.S. 592 (1982) ................................................................................. 16

*Alexander v. "Am. United" Inc.,*
    416 U.S. 752 (1974) ................................................................... 19, 24, 26

*Bauer v. Becerra,*
    858 F.3d 1216 (9th Cir. 2017) ................................................................. 40

*Bd. of Trs. of State Univ. of New York. v. Fox,*
    492 U.S. 469 (1989) ................................................................................. 18

*Bennett v. Spear,*
    520 U.S. 154 (1997) ................................................................................. 10

*Bezet v. United States,*
    276 F. Supp. 3d 576 (E.D. La. 2017) ..................................................... 22

*Bezet v. United States,*
    714 F. App'x 336 (5th Cir. 2017) ..................................... 14, 23, 37, 42

*Bob Jones Univ. v. Simon*
    416 U.S. 735 (1974) ................................................................. *passim*

*Caetano v. Massachusetts,*
    577 U.S. 411 (2016) ................................................................................. 36

*CIC Servs., LLC v. IRS,*
    141 S. Ct. 1582 (2021) ....................................................... 2, 20, 21, 22

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ......................................................................... 13, 14

*Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol & Tobacco Tax & Trade Bureau,*
    843 F.3d 810 (9th Cir. 2016) ................................................................. 27

*Deerfield Med. Ctr. v. City of Deerfield Beach,*
    661 F.2d 328 (5th Cir. 1981) ................................................................. 26

*DeMarco v. Bynum,*
    50 F.4th 479 (5th Cir. 2022) ................................................................. 12

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ................................................. 29, 30, 32, 42

*Enochs v. Williams Packing & Navigation Co.*,
   370 U.S. 1 (1962) ................................................................................ 19, 20, 24

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) ............................................................................. 31

*Florida v. Mellon*,
   273 U.S. 12 (1927) ............................................................................................ 17

*Helvering v. Davis*,
   301 U.S. 619 (1937) .......................................................................................... 17

*Hollis v. Lynch*,
   827 F.3d 436 (5th Cir. 2016) ................................................................. 29, 35, 36

*Jackson v. City and Cnty. of San Francisco*,
   746 F.3d 953 (9th Cir. 2014) ............................................................................. 31

*Kaszycki v. United States,*
   No. C19-1943, 2020 WL 2838598 (W.D. Wash June 1, 2020) ........................... 29

*Kemlon Prod. & Dev. Co. v. United States*,
   638 F.2d 1315 (5th Cir. 1981) ............................................................... 24, 25, 27

*Kwong v. Bloomberg*,
   723 F.3d 160 (2d Cir. 2013) .............................................................................. 40

*Lane v. Holder*,
   703 F.3d 668 (4th Cir. 2012) ............................................................................. 37

*Linn v. Chivatero*,
   714 F.2d 1278 (5th Cir. 1983) ...................................................................... 19, 20

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ..................................................................................... 13, 14

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) .......................................................................................... 17

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ..................................................................................... 16, 17

*McAllen Grace Brethren Church v. Salazar*,
   764 F.3d 465 (5th Cir. 2014) ............................................................................. 18

*Murdock v. Commonwealth of Pennsylvania*,
   319 U.S. 105 (1943) .......................................................................................... 40

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*,
   538 U.S. 803 (2003) .......................................................................................... 14

*New Jersey v. Sargent*,
    269 U.S. 328 (1926) ............................................................................... 16

*New York v. Mnuchin*,
    408 F. Supp. 3d 399 (S.D.N.Y. 2019) ............................................. 26, 27

*New York Rifle & Pistol Ass'n v. Bruen*,
    142 S.Ct. 2111 (2022) ................................................................... *passim*

*Or. Firearms Fed'n, Inc. v. Brown*,
    No. 2:22-CV-01815-IM, 2022 WL 17454829 (D. Or. Dec. 6, 2022) ................... 38

*Sonzinsky v. United States*,
    300 U.S. 506 (1937) ..................................................................... *passim*

*Texas v. Becerra*,
    No. 5:21-cv-300-H, 2021 WL 6198109 (N.D. Tex. Dec. 31, 2021) ...................... 17

*Texas v. ICC*,
    258 U.S. 158 (1922) ............................................................................... 16

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ................................................................. 17

*Thompson/Center Arms Co. v. Baker*,
    686 F. Supp. 38 (D.N.H. 1988) ...................................................... 23, 25

*Tineo v. Att'y General*,
    937 F.3d 200 (3d Cir. 2019) ................................................................. 18

*Town of Chester N.Y. v. Laroe Ests., Inc,*,
    137 S. Ct. 1645 (2017) ......................................................................... 18

*United States of Am. v. Royce*,
    No. 1:22-CR-130, 2023 WL 2163677 (D.N.D. Feb. 22, 2023) ...................... 29, 30

*United States v. Am. Friends Serv. Comm.*,
    419 U.S. 7 (1974) ................................................................... 19, 24, 26

*United States v. Aiken*,
    974 F.2d 446 (4th Cir. 1992) .......................................................... 33, 34

*United States v. AlAzhari*,
    2020 WL 7334512 (M.D. Fla. Dec. 14, 2020) ................................... 29, 30

*United States v. Ardoin*,
    19 F.3d 177 (5th Cir. 1994) ................................................................. 24

*United States v. Bolatete*,
    977 F.3d 1022 (11th Cir. 2020) ............................................................ 40

v

*United States v. Clintwood Elkhorn Mining Co.,*
    553 U.S. 1 (2008) ........................................................................................ 19

*United States v. Cox,*
    906 F.3d 1170 & n.12 (10th Cir. 2018) ........................................... 21, 29, 30, 35

*United States v. Gresham,*
    118 F.3d 258 (5th Cir. 1997) ................................................................. 23-24

*United States v. Hasson,*
    2019 WL 4573424 (D. Md. Sept. 20, 2019) ................................. 29, 30, 31, 32

*United States v. Holton,*
    No. 3:21-CR-0482, 2022 WL 1670195 (N.D. Tx. Nov. 3, 2022), *aff'd* 26 F.4th 610 (4th Cir. 2022) .................................................................................... 32, 34, 38

*United States v. Hoover,*
    No. 3:21-cr-22(S3)-MMH-MCR, 2022 WL 10524008 (M.D. Fla. Oct. 18, 2022) .... 32, 34, 38

*United States v. McCartney,*
    357 F. App'x 73 (9th Cir. 2009) ...................................................................... 29, 32

*United States v. One Palmetto State Armory,*
    115 F. Supp. 3d 544 (E.D. Pa. 2015) ........................................................... 25

*United States v. Perkins,*
    2008 WL 4372821 (D. Neb. 2008) .............................................................. 32, 33

*United States v. Price,*
    2022 WL 6968457 (S.D.W.Va. Oct. 12, 2022) ................................................ 38

*United States v. Reyna,*
    2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) ............................................. 38

*United States v. Ross,*
    458 F.2d 1144 (5th Cir. 1972) ..................................................................... 24

*United States v. Rush,*
    No. 22-cr-40008, 2023 WL 403774 (S.D. Ill. Jan. 25, 2023) ................................. 42

*United States v. Saleem,*
    No. 3:21-cr-00086, 2023 WL 2334417 (W.D.N.C. Mar. 2, 2023) ..................... 29, 31, 32, 34

*United States v. Stepp-Zafft,*
    733 F. App'x 327–30 (8th Cir. 2018) .................................................................. 29

*United States v. Thompson/Center Arms Co.*
    504 U.S. 505 (1992) .............................................................................. 33, 34, 35

*United States v. Tita,*
    2022 WL 17850250 (D. Md. Dec. 22, 2022) ....................................................... 38

*Virginia ex rel. Cuccinelli v. Sebelius,*
   656 F.3d 253 (2011) ................................................................................. 17

*Westfall v. Miller,*
   77 F.3d 868 (5th Cir. 1996) .................................................................... 14

**Federal Statutes**

5 U.S.C. § 706 ............................................................................................. 41

18 U.S.C. § 921 .................................................................................. 1, 7, 8, 9

26 U.S.C § 5848 .......................................................................................... 15

26 U.S.C. § 5801 ........................................................................................ 1, 3

26 U.S.C. § 5821 ..................................................................................... 21, 22

26 U.S.C. § 5822 ................................................................................... *passim*

26 U.S.C. § 5841 .................................................................................... 4, 7, 9

26 U.S.C. § 5842 .................................................................................... 4, 5, 6

26 U.S.C. § 5845 ....................................................................................... 1, 7

26 U.S.C. § 6511 ............................................................................................ 7

26 U.S.C. § 7421 ................................................................................ 2, 19, 23

26 U.S.C. § 7422 ............................................................................................ 7

26 U.S.C. §§ 5821 .................................................................................. 23, 25

**State Statutes**

8 Pa. Cons. Stat. § 908 ............................................................................... 37

720 I.L.C.S. 5/24-1 .................................................................................... 36

1759-1776 N.H. Laws 63 ........................................................................... 45

1866 Ga. Laws 27-28 ................................................................................. 45

1879 Tex. Crim. Stat. 24 ............................................................................ 44

1890 S.C. Act ............................................................................................. 44

Act of Jan. 8, 1781, ch. XII, § 13, 1781 N.J. Laws 39, 43 ....................... 43

Act of Feb. 21, 1867, ch. CCCXVII, §§ 1-8, 1867 Miss. Laws 412; Rev ............... 45

Act of Feb. 24, 1844, ch. 1, § 1, 1844 Miss. Laws 57-59 ......................... 45

Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Act ................................. 44

Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65 .................................... 44

Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25, 25 ....... 44

Alaska Stat. § 11-61 .................................................................................. 37

Ariz. Rev. Stat. § 13-3101 ......................................................................... 37

Ark. Code. Ann. ch. 48 § 1498 (1894) ............................................................ 44

Cal. Penal Code § 33410-15 .......................................................................... 36

Colo. Rev. Stat. § 18-12-102 ......................................................................... 37

Conn. Gen Stat. § 53a-211 ............................................................................ 37

Del. Code. Ann. Tit. 11 § 1444 ..................................................................... 36

Ga Code Ann. §§ 16-11-122 & 16-11-124 ................................................... 37

Gen. Laws § 11-47-20 ................................................................................... 36

Haw. Rev. Stat. §§ 134-8 & 134-11 .............................................................. 36

Kan. Gen. Stat. § 1003 (1901) ...................................................................... 44

Kan. Stat. Ann. § 21-6301 ............................................................................ 37

La. Rev. Stat. Ann. § 40:1379.3 (H)(2) (West Cum. Supp. 2022) ............... 39

Mich. Comp. Laws § 750.224 ....................................................................... 37

Miss Code Ann. § 97-37-31 .......................................................................... 37

Miss. Code. Ann. § 45-9-101 (2022) ............................................................ 39

Mo. Rev. Stat. § 571.020 .............................................................................. 37

Mont. Code Ann. § 45-8-337 ........................................................................ 37

N.C. Gen. Stat. § 14-288.8 ............................................................................ 37

N.D. Cent. Code § 62.1-05-01 ...................................................................... 37

N.H. Rev. Stat. Ann. § 207:4 ........................................................................ 37

N.J. Stat. Ann. § 2C:39-3 .............................................................................. 36

N.Y. Penal Law § 265.02 .............................................................................. 36

Nev. Rev. Stat. § 202.350 ............................................................................. 37

Ohio Rev. Code Ann. § 2923.17 ................................................................... 37

Or. Rev. Stat. § 166.272 ............................................................................... 37

Pennsylvania, ch. 1857, §§ 1-12, 346-51 ..................................................... 45

S.D. Codified Laws § 22-14-6 ...................................................................... 37

Section 2.052 of the Texas Government Code ......................................... 10, 11

Tex. Gov't Code Ann. § 411.174 ................................................................... 39

Tex. Gov't Code § 2.052 .......................................................................... 10, 17

Tex. Gov't Code § 2.054 ............................................................................... 10

Wash. Rev. Code §§ 9.41.250 & 9.41.251 ................................................... 37

Wis. Stat. § 941.298 ..................................................................................... 37

**Rules**

Fed. R. Civ. P. 56 ......................................................................................... 12

Federal Rule of Civil Procedure 5 .................................................................... 1

**Regulations**

26 C.F.R. § 301.6402-2 ........................................................................... 7, 25

27 C.F.R. § 479.62 ..................................................................................... 4

27 C.F.R. § 479.64 ............................................................................. 4, 6, 22

27 C.F.R. § 479.65 ..................................................................................... 5

27 C.F.R. § 479.86 ..................................................................................... 5

27 C.F.R. § 479.102 ................................................................................... 4

27 C.F.R. § 479.172 ............................................................................. 7, 25

**Other**

Christopher Ingraham, *There are More Guns than People in the United States, According to a New Study of Global Firearm Ownership,* The Washington Post,
  *available at* https://perma.cc/LNE7-8TZQ ................................................... 35

Joe Walsh, *U.S. Bought Almost 20 Million Guns Last Year — Second-Highest Year On Record*, Forbes (Apr. 14, 2022 at 2:05pm EDT),
  *available at*  https://perma.cc/TVS8-NNVW ............................................. 35, 36

*Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment,"*
  25 Law & Hist. Rev. 139 (2007)(discussing the colonial militia practice of surveying firearms owned by members of the community) .................................................. 43

*Robert J. Spitzer, Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*,
  83 L. & Contemp. Probs. 231 (2020) ........................................................ 33

Violence Pol'y Ctr., Silencers: A Threat to Public Safety, at 3 (July 2019),
  *available at* https://www.vpc.org/studies/silencers.pdf ..................................... 34

## SUMMARY

This case seeks to enjoin enforcement of the National Firearms Act of 1934, 26 U.S.C. § 5801 *et seq*. (the "NFA") and its implementing regulations, as applied to the making of firearms suppressors. A suppressor is a device that may be attached to a weapon in order to silence or diminish the sound that the weapon makes when fired. *See* 26 U.S.C. § 5845(a).[1] A suppressor cannot operate as a weapon on its own, nor is it necessary to the functioning of any other weapon.

