# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| KEN PAXTON, in his official capacity as | § | |
| Attorney General of Texas, | § | |
| DAVID SCHNITZ, | § | |
| TRACY MARTIN, and | § | |
| FLOICE ALLEN, | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Civil Action No. 4:22-cv-00143-P |
| | § | |
| STEVEN M. DETTELBACH, in his | § | |
| Official Capacity as Director, Bureau of | § | |
| Alcohol, Tobacco, Firearms and Explosives, | § | |
| and | § | |
| MERRICK B. GARLAND, in his | § | |
| Official Capacity as Attorney General | § | |
| of the United States, | § | |
| *Defendants.* | § | |

---

### PLAINTIFFS' BRIEF IN SUPPORT IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR SUMARY JUDGMENT

---

# TABLE OF CONTENTS

Table of Contents ....................................................................................................... 1

Table of Authorities .................................................................................................. 2

   I.   Corrections to Plaintiffs' Motion for Summary Judgment................................. 3

   II.  BATFE's explanation of its mass denial of applications further demonstrates the unconstitutionality of its application process. ................................................... 4

   III. Plaintiffs have standing. ................................................................................... 6

      A.    Texas has standing. ................................................................................. 6

      B.    Schnitz, Martin, and Allen have standing. .............................................. 7

   IV. The AIA does not bar this case. ......................................................................... 8

      A.    BATFE challenges arguments Plaintiffs did not make. ............................ 8

      B.    The AIA does not apply to Claims I, III, and IV ....................................... 8

      C.    The *Enochs* exception applies. ............................................................... 10

   V.  The Challenged Statutes Violate the Second Amendment as Applied to the Non-Commercial, Personal Making of Firearm Suppressors in Texas. ................... 11

      A.    Making firearm suppressors is conduct covered by the Second Amendment. ........... 11

      B.    Firearm suppressors are neither dangerous nor unusual. ........................... 13

      C.    Courts have *not* Already Held That the NFA's Application, Taxation, Registration, and Serialization Requirements are Constitutional. .................................. 15

      D.    BATFE does not Overcome its Burden to Show Analogous Founding-Era Regulations. ............................................................................................ 16

Certificate of Service ............................................................................................... 20

# TABLE OF AUTHORITIES

Cases

*Alfred L. Snapp & Son v. Puerto Rico*,
 458 U.S. 592 (1982) .................................................................................................. 6, 7
*CIC Services, LLC v. IRS*,
 141 S. Ct. 1582 (2021) .............................................................................................. 9, 10
*District of Columbia v. Heller*,
 554 U.S. 570 (2008) ...................................................................................................... 12
*Enochs v. Williams Packing & Nav. Co.*,
 370 U.S. 1 (1962) ........................................................................................................... 11
*Gibbons v. Ogden*,
 22 U.S. 1 (1824) ............................................................................................................ 19
*Heller v. District of Columbia*,
 670 F.3d 1244 (D.C. 2011) ......................................................................................... 16
*Massachusetts v. E.P.A.*,
 549 U.S. 497 (2007) ........................................................................................................ 7
*Murdock v. Commonwealth of Pennsylvania*,
 319 U.S. 105 (1943) ...................................................................................................... 17
*Nat'l Rifle Ass'n of Am., Inc. v. McCraw*,
 719 F.3d 338 (5th Cir. 2013) ......................................................................................... 8
*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
 142 S. Ct. 2111 (2022) .......................................................................................... passim
*Sonzinsky v. United States*,
 300 U.S. 506 (1937) ...................................................................................................... 18
*United States v. Am. Friends Serv. Comm.*,
 419 U.S. 7 (1974) ........................................................................................................... 11
*United States v. Cox*,
 906 F.3d 1170 (10th Cir. 2018) .................................................................................... 10
*United States v. Royce*,
 No. 1:22-CR- 130, 2023 WL 2163677 (D.N.D. Feb. 22, 2023) ............................... 14
*United States v. Saleem*,
 No. 3:21-cr-00086, 2023 WL 2334417 (W.D.N.C. Mar. 2, 2023) ........................... 13

Statutes

18 U.S.C. § 921(a)(25) ....................................................................................................... 5
18 U.S.C. § 3571(b) ............................................................................................................ 4
18 U.S.C. § 3571(c) ............................................................................................................ 4
26 U.S.C. § 5822 ................................................................................................................. 5
26 U.S.C. § 5845(a)(7) ....................................................................................................... 5
26 U.S.C. § 7421(a) ............................................................................................................ 9