The NFA requires any person who intends to make a suppressor for personal use to pay a $200 tax, accompanied by an application to the federal government. The statute also imposes registration and marking requirements in order to aid in the assessment, collection, and enforcement of the tax. Plaintiffs seek to enjoin enforcement of these provisions, based on the faulty theory that the NFA's tax scheme violates the Second Amendment as applied to suppressors.

Every court to consider the issue has held that firearms suppressors are not protected by the Second Amendment either because they are not "bearable arms," or alternatively because they are "dangerous and usual." Notwithstanding Plaintiffs' assertions, their claims do not require the Court to "re-evaluate Second Amendment jurisprudence" under *New York Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022). Pls.' Brief in Supp. of. Mot. for Summ. J. at 1, ECF 46-1 ("Pls.' Br."). On the contrary, both before and after *Bruen*, courts have consistently held that suppressors are not covered by the Second Amendment. This Court should not stray from that long line of unbroken precedent.

---

[1] While the statute uses the term "silencer," Plaintiffs' Complaint uses the term "suppressor" to describe these same devices. *See* Compl. ¶¶ 32-36. For purposes of this motion, the terms silencer and suppressor are used interchangeably to refer to the relevant devices covered by 26 U.S.C. § 5845(a) and 18 U.S.C. § 921(a)(24).

But the Court need not address the merits of Plaintiffs' Second Amendment challenge because summary judgment for Defendants is warranted for several threshold reasons.

First, the Court lacks jurisdiction over this case because none of the Plaintiffs have Article III standing. Plaintiffs—three individuals who have expressed a vague intention to make firearm suppressors for personal use in Texas (the "Individual Plaintiffs") and the State of Texas—have failed to demonstrate any cognizable injury flowing from the challenged laws.

Second, the Anti-Injunction Act (the "AIA") bars all of Plaintiffs' claims. The AIA provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421. Binding precedent makes clear that the NFA is a taxing statute and that the challenged provisions—including the NFA's application and registration requirements—are part of the statute's integrated tax scheme. *See Sonzinsky v. United* States, 300 U.S. 506, 511-13 (1937). Because the purpose of Plaintiffs' suit is to enjoin assessment and collection of the NFA's tax obligations, this case falls squarely within the AIA's jurisdictional bar. It is well settled that the AIA is not limited to claims that target the specific act of paying a levy, but rather it extends to other obligations that serve the collection and assessment of a tax (*e.g.*, application and registration requirements) when they are part of an integrated tax scheme. *See CIC Servs., LLC v. IRS*, 141 S. Ct. 1582, 1593-94 (2021). And the narrow "*Enochs* exception" to the AIA invoked by Plaintiffs does not apply.

Even if the Court had jurisdiction to hear this case, summary judgment should be granted for Defendants on the merits. To determine whether a law violates the Second Amendment, the Court must start by ascertaining whether the challenged law implicates the right to bear arms in the first place. *See Bruen*, 142 S.Ct. at 2130. Because suppressors are not "bearable arms" and

because they are "dangerous and unusual," they fall outside the Second Amendment's ambit. As noted above, nothing in Plaintiffs' motion justifies a departure from the unanimous precedent—both before and after *Bruen*—holding that the Second Amendment does not cover suppressors.

And, even assuming *arguendo* that suppressors could be weapons covered by the Second Amendment, the NFA's tax scheme itself does not implicate the Second Amendment. This is because the NFA does not ban making firearms, but rather permits making them when the application, payment, and registration requirements are met. Those ministerial requirements do not impinge upon Second Amendment rights, and are akin to the types of firearms licensing requirements that the Supreme Court and the Fifth Circuit have repeatedly upheld.

Finally, even if the Second Amendment were implicated here, the NFA's requirements are "consistent with the Nation's historical tradition of firearm[s] regulation," *id.*, because they are analogous to historical laws similarly regulating firearms and thus consistent with the Second Amendment.

Accordingly, summary judgment should be granted for Defendants.

## FACTUAL BACKGROUND

### I.   National Firearms Act Tax Scheme

The NFA "is a tax statute, located in the United States Code at Title 26 ('Internal Revenue Code'), Subtitle E ('Alcohol, Tobacco, and Certain Other Excise Taxes')." Compl. ¶ 52, ECF 21 (citing 26 U.S.C. § 5801 *et seq*.).[2] The NFA charges a $200 tax on any person who "shall make a firearm," which is defined to include "silencers" under the statute, *see infra* Part II, and imposes associated regulations in conjunction with that tax. Specifically, the NFA provides:

---

[2] Unless otherwise indicated, the term "Complaint" or "Compl." refers to the operative Second Amended Complaint, ECF 21.

> No person shall make a firearm unless he has (a) filed with the [Attorney General] a written application, in duplicate, to make and register the firearm on the form prescribed . . .; (b) paid any tax payable on the making and such payment is evidenced by the proper stamp affixed to the original application form; (c) identified the firearm to be made . . .; (d) identified himself in the application . . . if such person is an individual, the identification must include his fingerprints and his photograph; and (e) obtained the approval of the [Attorney General] to make and register the firearm and the application form shows such approval.

26 U.S.C. § 5822. The NFA also requires that the Attorney General "maintain a central registry of all firearms in the United States, which are not in the possession of or under the control of the United States" in the National Firearms Registration and Transfer Record ("NFRTR"), 26 U.S.C. § 5841(a), and that "[e]ach [] maker shall register each firearm he [] makes." *Id*. § 5841(b). Approval of an application to make and register the firearm, which is submitted alongside the $200 tax, "shall effectuate registration of the firearm to the applicant," 27 C.F.R. § 479.62, and "[u]pon receipt of the approved application, the maker is authorized to make the firearm described therein," *id*. § 479.64. Firearms made pursuant to these requirements must be marked with a serial number and the name of the maker in a manner that cannot "be readily removed, obliterated, or altered." 26 U.S.C. § 5842(a); 27 C.F.R. § 479.102.

In accordance with these statutory requirements, applications to make an NFA firearm must be made on an ATF Form 1, and be accompanied by the applicable tax payment, fingerprints and photograph of the maker, and law enforcement certification. *See* NFA Handbook, Chap. 6, §§ 6.1 – 6.2, at pp. 35-36; www.atf.gov/firearms/docs/guide/atf-national-firearms-act-handbook-atf-p-53208/download; *see also* Decl. of Amy L. Stely ¶¶ 6-7, App. 001 ("Stely Decl."). The Form 1 requires the applicant's name and address, country of citizenship, date and place of birth, social security number, and other identifying information, a description of the firearm to be made, including a unique serial number created by the applicant, a list of questions to be answered, and local law enforcement notification. *Id.* ¶ 7The Form 1 is available on ATF's website and may be

submitted by mail to the address on the form or through ATF's eForms. *See* www.atf.gov/firearms/applications-eforms.

Upon receiving an application to make an NFA firearm, ATF reviews the form for completeness, identifies the supporting documentation, compares the form to the supporting documents to ensure the information matches, confirms payment, ensures the serial number is not a duplicate of one already listed in the NFRTR, and verifies the chief law enforcement officer listed on the form is within the same city or county as the applicant. *Id.* ¶ 8. In addition, to conduct the background check, ATF is required by regulation to contact the National Instant Criminal Background Check System ("NICS"), 27 C.F.R. § 479.86, which is the FBI's national system that checks records on persons who may be disqualified from receiving firearms. *Id.* After receipt of the response from NICS, ATF will confirm that state law does not otherwise forbid possession of the NFA firearm that the applicant seeks to make. *Id.*

Under the NFA, "[a]pplications [to make firearms] shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law." 26 U.S.C. § 5822; 27 C.F.R. § 479.65. Accordingly, ATF approves applications to make firearms when it determines that the application is complete, that the tax is paid, and that the making and possession of the firearm would not violate Federal or state law. *Stely* Decl. ¶ 9. When an application is approved, it will be marked "approved," and then a tax stamp will be affixed to the Form 1 and returned to the applicant. Approval by ATF will effect registration in the NFRTR. Upon receipt of the approved Form 1 the applicant may make the firearm described on the form, *id.* ¶ 16, so long as they mark the firearm with the unique serial number that they submitted with their application, 26 U.S.C. § 5842(a).

Conversely, as required by the NFA, ATF denies applications to make firearms "if the making or possession of the [silencer] would place the person making the firearm in violation of the law." *Id.* ¶ 9 (quoting 26 U.S.C. § 5822). For example, ATF denies applications to make firearms in situations where the background check shows that the applicant is within a category of people prohibited from possessing firearms pursuant to a different law (e.g., a convicted felon), *id.* ¶ 10, or when the application indicates that the proposed firearm would be made from so-called "parts kits" that are already in and of themselves silencers, *id.* ¶¶ 11-13. If an application is ultimately not approved, the applicant's original form and $200 tax payment are returned to the applicant. 27 C.F.R. § 479.64.

Sometimes the information set forth in a particular application leaves unclear whether it can be approved and taxed in accordance with the NFA's statutory requirements. Stely Decl. ¶ 15. For example, the applicant's description of the proposed firearm may lack sufficient information or detail to determine whether it is lawful, or the NICS background check results may not be determinative. *Id.* Under those circumstances, because ATF can only approve applications that meet the NFA's requirements, ATF may need to request additional information from the applicant in order to complete the process. *Id.* The purpose of requesting this clarifying information is to give applicants an opportunity to demonstrate compliance so that their application can ultimately be approved, when appropriate, based on more complete information. *Id.* If additional information is needed, ATF will send a letter to the applicant requesting such information. *Id.* Once the necessary information is received, ATF then works expeditiously to resolve the application as soon as practicable, and typically within 90 days. *Id.*

In the event the maker of a firearm wishes to challenge the assessment of the NFA's tax against him, the Internal Revenue Code provides an administrative process to address that claim.

The maker can file a claim for refund or credit with the Attorney General after submitting an application and paying the applicable tax within the applicable limitations period. *See* 26 U.S.C. § 6511; 26 C.F.R. § 301.6402-2; 27 C.F.R. § 479.172. Only after those administrative remedies are exhausted can the maker then challenge the result in United States District Court, if necessary. *See* 26 U.S.C. § 7422 (civil actions for refund)*.*

## II.    Definition of Making Silencers for Purposes of the National Firearms Act

The NFA defines "make" to mean "manufacturing (other than by one qualified to engage in such business under this chapter), putting together, altering, any combination of these, or otherwise producing a firearm." 26 U.S.C. § 5845(i).[3]

For purposes of the NFA, the term "firearm" includes, *inter alia*, "any silencer." 26 U.S.C. § 5845(a). "Silencer" is defined to include "any device for silencing, muffling, or diminishing the report of a portable firearm," as well as "any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." 18 U.S.C. § 921(a)(24). A person who acquires a properly-registered silencer need not apply to "make" that same silencer. Rather, they must apply to have that silencer transferred to them. 26 U.S.C. § 5841 (requiring registration before silencer is manufactured or transferred); *see also* Stely Decl. ¶ 13.