**TO THE HONORABLE MARK T. PITTMAN, U.S. DISTRICT JUDGE:**

Plaintiffs, Ken Paxton, in his official capacity as Attorney General of Texas, David Schnitz, Tracy Martin, and Floice Allen, file this Brief in Support in Response to Defendants' Motion for Summary Judgment an in Reply to Defendants' Response to Plaintiffs' Motion for Summary Judgment, and will respectfully show the Court as follows:

## I.    Corrections to Plaintiffs' Motion for Summary Judgment

Plaintiffs made two minor errors in their Motion for Summary Judgment. First, Plaintiffs stated that the fine for violating the National firearms Act is up to $10,000. ECF 51 at 21, 38. In fact, the fine for violating the National Firearms Act is up to $250,000,[1] in addition to up to ten years imprisonment. (Notably, BATFE does not acknowledge these criminal penalties anywhere in its Motion for Summary Judgment.) Second, Plaintiffs attached the September 2019 version of the Form 1 as Exhibit 2 to their Brief in Support of their Motion for Summary Judgment. But ATF revised Form 1 effective December 2022. A copy of the current form is attached as Exhibit 1. The difference is that the current form recognizes a new kind of tax-exempt application for citizens with firearms not subject to the making tax, and states that to confirm tax-free status, BATFE "may require additional supporting documentation, such as photographs of the firearm to be registered." Exhibit 1 at 1. Suppressors are not tax-exempt, so this does not apply to this case.

---

[1]    https://www.atf.gov/firearms/docs/undefined/atf-national-firearms-act-handbook-chapter-15/download#:~:text=The%20criminal%20provisions%20of%20the,the%20case%20of%20an%20organization (citing 18 U.S.C. § 3571(b), (c)).

## II. BATFE's explanation of its mass denial of applications further demonstrates the unconstitutionality of its application process.

In addition to the other infirmities of the law, BATFE's explanation of its mass denial of applications demonstrates that the application process operates like a may-issue regime that can indefinitely delay the exercise of Texans Second Amendment rights.

the time Plaintiffs filed this lawsuit, BATFE denied a few thousand Form 1 applications to make firearm suppressors.  ECF 51 at 17–18.  BATFE now explains that around that time, it became aware of companies selling firearm suppressor parts, sometimes marketing them as "solvent traps," "flashlight suppressor kits," and/or "Form 1 silencer kits."  ECF 54-1 at 7. The statute defines a suppressor as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." 26 U.S.C. § 5845(a)(7); 18 U.S.C. § 921(a)(25). Thus, according to BATFE:

> These devices have the objective design features and characteristics of known silencer devices and are themselves properly classified as "silencers" under federal law. Further, these devices are often incorrectly marketed as items that a person may use to "make" a silencer upon receiving an approved ATF Form 1, generally by drilling out the center of an already manufactured baffle stack. Because these devices are already silencers in and of themselves, Form 1 applications seeking to "make" silencers with them cannot be approved.

ECF 54-1 at 7. Similarly, BATFE claims that it cannot approve the making of a firearm suppressor from a firearm suppressor parts kit because:

> Under the NFA, "parts" or "parts kits" that are that are already silencers in and of themselves (whether assembled yet or not), must be independently registered before being manufactured, transferred, or sold. A person who then acquires a properly-registered silencer (including parts or parts kits that are themselves silencers) need not also separately apply to "make" that same silencer, but instead must apply to have that silencer transferred

4

> to him or her. Accordingly, Form 1 applications seeking to "make" a silencer using parts or parts kits that are already "silencers" must be denied.

*Id*. BATFE correctly says it "must deny an application to make a silencer 'if the making or possession of the [silencer] would place the person making the firearm in violation of the law.' 26 U.S.C. § 5822." ECF 54 at 51. But it does not follow that if an applicant might have illegally obtained firearm suppressor parts (and thus, legally, a firearm suppressor) without permission, the applicant further violates the law by making the parts into a completed firearm suppressor, so permission to do so cannot be granted. The *transfer* of parts is a separate transaction from the *making* of the parts into a completed firearm suppressor. BATFE has no legal authority to deny an application to make a firearm suppressor simply because the parts are allegedly illegally possessed. To the contrary, once the allegedly illegally possessed parts are made into an approved firearm suppressor, the parts lose existence, and the former possessor of illegal parts becomes the legal maker and possessor of a firearm suppressor and is no longer "in violation of the law."