Notwithstanding Plaintiffs' suggestion to the contrary, Compl. ¶ 58, the NFA's definition of "silencer" does not include each and every part that may be used to make a silencer (*e.g.*, screws, bolts, pipes, washers, etc.), nor does ATF interpret it as such. *See* 18 U.S.C. § 921(a)(24); Stely Decl. ¶ 12. Rather, the NFA only includes *combinations of parts* that are *designed and/or intended*

---

[3] The NFA expressly distinguishes between persons who make firearms for personal use, as opposed to "manufacturers." The term "manufacturer" means any person who is engaged in the business of manufacturing [silencers]." 26 U.S.C. § 5845.

to be used together for making silencers (i.e. so-called suppressor "parts kits"), or a part that has the objective design features and characteristics to be identified as a part intended *only* for use in assembling or fabricating a silencer (e.g., a baffle, baffle stack, monolithic baffle core, threaded end cap, etc.). *Id.* By contrast, materials commonly found at a hardware store (e.g., screws, bolts, pipes, washers, etc.), are not "intended only for use" in assembling or fabricating a silencer and, thus, they are not regulated by ATF as "silencers" because they have a legitimate use outside of that purpose. *Id.* It is only when a person possesses those items *and* plans to use them for the purpose of making a suppressor that a Form 1 must be submitted in order to register that would-be silencer.

III.    **ATF Response to Largescale Manufacture of Unlawful Silencer Parts Kits**

In late 2021, ATF became aware that a large number of silencer parts kits were being unlawfully manufactured and sold under the misleading label of "solvent traps" or "solvent trap kits." Stely Decl. ¶ 19. Although these kits were marketed as "solvent traps" and "solvent trap kits" (purportedly to be attached to the barrel of a firearm during cleaning in order to catch excess cleaning fluid), they were actually devices that functioned as silencers and had the design characteristics of silencers—not cleaning devices. *Id.* ¶ 20. After these "solvent traps" were properly classified as silencers, their manufacturers were told to cease and desist selling those kits, unless and until they were manufactured and sold in compliance with the NFA, and two "solvent trap" manufacturers had their websites seized. *Id.* ¶ 21.

In early January 2022, ATF began seeing Form 1 Applications submitted by persons seeking to "make" silencers using "solvent trap" kits or potentially similar devices. *Id.* ¶ 22. ATF determined that, because these kits contained all the parts to make a silencer, and are "designed or redesigned, and intended for use in assembling or fabricating a firearm silencer," they fell within the NFA's definition of "silencer." *Id.* (quoting 18 U.S.C. § 921(a)(24)). Because such "parts kits"

are already silencers in and of themselves under the NFA (whether assembled yet or not), those kits should have been registered *before* being manufactured, transferred, or sold; otherwise, they are possessed unlawfully. *Id.*; *see also* 26 U.S.C. § 5841 (requiring registration before silencer is manufactured or transferred). This meant that applications stating an intention to "make" silencers using those unregistered "parts kits" would need to be denied because doing so would place the would-be maker "in violation of the law." 26 U.S.C. § 5822. Having become aware of this widespread problem, on February 2, 2022, ATF paused action on all Form 1 applications that appeared to implicate unregistered parts kits—which consisted of approximately 2,958 applications—pending further review and analysis.  Stely Decl. ¶ 23.

In some cases, it was clear the applicant had purchased the parts kit from one of the manufacturers against which ATF had taken enforcement action; on February 28, 2022, disapprovals were issued to approximately 847 of those applicants. *Id.* In other cases it was unclear from where the parts kit originated or if it was even a kit, depending on the description of the firearm on the particular Form 1, *id.* ¶ 22; with respect to those unclear applications, ATF had to seek additional information in order to determine if the NFA's requirements were met. *Id.* ¶ 24. Accordingly, on March 3, 2022, ATF emailed a letter to approximately 2,111 Form 1 Applicants who utilized eForms, seeking additional information in the form of photos, schematics, product, model or kit name, if any, and the source from which the parts were obtained, *i.e.*, the name of the store or website. *Id.* On or about April 11, 2022, ATF mailed the same letter to approximately 175 paper applicants. *Id.* Ultimately, approximately 1,485 applications were approved after ATF received the requested additional information. The remaining 1,649 applications were disapproved, either based on additional information received or because the applicant did not

respond to the request for additional information. *Id.* This process took a little over three months; the final approval and denial letters were sent out on June 22, 2022. *Id.*

This large number of simultaneous requests for additional information and denials in February-April of 2022 were unique to this unusual situation, specifically the culmination of ATF's investigation into the large-scale manufacture of unlawful silencer parts known as "solvent traps." *Id.* ¶ 25.

## IV.  Texas House Bill 957 Purports to Exempt Suppressors Made for Personal Use in Texas from Some Federal Laws

Texas House Bill 957 ("HB 957") was passed on May 4, 2021, and went into effect on September 1, 2021. HB 957 purports to exempt firearms suppressors made for personal use in Texas from some federal firearms laws. In particular, Section 2.052 of the Texas Government Code now provides that neither "[a] firearm suppressor that is manufactured in this state and remains in this state" nor "[a] basic material from which a firearm suppressor is manufactured in this state" is "subject to federal law or federal regulation . . . under the authority of the United States Congress to regulate interstate commerce." Tex. Gov't Code § 2.052 (as amended).

HB 957 further states: "On written notification to the attorney general by a United States citizen who resides in this state of the citizen's intent to manufacture a firearm suppressor to which Section 2.052 applies, the attorney general shall seek a declaratory judgment from a federal district court in this state that Section 2.052 is consistent with the United States Constitution." Tex. Gov't Code § 2.054.[4]

---

[4] Before HB 957 went into effect, ATF issued an "Open Letter to All Texas Federal Firearms Licensees" on July 26, 2021, advising them that regardless of HB 957, all federal firearms laws and regulations continued to apply. *See* Compl., Ex. 4. The Open Letter further explained that "[t]his letter does not impose any new obligations. It merely confirms the continuing applicability of existing federal obligations." *Id.* at 1. Plaintiffs have not brought any claims purporting to challenge the Open Letter itself, nor could they do so in light of the fact that the Open Letter imposes no legal obligations. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (holding that a federal

10

## V.      Individual Plaintiffs' Stated Intention to Make Suppressors for Personal Use

None of the Individual Plaintiffs has filed an application to make a firearm suppressor, much less paid the applicable tax, been subject to any request for additional information from ATF and/or had their application denied.

Individual Plaintiffs have submitted three identical declarations in this lawsuit, each claiming that they "intend[] to manufacture a firearm suppressor to which section 2.052 of the Texas Government Code applies and ha[ve] notified the attorney general of that fact in writing." ECF Nos. 46-4 ¶ 2; 46-5 ¶ 2; 46-6 ¶ 2. Individual Plaintiffs further state that they "intend to personally manufacture a firearm suppressor for [their] own non-commercial, personal use." ECF Nos. 46-4 ¶ 2; 46-5 ¶ 2; 46-6 ¶ 2. They provide no description or details about the suppressors they intend to make, only that "the firearm suppressor[s] will be manufactured in [their] home[s] from basic materials." ECF Nos. 46-4 ¶ 2; 46-5 ¶ 2; 46-6 ¶ 2. Plaintiffs have offered no further information about what types of materials they intend to use, or even more generally what they mean by "basic materials."

### PROCEDURAL HISTORY

Plaintiffs filed this lawsuit on February 24, 2022. On April 26, 2022, Defendants filed a Motion to Dismiss, ECF 10. Upon consideration of Defendants' motion, Plaintiffs filed an Amended Complaint on May 17, 2022, ECF 11. After Defendants moved to dismiss the First Amended Complaint on June 15, 2022, ECF 18, Plaintiffs sought leave to amend their complaint again, ECF 21, which the Court granted, ECF 20. Plaintiffs filed their now-operative Second Amended Complaint on July 15, 2022. ECF 21.

---

agency action is only final, and thus subject to legal challenge, if it is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow'") (citation omitted)).

Plaintiffs' operative Complaint asserts a Second Amendment challenge to the NFA's tax requirements and related processes, and splits that claim into four parts: Count I seeks to enjoin the NFA's requirement that Texans submit an application in conjunction with paying a tax on the making of firearms suppressors; Count II seeks to enjoin the NFA's requirement that Texans pay a $200 tax on making firearms suppressors; Counts III and IV seek to enjoin the NFA's registration and marking steps associated with paying that tax.

On August 2, 2022, Defendants filed a motion to dismiss Plaintiffs' Second Amended Complaint, arguing that the Court lacks jurisdiction because Plaintiffs do not have standing and because the Anti-Injunction Act bars Plaintiffs' challenge to the NFA's tax scheme; Defendants also moved to dismiss because Plaintiffs' had failed to state a claim upon which relief may be granted. ECF 26. After full briefing, the Court denied the Motion to Dismiss on October 3, 2022. ECF 33. The Court's order did not address the merits of Defendants' motion, explaining that "[h]aving reviewed the Motion and the applicable law, the Court finds the arguments contained therein are more appropriately raised at the summary judgment stage of the proceedings." ECF 33. The Court subsequently determined that discovery is not appropriate in this case and issued a schedule for summary judgment briefing. ECF 45.

## LEGAL STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also DeMarco v. Bynum*, 50 F.4th 479, 481 (5th Cir. 2022).

## ARGUMENT

**I.    Summary Judgment Should be Granted for Defendants Because Plaintiffs Have Failed to Establish Standing.**

Because Plaintiffs have failed to establish the requisite cognizable injury to meet the

"irreducible constitutional minimum of standing," this case is not properly before the Court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, Plaintiffs must show that they have "suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* (citations omitted). "'The party invoking federal jurisdiction bears the burden of establishing' standing–and, at the summary judgment stage, such a party 'can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411-12 (2013) (quoting *Lujan*, 504 U.S. at 561).  Neither the Individual Plaintiffs nor Texas has met that burden.

A.   Individual Plaintiffs Lack Standing Because They Have Failed to Demonstrate a Cognizable Injury.

Individual Plaintiffs have failed to establish any concrete injury suffered as a result of the challenged laws. None of the Individual Plaintiffs claim to have submitted an application to make a firearm suppressor, much less an application that has been delayed or denied. Individual Plaintiffs also do not allege that they are ineligible to make a firearm suppressor generally, such that filing any application would be futile. Nor do they claim that they are unable to pay the $200 tax, or that the $200 tax payment itself has impeded their ability to make a silencer in any way. Pls.' Br. at 17-19.

Instead, Individual Plaintiffs speculate that some nondescript application they might file in the future could be denied, based on the unknown particulars of that application—*e.g.*, if ATF were to determine that the use of certain (unidentified) parts to make their hypothetical suppressor would place the applicant "in violation of the law." Pls.' Br. at 18. Individual Plaintiffs set forth no facts to establish why their applications to make suppressors would be denied. They do not even describe their proposed suppressors or their parts, attesting only that they intend to make them

13

"from basic materials," without more. ECF Nos. 46-4 ¶ 2; 46-5 ¶ 2; 46-6 ¶ 2. It is well-settled that such vague and theoretical allegations of future harm are insufficient to establish standing. *See Lujan*, 504 U.S. at 560; *see also Clapper*, 568 U.S. at 411-12 (holding that conclusory assertions without any "specific facts" are insufficient to establish standing at the summary judgment stage). Indeed, the Fifth Circuit has repeatedly held that concern regarding future denial of a firearm certification or registration is insufficient to demonstrate Article III standing. *See*, *e.g.*, *Westfall v. Miller*, 77 F.3d 868, 871-72 (5th Cir. 1996) ("Just because Westfall does not like the firearms regulation does not give him standing to complain about its legality. . . . [C]ompletion of the statutory procedure is necessary to establish Westfall's injury."); *Bezet v. United States*, 714 F. App'x 336, 340 (5th Cir. 2017) ("A plaintiff wishing to challenge [firearm] certification laws must generally exhaust his certification options before suing in federal court. Otherwise, his 'inaction' caused his own injury.") (citing *Westfall*, 77 F.3d at 872).[5]

Alternatively, Individual Plaintiffs argue that they have standing based on vaguely purported fears that submitting an NFA application could "expos[e] them[] to potential criminal prosecution on account of their [unlawful] possession of parts disclosed in the application." Compl. ¶ 131; *see also* Pls.' Br. at 17-18. But Plaintiffs have asserted no facts to explain why they would need to disclose possession of any unlawful materials in order to file an NFA application to make

---

[5] Because Plaintiffs have not engaged in the requisite administrative process of filing an application at all—much less one that was denied—their claims also are not ripe. *See Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (ripeness is a justiciability doctrine that prevents courts "from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.").

a suppressor.[6] And, regardless, Plaintiffs' assertion fails as a matter of law. As Plaintiffs recognize, ATF is statutorily barred from using information disclosed in NFA applications "directly or indirectly, as evidence against that person in criminal proceeding with respect to a violation of law occurring prior to or concurrently with the filing of the application or registration." Pls.' Br. at 11 (quoting 26 U.S.C § 5848(a)). In light of this statutory bar, there is no credible risk of prosecution based on what Individual Plaintiffs might choose to disclose in their hypothetical NFA applications. Indeed, Plaintiffs do not put forth any facts or cite a single case suggesting that any would-be maker has faced prosecution as a result of suppressor parts disclosed in their NFA application.[7]

Accordingly, Individual Plaintiffs lack Article III standing and this Court lacks jurisdiction over their claims.