During this episode, BATFE admits that it denied approximately 847 applications based on the applications themselves, and another 1,649 applications after requesting "additional information." BATFE has no legal authority to deny applications to make firearm suppressors based on a belief that the applicant intends to make it out of illegally-possessed parts. And BATFE has no legal authority to demand "additional information" over what the statute and the regulations require. ECF 51 at 44–46. BATFE has "put [the application process] toward abusive ends" with "lengthy wait times" in violation of the Constitution. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2138 n.9 (2022). BATFE runs the application process more like a may-issue regime similar to the one disapproved in *Bruen*.

5

## III.  Plaintiffs have standing.

### A.  Texas has standing.

BATFE argues that Texas asserts *parens patriae* standing. ECF 54 at 26–27. But Texas does not. Texas asserts standing on the grounds that "a State has a quasi-sovereign interest in the health and well-being—both physical and economic of its residents in general." *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 607 (1982). As Texas argued, the unconstitutional regulation of firearm suppressors adversely affects Texans' health and well-being by delaying (by 30 or 45 days when the application is approved) or prohibiting (when the application is not approved) Texans' ability to use firearm suppressors for the purpose of home defense. ECF 16 at 23. BATFE does not—because it cannot—challenge this assertion. *See* ECF 54 at 25–27.

BATFE quotes *Alfred L. Snapp*'s statement that "[a] State does not have standing as parens patriae to bring an action against the Federal Government," 458 U.S. 610 n.16, and argues that Texas's assertion of quasi-sovereign interests is the same as asserting *parens patriae* standing. ECF 54 at 16. But they are not the same. In 2007, the Supreme Court specifically rejected the argument that states cannot assert quasi-sovereign interests against the federal government. *Massachusetts v. E.P.A.*, 549 U.S. 497, 520 n.17 (2007) ("Drawing on *Massachusetts v. Mellon*, 262 U.S. 447 [] (1923) and [*Alfred L. Snapp*] the CHIEF JUSTICE claims that we 'overloo[k] the fact that our cases cast significant doubt on a State's standing to assert a quasi-sovereign interest ... against the Federal Government.' Not so. *Mellon* itself disavowed any such broad reading when it noted that the Court had been 'called upon to adjudicate, not rights of person or property, not rights of dominion over physical domain, [and] *not quasi-sovereign rights actually invaded or threatened*." [262 U.S. at 484–485] (emphasis added)." (citations omitted)). Texas has standing to assert its own "quasi-

sovereign interest in the health and well-being—both physical and economic of its residents in general" against the federal government.

### B. Schnitz, Martin, and Allen have standing.

BATFE argues that Schnitz, Marti, and Allen lack standing because (1) they have not submitted an application to make a firearm suppressor; (2) do not allege that they cannot pay the tax; (3) do not allege that the $200 tax impedes their ability to make a suppressor; (4) produce no evidence that BATFE might deny their application; and (5) produce no evidence that they might be prosecuted. ECF 54 at 23–25. But these arguments are beside the point. As explained in their motion for summary judgment, the individual plaintiffs' injury arises from the application process and the tax itself, and being prosecuted if they make a firearm suppressor for non-commercial personal use without first applying and paying. ECF 51 at 31–32. It is not disputed that they must apply for permission and pay the tax before exercising their constitutional rights under the Second Amendment, and that they are subject to prosecution if they exercise their right to make a firearm suppressor without first applying for permission and paying the tax. *See Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 345 (5th Cir. 2013) ("When asking a federal court to engage in pre-enforcement review of a criminal statute, a plaintiff need not violate the statute; he may meet [the] injury requirement by showing an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and a credible threat of prosecution thereunder.") (cleaned up). That is an injury.

BATFE also argues that pre-*Bruen* cases establish that the individual plaintiffs have no standing to sue until they first apply and pay the tax. Those cases do not survive *Bruen*, because requiring permission to make a firearm suppressor and tax such making regulates conduct covered by the Second Amendment.