**B.    Texas Lacks Standing Because it has Failed to Demonstrate a Cognizable Injury.**

Texas also lacks standing because it has failed to articulate any "legally protected" state interest that is harmed as a result of the NFA and its associated regulations, much less a "concrete and particularized" injury. Texas has not alleged any direct or concrete injury, nor is it in any immediate danger of such injury. Indeed, the NFA imposes no obligations on the State at all.

Instead, Texas claims standing to assert its general sovereign interest in regulating the

---

[6] Even if Individual Plaintiffs had set forth any facts to establish that they possess unregistered silencers, such as "parts kits" (which they have not), nothing in the NFA or its regulations requires them to disclose that fact in order to make a suppressor. Rather, regardless of what other materials Individual Plaintiffs happen to possess, they remain free to file an application and pay the tax to make a suppressor using *lawful* parts. No step in that process requires them to disclose their separate possession of other firearms or parts not related to that suppressor.

[7] Plaintiffs cite several examples of cases in which people have been prosecuted for illegal possession of firearm suppressors, all of which are beside the point. Pls.' Br. at 17 n.7. Review of Plaintiffs' examples confirms that none of those cases involved prosecutions that were based on or resulted from information disclosed in NFA applications. Rather, in each of those cases the defendants were caught in the act of buying, selling, or using unregistered silencers.

making of firearm suppressors within Texas "and in promoting the availability of firearms suppressors in Texas." Compl. ¶ 20. That is insufficient. A state's alleged harm to its abstract interest in its own sovereignty is not in itself a justiciable injury. *See Massachusetts v. Mellon*, 262 U.S. 447, 484-85 (1923); *New Jersey v. Sargent*, 269 U.S. 328, 337 (1926) (allegations that provisions of federal law "go beyond the power of Congress and impinge on that of the state . . . do not suffice as a basis for invoking an exercise of judicial power"); *Texas v. ICC*, 258 U.S. 158, 162-63 (1922) (state's claim of infringement upon state sovereignty was merely "an abstract question of legislative power," not a justiciable case or controversy). These decisions make clear that Texas's abstract assertion of "sovereign interest" does not give rise to a controversy under Article III; Texas is asking this Court "to adjudicate, not rights of person or property, not rights of dominion over physical domain, not quasi sovereign rights actually invaded or threatened, but abstract questions of political power, of sovereignty, of government." *Mellon*, 262 U.S. at 484.

Alternatively, Texas argues that "a state has a quasi-sovereign interest in the health and well-being—both physical and economic of its residents in general." Pls.' Br. at 16 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982)). Texas does not acknowledge that the language it quotes from *Alfred L. Snapp* addressed *parens patriae* standing, or the fact that the Supreme Court made explicit in the same case that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." 458 U.S. 610 n.16. It is well-settled that a state cannot, acting as "parens patriae, . . . institute judicial proceedings to protect citizens of the United States from the operation of [federal] statutes." *Mellon*, 262 U.S. at 485-86. Because citizens of a state are also citizens of the United States, "it is the United States, and not the state, which represents [its citizens] as parens patriae" and, thus, "it is no part of [a State's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government." *Id.* The

16

Supreme Court has repeatedly reiterated that *Mellon* "prohibits" a state from suing federal defendants "to protect her citizens from the operation of federal statutes." *Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007) (*Mellon* "prohibits" "allowing a State 'to protect her citizens from the operation of federal statutes"). Texas thus cannot bring this suit against the federal government on the theory that the NFA burdens or otherwise injures Texas's citizens.

While Texas states in a conclusory fashion that it "is not trying to protect its citizens from the operation of federal law," Pls.' Opp. at 25, the only purported "health and well-being" concern it identifies is an interest in protecting Texans from restraints on their ability to use suppressors— *e.g.*, in "protecting" citizens from enforcement of the NFA by the federal government. *Id.* That is just the type of standing theory proscribed by *Alfred L. Snapp.* In the end, Texas concedes that it is suing "to vindicate [its] quasi-sovereign interests in promoting" its policy in favor of the use of firearms suppressors." Pls.' Br. at 17.[8] That abstract assertion of sovereign interest is insufficient to establish Article III standing. *See Mellon*, 262 U.S. at 485.

---

[8] Texas does not—and cannot—purport to have standing based on HB 957, the State's recently-enacted law purporting to exempt firearms suppressors made in Texas from federal law. Rather, Texas characterizes HB 957 as "set[ting] out the State's policy in favor of the use of firearms suppressors and direct[ing] the Attorney General to vindicate Texas's *independently existing*" interests in promoting that policy. Pls.' Br. at 16 (emphasis added). In the absence of any independent, legally-cognizable interests, it is well-settled that Texas could not manufacture its own standing to challenge a federal law by simply passing a statute purporting to nullify it. HB 957 merely provides that certain firearms suppressors made in Texas are "not subject to federal regulation under the authority of the United States Congress to regulate interstate commerce." Tex. Gov't Code § 2.052(b). Under the Supremacy Clause, a state law purporting to nullify federal law "must yield." *Florida v. Mellon*, 273 U.S. 12, 17 (1927); *see also Helvering v. Davis*, 301 U.S. 619, 645 (1937). For this reason, Courts consistently recognize that a state has standing based on "federal interference with the enforcement of state law" only when "'the state statute at issue regulate[s] behavior or provide[s] for the administration of a state program' *and does not 'simply purport [] to immunize [state] citizens from federal law.'" Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) (emphasis added) (citing *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253 (2011)); *see also Texas v. Becerra*, No. 5:21-cv-300-H, 2021 WL 6198109, at *21 (N.D. Tex. Dec. 31, 2021) (also citing *Cucinelli* for this same principle).

C.   The Court Must Consider Whether Each Plaintiff Has Standing.

Because none of the plaintiffs in this case has standing, judgment should be granted for Defendants across the board. However, Plaintiffs also are wrong to insist that "if one plaintiff has standing, there is no need to consider whether other plaintiffs have standing." Pls.' Mem. at 19 (citing *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014)). The general rule Plaintiffs cite does not apply where inclusion of a party without standing would alter the scope of available relief. The Supreme Court has made clear that "standing is not dispensed in gross." *Town of Chester N.Y. v. Laroe Ests., Inc,*, 137 S. Ct. 1645, 1650 (2017). Rather, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Id.* (citation omitted). And "[t]he same principle applies when there are multiple plaintiffs. At least one plaintiff must have standing to seek each form of relief requested in the complaint." *Id.* at 1651.

Plaintiffs challenge the NFA's requirements as applied in Texas, and seek to enjoin those requirements statewide. *See* Compl., Counts I-IV & Prayer for Relief. Only Texas—not the Individual Plaintiffs—could conceivably have standing to seek a statewide injunction in this case. This is because an as-applied claimant asserts only that "*the acts of his that are the subject of the litigation fall outside what a properly drawn prohibition could cover.*" *Bd. of Trs. of State Univ. of New York. v. Fox*, 492 U.S. 469, 482 (1989) (italics in original); *see also Tineo v. Att'y General*, 937 F.3d 200, 210 (3d Cir. 2019) (as-applied challenge turns on plaintiff's "particular circumstances at hand"). Thus, without Texas as a party, any relief would necessarily be limited to an injunction preventing application of the NFA's requirements to the Individual Plaintiffs. Under these circumstances, even assuming *arguendo* that the Individual Plaintiffs have standing, Texas's lack of standing is relevant to the scope of any relief.

## II.     This Court Lacks Jurisdiction Because the Anti-Injunction Act Bars All of Plaintiffs' Claims.

Because this lawsuit seeks to enjoin the NFA's tax scheme, it is barred by the the Anti-Injunction Act. The AIA provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is [a] person against whom such tax [is] assessed." 26 U.S.C. § 7421(a). In other words, the AIA "withdraw[s] jurisdiction from the state and federal courts to entertain suits seeking injunctions prohibiting the collection of federal taxes." *Linn v. Chivatero*, 714 F.2d 1278, 1281 (5th Cir. 1983) (quoting *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 5 (1962)).

The Supreme Court has made explicit that the AIA's jurisdictional limitations apply even where, as here, plaintiffs raise a constitutional challenge:

> The "*decisions of this Court make it unmistakably clear that the constitutional nature of a taxpayer's claim . . . is of no consequence*" *to whether the prohibition against tax injunctions applies*. This is so even though the Anti-Injunction Act's prohibitions impose upon the wronged taxpayer requirements at least as onerous as those mandated by the refund scheme—the taxpayer must succumb to an unconstitutional tax, and seek recourse only after it has been unlawfully exacted.

*United States v. Clintwood Elkhorn Mining C*o., 553 U.S. 1, 10 (2008) (quoting *Alexander v. "Am. United" Inc.*, 416 U.S. 752, 759 (1974)) (emphasis added); *see also United States v. Am. Friends Serv. Comm.*, 419 U.S. 7, 11 (1974) ("Even though the remitting of the employees to a refund action may frustrate" the plaintiffs' First Amendment rights, "the bar of the Anti-Injunction Act is not removed."); *Linn*, 714 F.2d at 1282 (Plaintiff's "decision to cast his lawsuit in constitutional terms does not mean that the Anti-Injunction Act is inapplicable").

The AIA protects the "Government's need to assess and collect taxes as expeditiously as possible with a minimum of preenforcement judicial interference 'and to require that the legal right to the disputed sum[] be determined in a suit for refund.'" *Bob Jones Univ. v. Simon* 416 U.S. 735,

19

736-37 (1974) (quoting *Enochs*, 370 U.S. at 7). Thus, it is well-settled that the AIA is not limited to claims targeting the specific act of paying a levy, but rather also encompasses requests for an injunction that are aimed at "collection or assessment of [that] tax," particularly when they are part of an integrated tax scheme. *CIC Servs. LLC*, 141 S. Ct. at 1590 (citation omitted). Moreover, the AIA bars suits against a "tax rule" regardless of whether the "tax in question is a so-called regulatory tax—that is, a tax designed mainly to influence private conduct, rather than to raise revenue." *Id.* at 1593 (citing *Sonzinsky*, 300 U.S. at 513).

To determine whether a plaintiff's claims are barred by the AIA, courts assess whether the "primary purpose" of the lawsuit is to seek relief that would "restrain the collection of taxes or the collection of information that would aid in the assessment of taxes." *Linn*, 714 F.2d at 1282 (quoting *Bob Jones*, 416 U.S. at 738). When considering "a suit's purpose" the Court must "inquire not into a taxpayer's subjective motive, but into the action's objective aim—essentially, the relief the suit requests." *CIC Servs., LLC* 141 S. Ct. at 1589 (cleaned up). The AIA "kicks in when the target of a requested injunction is a tax obligation—or stated in the Act's language, when that injunction runs against the 'collection or assessment of a tax.'" *Id.* at 1590 (citation omitted).

As detailed below, this case falls squarely within the jurisdictional bar of the AIA because every aspect of the NFA that Plaintiffs seek to enjoin is an integral component of the statute's mechanism for imposing a tax obligation. And the narrow *Enochs* exception to the AIA that Plaintiffs invoke does not apply here.