## IV.  The AIA does not bar this case.

### A.  BATFE challenges arguments Plaintiffs did not make.

BATFE notes that the AIA applies even when a lawsuit challenges the constitutionality of the tax. ECF 54 at 29. While Plaintiffs are challenging the constitutionality of the tax, they do not argue against the AIA's applicability on that ground. BATFE also argues that the AIA applies to regulatory taxes. ECF 54 at 30. But Plaintiffs do not challenge the AIA's applicability on that ground either.

Plaintiffs instead argue (1) the AIA simply does not apply to the application requirement (Count I), the registration requirement (Count III), or the serial-number requirement (Count IV); and (2) the AIA does not apply to any of the Counts under the *Enochs* exception.

### B.  The AIA does not apply to Claims I, III, and IV

The AIA does not apply to Plaintiffs' challenges to application requirement, the registration requirement, and the serial-number requirement because they are not "suit[s] for the purpose of restraining the assessment or collection of any tax." 26 U.S.C. § 7421(a). They "fall[] outside the Anti-Injunction Act because the injunction[s] [they] request[] do[] not run against a tax at all." *CIC Services, LLC v. IRS*, 141 S. Ct. 1582, 1593 (2021). Yet BATFE asserts, "This case is barred in its entirety because its 'primary purpose' is to seek relief that would restrain the 'collection or assessment of [a] tax.'" ECF 54 at 30 (citing *CIC Services*, 141 S. Ct. at 1589). But *CIC Services* never discusses the "primary purpose" of a lawsuit. Although BATFE puts the phrase "primary purpose" in quotation marks, it does not appear anywhere in the opinion. Whether Plaintiffs' suit has a "primary purpose" is of no consequence.

The suit in *CIC Services* only had one purpose—to challenge reporting requirements. Here, Plaintiffs' suit has four purposes, corresponding to the four Counts—to enjoin the application

process, the collection of the $200 tax, the registration requirement, and the serial-number requirement. Only Count II has "the purpose of restraining the assessment or collection of any tax." The AIA does not apply to the other three counts. "The Anti-Injunction Act kicks in when the target of a requested injunction is a tax obligation—or stated in the Act's language, when the injunction runs against the 'collection or assessment of [a] tax.'" *CIC Services*, 141 S. Ct. at 1590 (citing the AIA).

BATFE also argues that "it is well-settled that the AIA is not limited to claims targeting the specific act of paying a levy, but rather also encompasses requests for an injunction that are aimed at 'collection or assessment of [that] tax,' particularly when they are part of an integrated tax scheme." ECF 54 at 30 (citing *CIC Services*, 141 S. Ct. at 1590). But *CIC Services* says nothing of the sort, either on page 1590 or at any other part of the opinion. BATFE also cites the pre-*CIC Services* case *United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018) for the idea that "the NFA's tax payment cannot be treated in isolation. Rather, the challenged requirements together make up the NFA's integrated 'taxing scheme.'" ECF 54 at 31. But the AIA-question after *CIC Services* is not whether the NFA contains a "taxing scheme"; rather, the question is whether Plaintiffs' counts have the purpose of enjoining the collection or assessment of a tax. Count II does have that purpose, but the other Counts do not. *Cox* itself recognizes, "And on its face, the NFA is a taxing scheme…. *But the NFA does more than lay taxes*." *Cox*, 906 F.3d at 1179 (emphasis added). *CIC Services*, not *Cox*, is the controlling authority.

BATFE also argues that many courts have found that the NFA is a valid exercise of Congress's taxing authority. ECF 54 at 31. But whether that is true or not (it is not; see Part ___) has nothing to do with whether the AIA bars the Court's consideration of Counts I, III, and IV.

9

BATFE also cites pre-*CIC Services* authority holding that the AIA bars claims against statutory requirements that do not themselves assess or collect tax, but serve to aid in the assessment and collection of tax. ECF 54 at 31–34. But all of this authority is overruled by *CIC Services*. *See* ECF 51 at 26–30.

### C. The *Enochs* exception applies.

BATFE agrees with Plaintiffs that under the two-part test set forth in *Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1 (1962), a pre-enforcement injunction against the assessment or collection of taxes may be granted only: (1) "if equity jurisdiction otherwise exists," meaning that irreparable harm would result if the case does not go forward; and (2) "if it is clear that under no circumstances could the Government ultimately prevail." ECF 54 at 34.