A.      The AIA Bars This Case Because its Object is to Enjoin the Collection or Assessment of a Tax.

This case is barred in its entirety because its "primary purpose" is to seek relief that would restrain the "collection or assessment of [a] tax." *CIC Servs., LLC*, 141 S. Ct. at 1589 (citation omitted). Plaintiffs challenge the NFA's $200 tax on the making of a firearm suppressor (Count

20

II) and the NFA's application, registration, and marking requirements that aid in collection and enforcement of that tax (Counts I, III & IV). All four counts of Plaintiffs' Complaint seek to enjoin provisions of the NFA, which Plaintiffs concede "is a tax statute." Compl. ¶ 42; *see also Sonzinsky*, 300 U.S. at 511-13 (holding that the NFA is a lawful exercise of Congress's taxing power).[9]

Plaintiffs do not dispute that the AIA applies to the $200 tax payment imposed by the NFA, *see* Pls.' Br. at 19, nor could they. It is well settled that the AIA applies to excise taxes, *see Bob Jones*, 416 U.S. at 741, and that the levies imposed by the NFA are excise taxes. *See* 26 U.S.C. § 5821(a) ("There shall be levied, collected, and paid upon the making of a firearm [suppressor] *a tax* at the rate of $200 for each firearm made.") (emphasis added); *see also Sonzinksy*, 300 U.S. at 511-13. Plaintiffs instead break the NFA into parts, and ask the Court to rewrite the statute by eliminating its application, registration, and marking requirements. Compl. ¶¶ 129, 151. But the NFA's tax payment cannot be treated in isolation. Rather, the challenged requirements together make up the NFA's integrated "taxing scheme." *United States v. Cox*, 906 F.3d 1170, 1179 & n.12 (10th Cir. 2018) (finding that the NFA's process for collection of excise taxes and registration requirements are part of the statute's tax scheme); *id.* at 1183 n.12 (noting that "[o]ther circuits uniformly agree" that the NFA's requirements are "a valid exercise of Congress's taxing power," and listing cases). The Supreme Court has already held that the NFA's tax scheme regulates only

---

[9] In *Sonzinsky*, the Court considered whether the NFA's analogous tax scheme for firearms dealers was a constitutional exercise of Congress's taxing powers. The criminal defendant argued that the NFA's levy was not a true tax, "but a penalty imposed for the purpose of suppressing traffic in certain noxious type of firearms[.]"300 U.S. at 512. The Court held that "[e]very tax is in some measure regulatory . . . [b]ut a tax is not any the less a tax because it has a regulatory effect." *Id.* at 513-14. The Court further held that, since the measure operates as a tax, it is within Congress's taxing power and courts should not "speculate as to the motives which moved Congress to impose it." *Id.* The Supreme Court has consistently reiterated this principle. *See CIC Servs. LLC*, 141 S. Ct. at 1593 ("This Court has long since 'abandoned the view that brightline distinctions exist between regulatory and revenue-raising taxes.'") (quoting *Bob Jones*, 416 U.S. at 743 n.17).

"in aid of a revenue purpose." *Sonzinsky*, 300 U.S. at 513. Under this binding precedent, there can be no doubt that Plaintiffs' claims are barred by the AIA.

A closer look at the NFA's application, registration, and marking requirements confirms that those steps serve to aid in the assessment and collection of the tax. First, requiring application and approval to make a firearm, in conjunction with submitting the requisite tax payment, is merely the regulatory mechanism used to identify those who are required to pay the tax in the first place. *See generally Bezet v. United States*, 276 F. Supp. 3d 576, 618-19 (E.D. La. 2017). As set forth on the application form itself, the purpose of the information is to "verify payment of the tax imposed by 26 U.S.C. § 5821," and to confirm whether the applicant owes that tax because the firearm making can lawfully proceed. *Id*.[10] Thus, the NFA's application is not "a standalone reporting requirement" that exists independent of the tax, such that it would fall outside the purview of the AIA. *CIC Servs. LLC*, 141 S. Ct. at 1594.[11] Rather, the NFA directly levies a tax that flows directly from its application process. Indeed, use of the application process to assess the NFA's tax is

---

[10] Notably, if ATF determines that the applicant cannot make the requested firearm, and thus that no tax is owed, the applicant's $200 payment is returned. *See* 27 C.F.R. § 479.64.

[11] Plaintiffs incorrectly cite *CIC* for the broad proposition that "challenges to reporting requirements are not barred by the AIA." Pls.' Br. at 21. But *CIC* was far more limited. In *CIC*, the plaintiff challenged an IRS Notice that required reporting certain transactions, but did not raise any claim against the separate statutory tax that served as one way to enforce that reporting requirement. 141 S. Ct. 1590. The Court held that the AIA did not apply because the IRS's "standalone reporting requirement" was too attenuated from the separate statutory tax. *Id.* The Court made clear that "[h]ad Congress, or the IRS act[ing] through a delegation, imposed a tax on micro-captive transactions themselves—and had CIC then brought a pre-enforcement suit to prevent the IRS from applying that tax—the Anti-Injunction Act would have kicked in." *Id.* at 1594. The Court also made explicit that a "legal rule at issue is a tax provision" to which the AIA applies when "[t]he tax *does not backstop the violation of another law*" and instead "imposes a cost on perfectly legal behavior." *Id.* at 1593 (emphasis added). The result in *CIC* is clearly distinguishable from the facts at hand. Here, the NFA directly levies a tax, which flows directly from the statute's application requirement; and the NFA's tax is not a penalty, but rather is an excise tax that is assessed upon a person's *compliance* with the requisite process.

expressly required by the statute itself—a statute that Congress lawfully enacted pursuant to its taxing power. *See* 26 U.S.C. § 5822 ("No person shall make a firearm unless he has . . . filed with the [Attorney General] a written application, in duplicate, to make and register the firearm on the form proscribed"); *see also* Compl., Ex. 3 at 4 (NFA Form-1 statement that "[s]olicitation of this information is made pursuant to the National Firearms Act (26 U.S.C. §§ 5821 and 5822)").

Plaintiffs argue that the AIA does not apply to the NFA's application process because some applications are denied, which results in a tax obligation of $0. Pls.' Br. at 21 (arguing that denying an application is "an effort to *not* collect taxes"). Pls.' Br. at 20-21. But the AIA bars suit for the purpose of restraining "the assessment *or* collection of any tax." 26 U.S.C. § 7421(a) (emphasis added). Enjoining the NFA's application requirement would restrain the assessment of the tax that flows from the application process—regardless of whether Defendants' ultimate assessment is that no tax is owed. Indeed, that is why the only court to consider whether the AIA bars challenges to the NFA's tax scheme (including its application requirement) held that it did. *See Thompson/Center Arms Co. v. Baker*, 686 F. Supp. 38 (D.N.H. 1988).

Second, the NFA's registration and related marking requirements serve to aid ATF in its ability to enforce the applicable tax—a fact that both the Supreme Court and the Fifth Circuit have recognized. In *Sonzinsky v. United States*, the Supreme Court upheld the NFA's registration provisions as a constitutional exercise of Congress's taxing power, on the basis that those registration requirements are "obviously supportable as in aid of a revenue purpose." 300 U.S. at 513. Likewise, the Fifth Circuit has repeatedly upheld Congress's ability to enforce a tax through the promulgation of firearm registration requirements. *See, e.g.*, *Bezet v. United States,* 714 F. App'x 336, 342 (5th Cir. 2017) (holding that the registration requirement in Section 5822 of the NFA is "part of the web of regulation aiding enforcement of the . . . tax provision"); *United States*

*v. Gresham*, 118 F.3d 258, 263 (5th Cir. 1997) (holding requirement to register pipe bombs was "not a mere pretext for a police power, but is 'part of the web of regulation aiding enforcement of the [] tax provision'"); *United States v. Ardoin*, 19 F.3d 177, 188 (5th Cir. 1994) (holding requirements to register weapons can be constitutionally premised on Congress's taxing power); *United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972) (upholding penalty on possession of unregistered weapons under Congress's taxing power because "[s]uch a penalty imposed on transferees ultimately discourages the transferor on whom the tax is levied from transferring a firearm without paying the tax").

Accordingly, notwithstanding Plaintiffs' assertions to the contrary, Pls.' Br. at 19-23, every NFA provision and regulation they seek to enjoin serves the assessment and collection of a tax. Thus, Plaintiffs' claims are therefore barred by the AIA.

B.    The *Enochs* Exception to the AIA Is Narrow and Does Not Apply

Plaintiffs invoke the exception to the AIA set forth in *Enochs*, 370 U.S. 1 (1962), Pls.' Br. at 23-25, but that exception is narrow and does not apply. Under the two-part test set forth in *Enochs*, a pre-enforcement injunction against the assessment or collection of taxes may be granted only: (1) "if equity jurisdiction otherwise exists,"  meaning that irreparable harm would result if the case does not go forward; and (2) "if it is clear that under no circumstances could the Government ultimately prevail." *Enochs*, 370 U.S. at 7; *see also Bob Jones Univ.*, 416 U.S. at 748-49. "Unless both conditions are met, a suit for preventive injunctive relief must be dismissed." *Am. Friends Serv. Comm.*, 419 U.S. at 10 (quoting *Alexander*, 416 U.S. at 758). Plaintiffs cannot satisfy either prong of the *Enochs* test, much less both.

1.    *Equity Jurisdiction Is Not Implicated*

Equity jurisdiction is not implicated here because Plaintiffs cannot establish "irreparable injury and inadequacy of legal remedy." *Kemlon Prod. & Dev. Co. v. United States*, 638 F.2d

24

1315, 1321 (5th Cir. 1981). If this case is dismissed pursuant to the AIA, Individual Plaintiffs would not lack alternative means to litigate their claims. Rather, they can employ the appropriate administrative procedure, which is to file a claim for refund *after* submitting an application and paying the applicable tax within the limitations period, and thereafter to challenge the result in United States District Court, if necessary. *See* 26 U.S.C. §§ 6511, 7422; 26 C.F.R. § 301.6402-2; 27 C.F.R. § 479.172; *see also Thompson/Center Arms Co. v. Baker*, 686 F. Supp. 38 (D.N.H. 1988) (dismissing challenge to NFA's taxing provisions for firearms makers based on the AIA, and explaining appropriate alternative process for the challenge). Alternatively, in the event Individual Plaintiffs submitted an application to make a firearm and that application were denied (which there is no basis to conclude would happen based on the record before the Court), they could file a lawsuit challenging the denial at that time. Such a challenge would then take into account the reason for the denial and the effect of any alleged resulting injury. *See, e.g.*, *United States v. One Palmetto State Armory*, 115 F. Supp. 3d 544, 577 (E.D. Pa. 2015) (holding firearms maker had standing to challenge denial of NFA application to make a firearm).[12]

Nor can Plaintiffs claim irreparable harm based on a purported loss of Second Amendment rights. As discussed *infra* in Part III, no constitutional rights are implicated here because the Second Amendment does not apply. But, even assuming *arguendo* that constitutional rights were involved, the Supreme Court has made clear that "the constitutional nature of a taxpayer's claim, as distinct from its probability of success, is of no consequence under the Anti-Injunction Act."

---

[12] Nor can the Individual Plaintiffs claim irreparable harm based on their vague purported fear that submitting an NFA application could "expos[e] them[] to potential criminal prosecution on account of their [unlawful] possession of parts disclosed in the application." Compl. ¶ 131. As discussed *supra* in Part I.A, Plaintiffs neither explain what parts they possess, nor offer any explanation as to how or why they may have those parts illegally. Moreover, Plaintiffs do not allege facts suggesting that any would-be maker has faced or could face prosecution as a result of suppressor parts disclosed in their NFA application.

*Am. Friends Serv. Comm.*, 419 U.S. at 11 (quoting *Alexander*, 416 U.S. at 759). Under this precedent, any delay in Plaintiffs' ability to make a suppressor is insufficient to establish irreparable harm in this context. Comparison to First Amendment caselaw only confirms this point. Contrary to Plaintiffs' assertions, it is not "well settled that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury" *for purposes of the AIA.* Pls.' Opp. at 6 (quoting *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981)).[13] Just the opposite—the Supreme Court has applied this rule even where subjecting a plaintiff to the challenged taxation method would, in and of itself, *permanently* deprive the plaintiffs of access to First Amendment rights. *See American Friends Serv. Comm.*, 419 U.S. at 11 ("Even though the remitting of the employees to a refund action may frustrate their chosen method of bearing witness to their religious convictions, a chosen method which they insist is constitutionally protected, the bar of the [AIA] is not removed.").

Finally, Plaintiffs claim that "Texas is also irreparably harmed by delays to or prohibitions on Texans' ability to use firearm suppressors for the purpose of home defense" which it argues "run[s] counter to state policy favoring firearm suppressors." Pls.' Br. at 25. But, Texas has not identified any concrete harm to itself, such that the State requires an injunction on its own behalf. Rather, Texas's claims are entirely derivative of the injuries claims by individual Texans, specifically would-be makers of firearm suppressors and, in particular, the Individual Plaintiffs. *See supra* Part I.B. Texas has offered no explanation as to why the rights of individual Texans— and by extension its purported interest therein—cannot be addressed through the requisite NFA process described above. *See New York v. Mnuchin*, 408 F. Supp. 3d 399, 412 (S.D.N.Y. 2019)

---

[13] *Deerfield Medical Center* addressed the irreparable harm prong of the preliminary injunction standard in a case challenging an abortion restriction. 661 F.2d at 338. It had nothing to do with the AIA or the Second Amendment.