The NFA causes irreparable harm to citizens wishing to make firearm suppressors for non-commercial, personal use by delaying or prohibiting such makings, and by requiring registration and serial numbers which cannot be repaired. ECF 51 at 31–32. BATFE responds by arguing that *United States v. Am. Friends Serv. Comm.*, 419 U.S. 7 (1974) holds that "any delay in Plaintiffs' ability to make a suppressor is insufficient to establish irreparable harm in this context," ECF 54 at 36, and that "the Supreme Court has applied this rule even where subjecting a plaintiff to the challenged taxation would, in and of itself, *permanently* deprive the plaintiffs of access to First Amendment rights," *id.* (citing *Am. Friends Serv. Comm.* at 11). But *Am. Friends Serv. Comm.* does not so hold. The Plaintiffs were employees whose employer complied with their religiously inspired desire not to withhold 51.6% of income taxes due (51.6% being the amount representing their estimate of the percentage of the federal budget which is military related) to make the government levy the taxes directly from the employees. The employees did not (because they could

not) argue that a delay of the exercise of a constitutional right was causing them irreparable injury. Instead, they argued that a refund suit was an inadequate remedy because they would lose. This case does not support BATFE's position that a delay in exercising constitutional rights cannot be an irreparable injury under the AIA (unlike in all other contexts) because no such delay was at issue.

Moreover, it is clear that under no circumstances can BATFE prevail for the reasons presented elsewhere in Plaintiffs' motion for summary judgment.

BATFE also argues that the AIA bars Texas's claims because Texas citizens can file their own refund claims. ECF 54 at 36–37. But that is beside the point because Texas is not suing on behalf of its citizens. As explained above, it is suing to assert its own "quasi-sovereign interest in the health and well-being—both physical and economic of its residents in general" against the federal government.

## V.   The Challenged Statutes Violate the Second Amendment as Applied to the Non-Commercial, Personal Making of Firearm Suppressors in Texas.

### A.  Making firearm suppressors is conduct covered by the Second Amendment.

Despite the NFA's inclusion of firearms suppressors in its definition of "firearm," BATFE argues that the Second Amendment does not apply to the making of firearm suppressors for non-commercial, personal use because:

> Under *District of Columbia v. Heller*, the Second Amendment extends only[2] to "instruments that constitute bearable arms." 554 U.S. 570, 582 (2008); *Hollis v. Lynch*,

---

[2] BATFE miscites *Heller*. The exact quote is, "Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008) (citations omitted). *Heller* does not use the word "only."

827 F.3d 436, 447 (5th Cir. 2016) (same). No court has ever held that a firearm suppressor is an "arm" within the meaning of the Second Amendment. In fact, every court to consider the issue has found that suppressors do not qualify as "bearable arms."

ECF 54 at 39 (citing pre-*Bruen* cases and two post-*Bruen* district court opinions, discussed below).

Plaintiffs have already addressed this issue. ECF 51 at 35–38. Whether a firearm suppressor is itself an "arm" is not the proper question post-*Bruen*. **The Second Amendment regulates conduct, not arms.** *Bruen*, 142 S. Ct. at 2126 ("[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."). The right to keep and bear arms includes the right to keep and bear all kinds of arms—for instance, arms with or without suppressors, laser sights, scopes, tactical slide racks, biometric trigger locks, bipods, folding stocks, extended magazines, mounted lights, speed loaders, holsters, etc. It is immaterial whether the arms at issue are accessories that improve the usage of a firearm or parts necessary for the use of a firearm because both instances involve **conduct** covered by the Second Amendment. Similarly, the conduct of driving a car includes the conduct of driving a car equipped with a muffler, whether or not a muffler is itself a car, and whether or not a muffler is "necessary" to the operation of a car. And the right to free press covers ink and paper, even though ink and paper is not itself press and even though it is possible to communicate words without ink and paper, audibly and digitally.