(explaining that the AIA would bar the state's claims if the state only sought "to assert the rights of their taxpayers—rights that the taxpayers could defend themselves in a refund action"); *Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol & Tobacco Tax & Trade Bureau*, 843 F.3d 810, 815 (9th Cir. 2016) (finding AIA barred tribe from bringing claims aimed at protecting its members because, *inter alia*, the members were incentivized to raise their own claims).

2.    *Plaintiffs Cannot Establish that the Government Is Unable to Prevail Under Any Circumstances.*

Because Plaintiffs cannot satisfy the first prong of *Enochs*, the narrow exception does not apply, and the Court need not address the merits to determine that this case is jurisdictionally barred under the AIA. *See Kemlon Prod.*, 638 F.2d at 1321 ("*Enochs* establishes two prongs, both of which must be satisfied.").

In any event, Plaintiffs also have not established that the United States is unable, under any circumstances, to ultimately prevail in this suit. For purposes of the *Enochs* exception, the Court need only determine whether the United States *could* succeed based on the "most liberal view of the law and the facts." *Kemlon Prod.*, 638 F.2d at 1321. In other words, Plaintiffs' Second Amendment claims need only be "sufficiently debatable to foreclose any notion that 'under no circumstances could the [United States] ultimately prevail.'" *Bob Jones*, 416 U.S. at 749. As detailed *infra* in Part III, if the Court were to reach the merits in this case, Defendants would be entitled to summary judgment. For the same reasons, and particularly given the extensive precedent supporting Defendants' positions, there can be no doubt that Defendants have a path to success under "most liberal view of the law."

27

III.    **Summary Judgment Should Be Granted for Defendants Because the Challenged Laws Are Constitutional.**

Even if the Court were to reach the merits in this case, summary judgment should be granted for Defendants because the NFA's tax scheme is plainly constitutional as applied to suppressors. To determine whether a law violates the Second Amendment, the Court must first determine whether the challenged law impinges upon a right protected by the text of the Second Amendment at the outset. *See Bruen*, 142 S.Ct. at 2130. As detailed below, every court to consider the issue—both before and after *Bruen*—has held that firearms suppressors are not protected by the Second Amendment, either because they are not "bearable arms" or because they are "dangerous and unusual." Nothing in Plaintiffs' motion justifies a departure from that unbroken precedent in this case.[14]

More broadly, the NFA's tax scheme also does not implicate the Second Amendment because it does not ban making silencers, but rather imposes ministerial requirements that are akin to the type of firearms licensing requirements that the Supreme Court and the Fifth Circuit have repeatedly upheld. And, even if the Second Amendment covered the laws at issue here, they are "consistent with the Nation's historical tradition of firearm[s] regulation," *Bruen*, S.Ct. 2130, and therefore do not run afoul of the Constitution.

---

[14] Rather than grapple with the extensive caselaw regarding suppressors and the NFA, Plaintiffs provide an eight-page footnote, cataloguing post-*Bruen* decisions that address *other* firearms and *other* laws not challenged here. *See* Pls.' Br. at 42-50. While the Court should focus on the abundant caselaw that directly applies to the questions at hand, it is worth noting that the majority of cases listed in Plaintiffs' footnote held the restrictions at issue to be constitutional in the wake of *Bruen.* If anything, Plaintiffs' catalogue only further confirms the salient point made in *Heller*, and reiterated in *Bruen*, that the Second Amendment does not provide "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Bruen*, 142 S.Ct. at 2128.

A.   <u>Firearm Silencers are Not Bearable Arms, So Their Use Is Not Protected by the Second Amendment.</u>

Under *District of Columbia v. Heller*, the Second Amendment extends only to "instruments that constitute bearable arms." 554 U.S. 570, 582 (2008); *Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016) (same). No court has ever held that a firearm suppressor is an "arm" within the meaning of the Second Amendment. In fact, every court to consider the issue has found that suppressors do *not* qualify as "bearable arms." *See, e.g., Cox*, 906 F.3d at 1186 ("A silencer is a firearm accessory; it's not a weapon in itself."); *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) (holding that silencers are not protected by the Second Amendment); *United States v. Stepp-Zafft*, 733 F. App'x 327, 329–30 (8th Cir. 2018) (on plain error review, finding no plain error where district court failed to dismiss unregistered silencer charge on Second Amendment grounds); *United States v. Saleem*, No. 3:21-cr-00086, 2023 WL 2334417 (W.D.N.C. Mar. 2, 2023) ("[S]ilencers] . . . are not firearms within the meaning of the Second Amendment but are instead firearm accessories that fall outside its protection."); *United States of Am. v. Royce*, No. 1:22-CR-130, 2023 WL 2163677, at *4 (D.N.D. Feb. 22, 2023) (holding that "there is no Second Amendment right to possess a silencer" because they "are not considered 'arms' within the meaning of the Second Amendment"); *United States v. Al-Azhari*, 2020 WL 7334512, at *3 (M.D. Fla. Dec. 14, 2020) (same); *Kaszycki v. United States*, No. C19-1943, 2020 WL 2838598, at *4 (W.D. Wash June 1, 2020) (same); *United States v. Hasson*, 2019 WL 4573424, at *4-5 (D. Md. Sept. 20, 2019) ("Silencers generally have no use independent of their attachment to a gun. They do not fire bullets on their own and do not contain a slide, trigger, firing pin, cartridge case, barrel, primer, or gunpowder."), *aff'd* 26 F.4th 610 (4th Cir. 2022).

As the Tenth Circuit explained in *Cox*, "[a]n instrument need not have existed at the time of the founding to fall within the amendment's ambit, but it must fit the founding-era definition of

an 'Arm[].'" 906 F.3d at 1186 (citing *Heller*, 554 U.S. at 581); *see also Bruen*, 142 S.Ct. at 2132

("[T]he Second Amendment's definition of 'arms' is fixed according to its historical

understanding[.]"). Consistent with this requirement, *Heller* explained that the historical

understanding of the term "arm" covers "[w]eapons of offence or armour of defence," or "any

thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike

another." 554 U.S. at 581 (citing two dictionaries from the eighteenth, and one from the nineteenth,

century). Courts have rightly held that, because suppressors are neither weapons nor "an armour

of defense," they fall squarely outside the historical definition of "arms" and are not within the

Second Amendment's "ambit." *Cox*, 906 F.3d at 1187; *see also Hasson*, 2019 WL 4573424 at *4

(collecting cases); *Al-Azhari*, 2020 WL 7334512 at *3 (adopting the historical analysis from *Cox*).

Nothing in *Bruen* calls those decisions into question. Rather, courts correctly looked to founding-

era definitions of the term "arms" in order to determine that suppressors are not covered—which

is the same "text-and-history" standard demanded by *Bruen.* 142 S.Ct. at 2138. Thus, it is

unsurprising that courts have continued to hold that suppressors are not "arms," and that they are

not subject to Second Amendment protection, in the months since *Bruen* was decided. *See Royce*,

2023 WL 2163677 at *4; *United States v. Al-Azhari*, 8:20-cr-206, ECF No. 280 (M.D. Fl. Oct 14,

2022) (denying motion to reconsider decision finding silencer is not a bearable arm within the

meaning of the Second Amendment based on *Bruen*).

Plaintiffs urge the Court to disregard this precedent, arguing that "whether a firearm

suppressor is or is not an 'arm' is not the issue." Pls.' Br. at 28. Plaintiffs' theory is that, because

suppressors may be used in conjunction with a protected weapon, the conduct of using a suppressor

is automatically covered by the Second Amendment. *Id.* at 28-20. Plaintiffs do not cite a single

case in support of this proposition with respect to suppressors, and indeed there is none. Instead,

courts have recognized that the Second Amendment does not cover anything and everything associated with using a protected firearm—rather, only what is "necessary to the exercise of the core Second Amendment right." *Hasson*, 2019 WL 4573424 at *4-5. And, "[a]lthough silencers may improve the usage of a firearm, they are not necessary, and they are therefore not protected by the Second Amendment." *Id.* at *5; *see also Saleem*, 2023 WL 2334417 at *10 (holding that silencers do not qualify for Second Amendment protection because "[t]he use of a silencer is in no way necessary to the effective use of a firearm—it certainly has benefits for the user, but unlike cleaning materials or bullets, a firearm can be used safely and effectively without a silencer.").

For these same reasons, Plaintiffs' attempt to draw a comparison between making suppressors and "when one goes to a firing range" or "when one uses ammunition" is inapt. Pls.' Opp. at 10. Unlike suppressors, the Seventh Circuit found that firing ranges are not "categorically unprotected by the Second Amendment" because "the right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011).[15] Similarly, courts have held that the Second Amendment covered ammunition because, unlike a restriction on making suppressors, "[a] regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose." *Jackson v. City and Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). By contrast, every court to apply this same standard to suppressors has reached the opposite conclusion. *See, e.g.*, *Hasson*, 2019 WL 4573424 at *5

---

[15] The *Ezell* Court also found that protection of the right to target practice (and by extension access to a firing range) had a historical basis in the Second Amendment. *Id.* at 405. By contrast, Plaintiffs cite to no similar historical analogue with respect to suppressors, which were not even invented until the Twentieth Century.

(holding that silencers are distinguishable from firing ranges and ammunition because "there is no evidence that silencers are 'so critical' to firearm ownership that firearms cannot be used effectively without them").

Because suppressors are not "arms" protected by the Second Amendment, the NFA does not implicate Plaintiffs' constitutional rights as applied to them, and summary judgment should be granted for Defendants.

B.    <u>Suppressors are Not Protected by the Second Amendment Because They Are Dangerous and Unusual</u>

Even if suppressors could be deemed "arms," they still would not implicate the Second Amendment because they are "not typically possessed by law-abiding citizens for lawful purposes," *Id*. at 625, and thus are considered "dangerous and unusual" based on historical tradition. *Heller*, 554 U.S. at 627. In *Bruen*, the Supreme Court reaffirmed *Heller's* holding that not all weapons are protected by the Second Amendment. *Bruen*, 142 S.Ct. at 2128 ("[T]he right [is] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."). Rather, there exists a "historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id*. at 2162 (quoting *Heller*, 554 U.S. at 626–27) (Kavanaugh, J., concurring); *United States v. Holton*, No. 3:21-CR-0482, 2022 WL 1670195 (N.D. Tx. Nov. 3, 2022) ("The Supreme Court in *Bruen* and *Heller* confirmed that [dangerous and unusual] weapons are not protected under the Second Amendment.").

Every court to consider the question has upheld silencer restrictions on the grounds that silencers are dangerous and unusual. See, *e.g., McCartney,* 357 F. App'x. at 76 ("[S]ilencers . . . are not 'typically possessed by law-abiding citizens for lawful purposes'" and are less common than either short-barreled shotguns or machineguns); *Saleem*, 2023 WL 2334417 at *11 ("[S]ilencers fall into the category of 'dangerous and unusual weapons' and are outside the scope

32

of the Second Amendment's protection."); *United States v. Perkins*, 2008 WL 4372821, at *4 (D. Neb. 2008) ("[S]ilencers/suppressors are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use.") (citation omitted).

Indeed, firearms suppressors were perceived as "not typically possessed by law-abiding citizens for lawful purposes" almost immediately after their invention, and they were quickly used to facilitate crimes. *See* Robert J. Spitzer, Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers, 83 L. & Contemp. Probs. 231, 246-49 (2020). The silencer was invented in the early 1900s and patented in 1908. *Id.* at 246. "Objections to civilian use of silencers appeared almost immediately." *Id.* By 1909, Maine became the first state to ban the sale or possession of silencers, and New Jersey followed two years later. *Id*. at 247. The primary concern underlying the unregulated possession of suppressors was crime that would be committed by both typical criminals and hunters/poachers. *Id.* "From 1909 to 1936, at least fifteen states enacted silencer restrictions," including Arizona, Louisiana, Michigan, North Carolina, Pennsylvania, and Wyoming. *Id.* at 248, n.123. Ultimately, the inventor of the silencer and his company "discontinued manufacturing silencers because of the popular impression that this invention was an aid to crime." *Id*. at 248 n.125 (Maximum Bans Gun Silencer, N.Y. TIMES, May 8, 1930, at 27).