BATFE notes that, since Plaintiffs filed their motion for summary judgment, two district courts have ruled that firearm suppressors are not "arms" and that the Second Amendment does not apply to them. ECR 54 at 39. Both opinions mis-apply *Bruen*, have no precedential value, and should not be followed by the Court. In *United States v. Saleem*, No. 3:21-cr-00086, 2023 WL 2334417 (W.D.N.C. Mar. 2, 2023), the court denied a motion to dismiss an indictment for illegal possession of an unregistered firearm suppressor "because [firearm suppressors] are not

independently operable and do not serve any central self-defense purpose, [they] are not firearms within the meaning of the Second Amendment but are instead firearm accessories that fall outside its protection," *Saleem* at *9, and because "[t]he use of a silencer is in no way necessary to the effective use of a firearm—it certainly has benefits for the user, but unlike cleaning materials or bullets, a firearm can be used safely and effectively without a silencer," *id.* at *10. Neither of these arguments are a correct application of *Bruen*. The court in *United States v. Royce*, No. 1:22-CR- 130, 2023 WL 2163677, at *4 (D.N.D. Feb. 22, 2023) came to the same incorrect conclusion for the same incorrect reason. *Royce* at *4 ("The Government contends there is no Second Amendment right to possess a silencer. The Court agrees. Unlike rifles, silencers are not considered "arms" within the meaning of the Second Amendment."); *id.* ("A silencer is not necessary to make a firearm operable. Rather, a silencer is simply a means to reduce sound omitted from a firearm."). Both cases incorrectly address whether a firearm suppressor is an "arm," and incorrectly address whether a firearm suppressor is "necessary," rather than addressing the conduct of keeping and bearing arms with firearm suppressors.

### B.  Firearm suppressors are neither dangerous nor unusual.

BATFE argues that even if firearm suppressors are "arms," the Second Amendment does not apply to them because they are "dangerous and unusual." CEF 54 at 42. Plaintiffs have already explained why firearms suppressors are neither dangerous nor unusual. ECF 51 at ___.

**Not dangerous.** Even the former second-in-command of BATFE during the Obama Administration has written that firearm suppressors are not dangerous. ECF 51-1. Yet BATFE argues that they are, first by noting that there are records of some crimes being committed by persons using firearms equipped with firearm suppressors pre-1934, ECF 54 at 43, and that there are reports of people using firearms with firearm suppressors in crimes more recently, ECF 54 at

44.[3] But that is not the test. All weapons—indeed all things—are sometimes used in crime. Firearm suppressors are not "dangerous" even though they are occasionally—*very* occasionally—used in crime. Although there are over 2.6 million registered firearms suppressors in the United States, "ATF has only recommended 44 defendants a year for prosecution on silencer-related violations." ECF 51 at 11. That number includes prosecutions for possession crimes.

BATFE then argues, "From 1909 to 1936, at least fifteen states enacted silencer restrictions." ECF 54 at 43 (citing Robert J. Spitzer, Gun Accessories and the Second Amendment: Assault Rifles, Magazines, and Silencers, 83 L. & Contemp. Probs. 231, 248 n.123). But the fact that some states have regulated a firearm does not establish that the firearm is "dangerous." Courts must make an independent determination. For instance, the statute at issue in *Bruen* did not establish that carrying a handgun outside the home without a may-issue license is "dangerous." To the contrary, the *Bruen* court held that such activity is protected by the Second Amendment. Notably,

---

[3] Notably, neither the BATFE, nor the anti-gun activists authoring the report they rely on, specify which of the cited cases showing the "dangerousness" of suppressors involved individuals who received a suppressor permit from the BATFE. Indeed, the BATFE issued a suppressor permit to the Virginia Beach shooter. See Chief James A. Cervera, May 19, 2019, Mass Homicide Updated Executive Summary, City of Virginia Beach at *9 (Apr. 24, 2020), https://www.vbgov.com/government/departments/communications-office/Documents/04242020_InterimMay31InvestSummary.pdf (In 2017, [the shooter] applied for a firearms suppressor permit."). And the suppressor likely had no impact on the severity of the shooting, as "gun-rights advocates and most law enforcement experts say [the shooter's] use of a suppressor likely had no bearing on his ability to kill so many people in so little time... 'A suppressor does not alter the lethality of the weapon at all. All it does is just limit the noise it makes,' said Gregory Shaffer, a retired FBI agent who was a member of the bureau's elite Hostage Response Team. 'It doesn't increase the rate of fire. It doesn't do anything other than make it more comfortable to shoot because it's not so loud.'" Lisa Marie Pane, Did 'Silencer' Make a Difference in Virginia Beach Carnage?, NBCDFW (Jun 1, 2019), https://www.nbcdfw.com/news/national-international/virginia-beach-shooting-silencers/232260/

BATFE does not cite these minority state "silencer restrictions" in an effort to establish a historical tradition of silencer regulation, since they do not do so.