The dangerousness of silencers is further affirmed by Congress's decision to include them in the NFA. "It is . . . clear from the face of the Act that the NFA's object was to regulate certain weapons likely to be used for criminal purposes . . . ." *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992); *see also* H.R. Rep. No. 1337, 83d Cong., 2d Sess., A395 (1954) (indicating "congressional intent to cover under the National Firearms Act only such modern and

lethal weapons . . . as could be used readily and efficiently by criminals and gangsters"); *see also United States v. Aiken*, 974 F.2d 446 (4th Cir. 1992) (explaining that purpose of the NFA is to tax and regulate "certain specially dangerous and concealable weapons."). By including silencers within the NFA's ambit, and then later expanding the statutory definition of silencers to encompass combinations of parts or parts kits, *See* Pub. L. No. 99-308, § 109(b), 100 Stat. 449, 460 (1986), "Congress determined silencers are 'modern and lethal weapons' that are 'likely to be used for criminal purposes.'" *Saleem*, 2023 WL 2334417 at *11. Based on this legislative history, another judge on this Court recently held that the NFA is "a statute regulating dangerous and unusual weapons." *Holton*, 2022 WL 16701935 at *3.

Plaintiffs ask the Court to disregard the history demonstrating dangerousness of suppressors, on the theory that they have been "infrequently used in criminal activity" in more recent years. Pls.' Br. at 3-4 (citing data from 2017). But a lower rate of suppressor use by criminals today may simply indicate that Congress's attempt to deter the unlawful use of silencers has succeeded. And, in any event, suppressors continue to be used to commit dangerous crimes in modern society. For example, in 2019, a gunman used a handgun with a silencer attached to kill twelve people and injure four people in Virginia Beach. Violence Pol'y Ctr., Silencers: A Threat to Public Safety, at 3 (July 2019), *available at* https://www.vpc.org/studies/silencers.pdf. And, over the last decade, silencers also have been used by criminals seeking to avoid detection when committing robberies, drug trafficking, terrorist plots, gang-related and other murders, and hate crimes, among other things. *Id.* at 3-7. This is unsurprising, given that the purpose of a suppressor is to muffle the sound of a gun, which makes it easier for a perpetrator to avoid detection. As courts have recognized in other contexts, firearm features that help to conceal a weapon may render that weapon increasingly dangerous. *See, e.g., Thompson/Center Arms Co.*, 504 U.S. at 517

34

(emphasizing the regulation of short-barreled rifles because they are "concealable weapon[s]" that are thus likely to be used for criminal purposes); *Cox*, 906 F.3d at 1185 (holding that "possession of short-barreled rifles falls outside the Second Amendment's guarantee," given dangerousness of such weapons, because their "concealability fosters [their] use in illicit activity").

Nor are suppressors "typical" (*i.e.,* common or usual), as Plaintiffs suggest. *See* Pls.' Br. at 30. In *Hollis v. Lynch*, the Fifth Circuit identified the "wide variety in methodological approaches" that may be used to determine "usualness"—including, the "total number" of the particular weapon in the United States, the "percentage and proportion" of the particular weapon relative to that total number, and consideration of the number of jurisdictions in which the particular weapon is banned or limited. 827 F.3d at 449. Suppressors are not common by any of these metrics.

First, as Plaintiffs lay out, there are approximately 2.6 million firearm suppressors in the United States, Pls.' Br. at 30; that total number of suppressors falls far short of the requisite threshold for "common use" that has been recognized by the Fifth Circuit. *See Hollis*, 827 F.3d at 449–50 (comparing number of machine guns to "50 million large-capacity magazines" in use, or the "more than 8 million AR- and AK-platform semi-automatic rifles").

Second, to the extent "[p]ercentage analysis may also be relevant," the number of suppressors relative to the total number of firearms in the United States is "quite low." *Id.* at 449-50. Conservatively estimating that there are approximately 400 million civilian-owned firearms in the United States,[16] the number of silencers (2.6 million) amounts to less than one percent of that amount (0.65%).

---

[16] *See* Christopher Ingraham, *There are More Guns than People in the United States, According to a New Study of Global Firearm Ownership,* The Washington Post, (June 19, 2018 at 10:31am EDT), *available at* https://perma.cc/LNE7-8TZQ (citing 2018 study estimating 393 million civilian-owned firearms in the United States). Total current firearm ownership is likely far higher than 400 million, as consumers have purchased nearly twenty million firearms *per year* in recent

But, even if the raw numbers associated with suppressor ownership were deemed relatively high compared to other weapons, that alone would be insufficient to establish "usualness." *See id.* at 449. In *Hollis*, the Fifth Circuit looked to Justice Alito's concurring opinion in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), which suggested that the evaluation involves, at the very least, looking to the "absolute number" of weapons at issue "*plus*" the number of states where the firearm "may be lawfully possessed." *Hollis*, 827 F.3d at 449–50 (emphasis in original). While the Supreme Court found that 200,000 stun-guns in *Caetano* did not render them unusual, *Hollis* explicitly rejected the argument that the "absolute number [of firearms] by itself was sufficient" in *Caetano* to determine usualness. *Hollis*, 827 F.3d at 450. Rather, the Fifth Circuit also looked to the number of states in which machine guns could be "lawfully possessed." *Id*. Specifically, the Court added together states in which machine guns were "entirely ban[ned]," and states where machine guns are banned "unless the weapon is legal under federal law." *Id*. Concluding that 34 states "prohibit possessing machineguns," the Fifth Circuit found this to be further support that machine guns are unusual. *Id*. Similarly here, the majority of states have severely restricted possession of suppressors. Eight states and the District of Columbia ban suppressors entirely, even when they are legal under federal law.[17] An additional eighteen states ban suppressors unless they

---

years. *See* Joe Walsh, *U.S. Bought Almost 20 Million Guns Last Year — Second-Highest Year On Record*, Forbes (Apr. 14, 2022 at 2:05pm EDT), *available at* https://perma.cc/TVS8-NNVW (citing estimates that 19.9 million firearms were purchased in 2021 and 22.8 million were purchased in 2020).

[17] *See* Cal. Penal Code § 33410-15; Del. Code. Ann. Tit. 11 § 1444; Haw. Rev. Stat. §§ 134-8 & 134-11; 720 I.L.C.S. 5/24-1(a)(6); Mass. Gen. Laws. Ann. Ch. 269 § 10A; N.J. Stat. Ann. § 2C:39-3(c); New York, N.Y. Penal Law § 265.02(2); R.I. Gen. Laws § 11-47-20.

are legal under federal law.[18] And out of the remaining 24 states, some still have other restrictions affecting or limiting suppressor possession.[19]

Accordingly, because suppressors are both dangerous and unusual, they fall outside the ambit of the Second Amendment. Summary judgment should be granted for Defendants.

C.     The NFA's Tax Scheme Does Not Infringe the Second Amendment

Even putting aside that suppressors are not protected, more broadly, the NFA's tax scheme does not infringe the Second Amendment. The NFA does not ban making firearms (e.g., silencers), but rather permits the making when its application, payment, and registration requirements are met. These ministerial hurdles cannot amount to a constitutional violation. On the contrary, as the Fifth Circuit has explained, similar firearm licensing requirements such as being "photographed and fingerprinted" do not harm any a legally-protected interest, and are "merely 'additional costs and logistical hurdles' that all citizens bear as ancillary to living under a government." *Bezet*, 714 F. App'x 336, 340 (5th Cir. 2017); *see also Lane v. Holder*, 703 F.3d 668, 672–73 (4th Cir. 2012) (finding no injury from "additional costs and logistical hurdles" in purchasing handguns, distinguishing laws imposing "minor inconveniences" from those amounting to "an absolute deprivation" of the right to bear arms).

As Justice Kavanaugh reiterated in his *Bruen* concurrence, 43 states employ concealed-carry licensing regimes that may demand "fingerprinting, a background check, a mental health

---

[18] *See* Alaska Stat. § 11-61-200(h); Ariz. Rev. Stat. § 13-3101(8)(a)(ii); Conn. Gen Stat. § 53a-211; Ga Code Ann. §§ 16-11-122 & 16-11-124; Kan. Stat. Ann. § 21-6301; Mich. Comp. Laws § 750.224; Miss Code Ann. § 97-37-31; Mo. Rev. Stat. § 571.020; Mont. Code Ann. § 45-8-337; Nev. Rev. Stat. § 202.350; N.D. Cent. Code § 62.1-05-01; N.C. Gen. Stat. § 14-288.8(c)(3); Ohio Rev. Code Ann. § 2923.17(C)(5); Or. Rev. Stat. § 166.272; 8 Pa. Cons. Stat. § 908; S.D. Codified Laws § 22-14-6; Wash. Rev. Code §§ 9.41.250 & 9.41.251; Wis. Stat. § 941.298.

[19] *See, e.g.*, Colo. Rev. Stat. § 18-12-102 (requiring permitting and licensing for silencer possession); N.H. Rev. Stat. Ann. § 207:4(1) (outlawing hunting with a silencer unless issued a permit).

37

record check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." 142 S.Ct. 2111, 2162 (2022) (Kavanaugh, J., concurring). These licensing regimes, which use "objective licensing requirements," impose no Second Amendment violation. *Id*. The majority's opinion took pains to explaining that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of such licensing regimes. *Id.* at 2138 n.9. ATF's application process likewise involves features that posed no constitutional problem in *Bruen*, such as fingerprinting and a background check. If such procedures create no constitutional infirmity when employed by state governments, the same holds true for federal registration. *Accord Or. Firearms Fed'n, Inc. v. Brown*, No. 2:22-CV-01815-IM, 2022 WL 17454829, at \*15 (D. Or. Dec. 6, 2022) (holding constitutional, under *Bruen*, state firearms permit requirement that includes a "background check, fingerprinting, a mental health check, and training in firearms").

Likewise, the registration and marking requirements that are ancillary to the NFA's application and taxing process, *see supra* Part II.A, do not infringe on any individual's Second Amendment rights because they "do not impair the use or functioning of a weapon in any way[.] . . . [A] person is just as capable of defending himself with a marked firearm as with an unmarked firearm." *Holton*, 2022 WL 16701935 at \*4 (holding that the Gun Control Act's prohibition against possessing firearms with removed serial numbers does not regulate conduct protected by the Second Amendment because "it does not infringe on an individual's right to bear arms for self-defense") (citation omitted); *see also United States v. Tita*, 2022 WL 17850250 (D. Md. Dec. 22, 2022) (same); *United States v. Reyna*, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) (same).[20]

---

[20] While one other district court held this same law unconstitutional, *United States v. Price*, 2022 WL 6968457 (S.D.W.Va. Oct. 12, 2022), another judge on this Court expressly declined to follow the *Price*'s interpretation and then held the opposite in *United States v. Holton*, 2022 WL 1670193 (N.D. Tex. Nov. 3, 2022).

While the *Bruen* Court left open the possibility that otherwise constitutional licensing regimes might infringe Second Amendment rights, namely where registration requires "lengthy wait times" or "exorbitant fees" which effectively "deny ordinary citizens their right to public carry," *Bruen*, 142 S.Ct. at 2138 n.9, Plaintiffs cannot show that any such extraordinary circumstances are present here. ATF's current estimated processing times for NFA applications, which Plaintiffs themselves reference, state that the average processing time is 45 days for paper submissions and 30 days for efiled submissions. Pls.' Br. at 10 (citing *Current Processing Times*, ATF, atf.gov/resource-center/current-processing-times).

Similarly, Plaintiffs cannot contend that the $200 tax is "exorbitant" such that it prohibits them from compliance with the NFA's tax scheme. Plaintiffs do not allege that payment of this amount will impose any financial hardship at all, let alone that the amount is so significant that they are effectively denied their right to make a suppressor. Indeed, this exact tax has remained constant since the NFA was enacted in 1934.

To the extent that Plaintiffs argue the Second Amendment is violated whenever *any* tax or fee is required in firearm licensing, Pls.' Br. at 36-37, that position would threaten every state and federal licensing or registration requirement where a tax or fee is involved. Such a position is precluded by *Bruen*, given that the very licensing regimes whose unconstitutionality was not even "suggest[ed]" frequently require the payment of some amount of money. *See, e.g.,* La. Rev. Stat. Ann. § 40:1379.3 (H)(2) (West Cum. Supp. 2022) ($25 fee per year); Miss. Code. Ann. § 45-9-101 (5)(c) (2022) ($80 license fee); Tex. Gov't Code Ann. § 411.174(a)(6) (West Cum. Supp. 2021) ($40 application and license fee); *see also Bruen*, 142 S.Ct. at 2123 nn. 1, 9 (listing state laws regulating concealed-carry licenses).