BATFE next argues that the fact that firearm suppressors are regulated by the NFA "further affirms" their "dangerousness." ECF 54 at 43. Again, however, legislation cannot establish "dangerousness."

**Not unusual.** BATFE admits that there are 2.6 million registered firearm suppressors, and they are legal in 42 states. ECF 54 at 45. They are in common use just like AR-15s are in common use, as the D.C. Circuit found because "[a]pproximately 1.6 million AR–15s alone have been manufactured since 1986." *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. 2011) (*Heller* on remand). BATFE nevertheless insists that they are not in "common use" because "eighteen [of the 42] states ban suppressors unless they are legal under federal law" and "out of the remaining 24, some still have other restrictions affecting or limiting suppressor possession." ECF 54 at 45. None of this has anything to do with whether firearm suppressors are "unusual."

### C. Courts have *not* Already Held That the NFA's Application, Taxation, Registration, and Serialization Requirements are Constitutional.

BATFE quotes the *dicta* in *Bruen* that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of "objective licensing requirements." ECF 54 at 48 (citing *Bruen* at 2138 n.9.). But neither did *Bruen* hold that such licensing schemes are constitutional. The question is open. BATFE has the burden to show a historical tradition of such licensing schemes. BATFE does make the attempt, albeit unsuccessfully, as discussed in the next section.

BATFE also argues that the NFA's application, taxation, registration, and serialization requirements "do not impair the use or functioning of a weapon in any way." ECF 54 at 48. But

15

that is not the test under *Bruen*. The test is whether there is a historical tradition of those requirements.

BATFE next argues against Plaintiffs' position that *Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105 (1943), prohibits the taxation of the exercise of a constitutional right. BATFE claims that "*Murdock* struck down a licensing fee for religious canvassing on First Amendment grounds because—in stark contrast to the NFA—it was 'not a nominal fee, imposed as a regulatory measure and calculated to defray the expense' of regulating the activities in question." ECF 54 at 50 (citing *Murdock* at 113–14). But the NFA tax is in no way "a nominal fee, imposed as a regulatory measure and calculated to defray the expense" of implementing the NFA. The *Murdock* court goes on to distinguish such fees from an unconstitutional "flat license tax levied and collected as a condition to the pursuit of activities whose enjoyment is guaranteed by the First Amendment." *Id*. at 114. The NFA tax is this later kind of unconstitutional tax.

Finally, BATFE denies that last year's lawless episode of denying applications to make firearm suppressors based on a belief that the applicant intends to make it out of allegedly illegally-possessed parts "put the application process to abusive ends," ECF 54 at 50–51, because it denied that it was lawless. Nonetheless, there is no legal authority to deny applications on the stated basis, and BATFE did in fact "put the application process to abusive ends."

### D. BATFE does not Overcome its Burden to Show Analogous Founding-Era Regulations.

BATFE argue that the NFA is a "longstanding, presumptively regulatory measure [that] likely implicate[s] no Second Amendment rights." ECF 54 at 52. But the statue in *Bruen* was over one hundred years old—older than the NFA. And *Bruen* clarified that "longstanding" means "consistent with this Nation's historical tradition of firearm regulation," *id*. at 2126, and that

16

"belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of the Constitution in 1787," *id*. at 2137 (cleaned up, citation omitted). The NFA is not old enough to be "longstanding." BATFE also argues that *Sonzinsky v. United States*, 300 U.S. 506 (1937) "already upheld other analogous sections of the NFA as valid exercise of taxing powers." ECF 54 at 52. But *Sonzinsky* did not consider the Second Amendment, let alone *Bruen*'s methodology, so this does not support BATFE's case.

Next, BATFE cites some old state statutes in an effort to point to "a well-established and representative historical analogue" to the NFA. ECF 54 at 53 (citing *Bruen*, 142 S. Ct. at 2133). Statutes must be representative," not "outliers." *Id*. at 2133. But BATFE points only to outliers. For instance, it cites a 1781 New Jersey statute which it characterizes as authorizing "door-to-door surveys of firearms." ECF 54 at 53. That statute in fact required that "the Captain or Commending Officer of Each Company shall, once every four Months, order a Sergeant to call at the Place of Abode for each person enrolled as aforesaid, for the Purpose of examining the State of his Arms, Accoutrements, and Ammunition."[4] The people "enrolled as aforesaid" referred to are explained in another part of the statute: "[T]he Captain or Commanding Officer of each Company shall keep a true and perfect List or Roll of all elective Men between the ages of fifteen and fifty Years, residing in the District of such Company."[5] BATFE also cites a 1775 Massachusetts statute and a 1778 New York statute requiring militia members to have their firearms inspected. None of these outliers are analogous to the NFA's application, taxation, registration, or serialization requirements. They are not analogous to the registration requirements because the NFA requires each firearm suppressor