By contrast, Plaintiffs' reliance on *Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105 (1943), is misplaced. Pls.' Br. at 36-37. *Murdock* does not stand for a *per se* rule that the Government cannot tax firearms; in fact, it had nothing to do with firearms or the Second Amendment at all. Rather, *Murdock* struck down a licensing fee for religious canvassing on First Amendment grounds because—in stark contrast to the NFA—it was "not a nominal [fee], imposed as a regulatory measure and calculated to defray the expense" of regulating the activities in question. 319 U.S. at 113-14. Neither the Fifth Circuit nor the Supreme Court has extended *Murdock* to the Second Amendment context. Some courts have expressly declined to do so. *See United States v. Bolatete*, 977 F.3d 1022, 1036 (11th Cir. 2020) (on plain error review, declining to extend *Murdock* to the Second Amendment context because "[t]he absence of [binding precedent] rules out a holding that" the failure to do so was erroneous). And, even courts that have imported *Murdock* into their Second Amendment analyses nonetheless have upheld the restrictions at issue under that standard. *See Bauer v. Becerra*, 858 F.3d 1216, 1226 (9th Cir. 2017) (fees supporting background check program "can fairly be considered an 'expense[] of policing the activities in question' or an 'expense incident to . . . the maintenance of public order in the matter licensed'") (citation omitted)); *Kwong v. Bloomberg*, 723 F.3d 160, 165 (2d Cir. 2013) (finding $340 fee for residential handgun licensing permissible).

Finally, Plaintiffs are wrong to argue that "last year, Defendants put the application process toward abusive ends" by seeking additional information from certain applicants upon receiving their Form 1 applications to make suppressors. Pls.' Br. at 37-39 (citing *Bruen*, 142 S.Ct. at 2138 n.9).[21] Plaintiffs contend that, by seeking follow-up information from some applicants, ATF

---

[21] Notably, Plaintiffs do not—and could not—argue that ATF has "abused the process" by improperly denying any applications to make suppressors. ATF has only denied applications to make suppressors where "the making or possession of the [silencer] would place the person

exceeds its statutory and regulatory authority, and is "just mak[ing] up a 'process' of indeterminate length." *Id.* On the contrary, ATF only seeks additional information from applicants when it is warranted by the statute—that is, when a particular application contains insufficient information for the agency to determine whether it can be approved and taxed in accordance with the NFA's requirements. Stely Decl. ¶¶ 15, 22-24. Because the NFA mandates that ATF must deny an application when making the proposed suppressors would "place the person making the firearm in violation of the law," 26 U.S.C. § 5822, this step is wholly consistent with—indeed necessary for—ATF's exercise of its statutory obligations.[22] Indeed, rather than simply deny unclear applications for failure to meet NFA's requirements, ATF seeks clarifying information from such applicants solely for the purpose of givinng them further opportunity to demonstrate compliance—*so that their application can ultimately be approved*, when appropriate. *Id.* And, once ATF receives the additional information it needs to make a determination, it moves as expeditiously as possible to resolve the application. *Stely* Decl. ¶¶ 15, 22-24. There is, thus, nothing abusive about ATF's approach, which is designed to maximize access under the statute, not to limit it.

For these reasons, the NFA's tax scheme does not prevent "law-abiding, responsible citizens" from exercising their Second Amendment rights, *Bruen*, 142 S.C.t at 2138 n.9, and summary judgment should be granted for Defendants.

---

making the firearm in violation of the law," Stely Decl. ¶¶ 9-11, 13-14, 22-24, which is what is required by the NFA. 26 U.S.C. § 5822.

[22] Plaintiffs repeatedly assert that Defendants "have no authority" to seek additional information under the statute. Pls.' Br. at 38. For the reasons set forth above, Defendants' interpretation of their statutory authority is plainly reasonable here. But, in any event, any questions about the scope of the agency's authority are not properly before this Court. Plaintiffs have not brought any claims challenging Defendants' interpretation of the NFA under the Administrative Procedure Act, which would be the appropriate vehicle for such claims. *See* 5 U.S.C. § 706(2)(C). This case only raises Second Amendment challenges to the NFA's tax scheme.

D.     Regulating the Possession of Silencers is Consistent with the Nation's Historical Tradition of Firearm Regulation.

Even if suppressors *and* the NFA's tax scheme were covered by the Second Amendment, such that the right to bear "arms" were implicated here, the challenged laws would still pass constitutional muster. The NFA does not "require applicants to show an atypical need" for a suppressor, nor does it otherwise "prevent 'law-abiding, responsible citizens,'" from making a suppressor. *Bruen*, 142 S.Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). Rather, the NFA is a longstanding tax statute that has been in place for nearly a century. As both the Supreme Court and the Fifth Circuit have recognized, "'longstanding, presumptively regulatory measures' likely implicate no Second Amendment rights." *Bezet*, 714 F. App'x at 336 (quoting *Heller*, 554 U.S. at 627) (cleaned up). That is especially true here, where the Supreme Court has already upheld other analogous sections of the NFA as a valid exercise of the taxing powers. *Sonzinksy*, 300 U.S. at 514.[23] And, the challenged laws rest upon centuries of similar taxation and registration requirements.

Where a law affects the Second Amendment, the Government may justify the law "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."

---

[23]By contrast, Defendants are not aware of any case holding the NFA's making requirements unconstitutional based on the Second Amendment or on any other basis. Indeed, the Fifth Circuit previously upheld the NFA's making requirement even in the context of actual "arms" (as opposed to suppressors), albeit based on the means-end scrutiny standard that the Supreme Court has since abrogated in *Bruen. See Bezet v. United States*, 714 F. App'x 336 (5th Cir. 2017). While no court has yet had the opportunity to examine the NFA's making requirements based specifically on *Bruen's* "historical tradition" standard, courts have upheld other provisions of the NFA post-*Bruen* on other grounds. *See, e.g.*, *United States v. Hoover*, No. 3:21-cr-22(S3)-MMH-MCR, 2022 WL 10524008, at *1-2 (M.D. Fla. Oct. 18, 2022) (rejecting post-*Bruen* constitutional challenge to NFA's requirements for unregistered machineguns because machineguns are "dangerous and unusual"); *United States v. Rush*, No. 22-cr-40008, 2023 WL 403774 at *3 (S.D. Ill. Jan. 25, 2023) (rejecting post-*Bruen* constitutional challenge to NFA requirements for short-barreled rifles because they are "dangerous and unusual").

*Bruen*, 142 S.Ct. at 2130. The Government may do so by pointing to "a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 2133. To be analogous, historical and modern firearms regulations must be "relevantly similar," meaning that they impose a "comparable burden" on the right of armed self-defense that is "comparatively justified." *Id.* at 2132-33. This historical analysis can be "nuanced," and it is important to account for the fact that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132.

From colonial times, state and local governments have routinely exercised their authority to regulate the possession and manufacture of firearms, through taxation, registration, licensing, and similar requirements. Indeed, colonial and early state governments regularly sought to gather information regarding firearm ownership in their jurisdiction. As early as 1631, Virginia required a regular survey of people in the colony and "also of arms and munition."[24] Likewise, door-to-door surveys of firearms were authorized in Rhode Island in 1667, South Carolina in 1747, and New Jersey in 1781.[25] In a similar vein, militia members in Massachusetts (1775) were required to have their firearms inspected, with an official record documenting all such inspections, and New

---

[24] Act of Mar. 2, 1631, act LVI, 1631 Va. Acts 175.

[25] *See Records of the Colony of Rhode Island and Providence Plantations, In New England*, 2:196 (John Russell Bartlett, ed., Providence: A. Crawford Greene and Brother vol. 2, 1857); "An Act for the better regulating of the Militia of this Province," 1747, McCord, *Statutes at Large*, 9:647; Act of Jan. 8, 1781, ch. XII, § 13, 1781 N.J. Laws 39, 43. *See also* Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment," 25 Law & Hist. Rev. 139, 161-62 (2007) (discussing the colonial militia practice of surveying firearms owned by members of the community).

York (1778) imposed similar requirements.[26] In 1805 Massachusetts required that all musket and pistol barrels manufactured in the state and offered for sale be "proved" (inspected and marked by designated individuals) upon payment of a fee, to insure their safe condition, and Maine enacted similar requirements in 1821.[27] Licenses or inspection were also required in certain states to export or sell gunpowder (akin to modern ammunition), such as in Massachusetts (1651, 1809), Connecticut (1775), and New Hampshire (1820).[28] South Carolina authorized the issuance of licenses for the sale of pistols (1890).[29] And personal firearm licenses for sporting purposes were required in Hawaii (1870) and Wyoming (1899).[30]

Further, Plaintiffs' assertion that there is no "historical tradition" of taxes on firearms, Pls.' Br. at 35, is belied by multiple historical statutes. In 1759, New Hampshire required that certain

---

[26] 1775-1776 Mass. Acts 18; Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65.

[27] Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, 259-61 (1807); Laws of the State of Maine 546 (1830).

[28] Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890); 2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822, 199 (1823); 15 The Public Records of the Colony of Connecticut 191 (1890); Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed 277 (1830).

[29] An Act to Provide a License for the Sale of Pistols or Pistol Cartridges within the Limits of this State, § 1, 1890 S.C. Acts 653.  Arkansas (1881) prohibited the sale or exchange of most pistols. Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191, 191 (codified at Ark. Code. Ann. ch. 48 § 1498 (1894)).  Other states, including Texas (1871), Kansas (1872), Wyoming (1875), and Tennessee (1879), enacted prohibitions or other restrictions on the carrying of pistols. *See* Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25, 25 (codified at 1879 Tex. Crim. Stat. 24); Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210, 210 (codified at Kan. Gen. Stat. § 1003 (1901)); Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352, 352; Act of Mar. 26, 1879, ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231, 231.

[30] An Act to License the Carrying of Fowling Pieces and other Fire-Arms, 1870 Haw. Sess. Laws 26, §§ 1-2; Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27, 32–33.

44

ships pay a tax of money or gunpowder.[31] Taxes on firearms specifically were common through the 19th century. Indeed, taxes were specifically levied on pistols and in some instances certain other firearms, in Alabama (1867), Mississippi (1844, 1867), North Carolina (1857), and Georgia (1866).[32]

Taken together, the above laws illuminate an unbroken historical tradition of American firearm regulation "relevantly similar" to that required by the NFA. *Bruen*, 142 S.Ct. at 2133. Like colonial and state laws in the 17th, 18th, and 19th centuries, the modern NFA and its corresponding regulations seek to raise revenue through taxation, regulate but do not prohibit firearm ownership, and gather information on firearms and their owners in a given jurisdiction. Accordingly, any modest burden imposed by the NFA's tax scheme is certainly "comparable" and "comparably justified" to the numerous historical laws listed above. Given this history and tradition, there is no constitutional violation and Plaintiffs' claims fail as a matter of law.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be denied and summary judgment should be granted for Defendants.

---

[31] An Act About Powder Money, 1759-1776 N.H. Laws 63; Pennsylvania similarly imposed a taxation, testing, and grading regime for all gunpowder to be sold in Philadelphia. *See* The Statutes at Large of Pennsylvania, ch. 1857, §§ 1-12, 346-51 (James T. Mitchell & Henry Flanders comps. 1911).

[32] Joseph Abram Walker, The Revised Code of Alabama 169 § 10, (Reid & Screws, State Printers, 1867); Act of Feb. 24, 1844, ch. 1, § 1, 1844 Miss. Laws 57-59; Act of Feb. 21, 1867, ch. CCCXVII, §§ 1-8, 1867 Miss. Laws 412; Revenue, ch. 34, § 23(4), 1857 N.C. Sess. Laws 34; County Bonds, Taxes, Etc. tit. VI, 1866 Ga. Laws 27-28.

DATED: March 13, 2023                Respectfully submitted,

                                     BRIAN M. BOYNTON
                                     Principal Deputy Assistant Attorney General
                                     Civil Division

                                     LESLEY FARBY
                                     Assistant Branch Director

                                     */s/ Emily B. Nestler*
                                     EMILY B. NESTLER (D.C. Bar # 973886)
                                     Trial Attorney
                                     United States Department of Justice
                                     Civil Division, Federal Programs Branch
                                     1100 L Street, NW
                                     Washington, D.C. 20005
                                     Tel: (202) 305-0167
                                     Email: emily.b.nestler@usdoj.gov

                                     *Counsel for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

On March 13, 2023, I electronically submitted the foregoing with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


*/s/ Emily B. Nestler*

EMILY B. NESTLER