---

[4] njlaw.rutgers.edu/cgi-bin/diglib.cgi?collect=njleg&file=005&page=0043&zoom=120
[5] njlaw.rutgers.edu/cgi-bin/diglib.cgi?collect=njleg&file=005&page=0042&zoom=120

to be individually registered, while the cited laws only require that militia members' arms be inspected, presumably for functionality and safety, without any additional requirement that the weapons themselves be registered. Moreover, registering weapons has nothing to do with ensuring their functionality or safety, and the NFA does not seek to insure functionality or safety of weapons. BATFE also points to an 1805 Massachusetts statue and an 1821 Maine statute (possibly the same statute, as Maine was part of Massachusetts until 1820) requiring musket and pistol barrels be inspected and marked, upon payment of a fee, to ensure their safe condition. This outlier is similarly not analogous to the NFA's application, taxation, registration, or serialization requirements.

BATFE further points to statutes in three states requiring licenses or inspection to export or sell gunpowder. ECF 54 at 54. But there is a tradition of regulating founding-era gunpower, which sometimes exploded. The Supreme Court has long held that regulation of founding-era gunpowder is part of the police power of states. *See*, *e.g.*, *Gibbons v. Ogden*, 22 U.S. 1, 119 n.59 (1824). Regulating gunpowder is not analogous to regulating firearm suppressors, which do not explode.

BATFE also claims that there is a historical tradition of taxing firearms. The only founding-era statute it cites is New Hampshire's 1759 "An Act about Powder Money," which states:

> That every foreign ship or vessel above thirty tons, coming into any port or part of this province from over the sea to trade or traffick [sic], all or the major part of the owners whereof are not actually inhabitants of this province, shall, every voyage they make, pay two shillings in money per ton, or one pound of good gunpowder, for the supply of his Majesty's fort and fortifications within this province, to be received by the treasurer, or such other person or persons as shall be appointed to receive the same.[6]

---

[6] https://firearmslaw.duke.edu/laws/1759-76-n-h-laws-63-an-act-about-powder-money/

This statute is not a tax on firearms or even on gunpowder. It is a tax on ships, to be paid in money or in gunpowder. This outlier does not establish a historical tradition of regulating firearm suppressors.

BATFE has failed to overcome its burden to establish a historical tradition justifying the NFA's regulations of firearm suppressors made for non-commercial, personal use in Texas.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment and deny Defendants' motion for summary judgment.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

AARON F. REITZ
Deputy Attorney General for Legal Strategy
State Bar No. 24105704

*/s/ Charles K. Eldred*
CHARLES K. ELDRED
Special Counsel for Legal Strategy
State Bar No. 00793681

JOHNATHAN STONE
Assistant Attorney General
General Litigation Division
State Bar No. 24071779

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P. O. Box 12548
Austin, Texas 78711-2548
(512) 936-1706 • fax (512) 320-0167
charles.eldred@oag.texas.gov

***Attorneys for Ken Paxton,***
***Attorney General of Texas***

*/s/ Tony K. McDonald*
TONY K. MCDONALD
State Bar No. 24083477

THE LAW OFFICES OF TONY MCDONALD
1501 Leander Dr., Suite B2
Leander, Texas 78641
(512) 200-3608 • fax (815) 550-1292
tony@tonymcdonald.com

WARREN V. NORRED
State Bar No. 24045094

NORRED LAW, PLLC
515 E. Border Street
Arlington, Texas 76010
(817) 704-3984 • fax (817) 524-6686
warren@norredlaw.com

***Attorneys for David Schnitz,***
***Tracy Martin, and Floice Allen***

## CERTIFICATE OF SERVICE

We certify that a true and accurate copy of the foregoing document was filed electronically

(via CM/ECF) on April 17, 2023.

*/s/ Charles K. Eldred*   */s/ Tony K. McDonald*
Charles K. Eldred     Tony K. McDonald