**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **KEN PAXTON, in his official capacity as** | ) | |
| **Attorney General of Texas,** | ) | |
| **DAVID SCHNITZ,** | ) | |
| **TRACY MARTIN, and** | ) | |
| **FLOICE ALLEN,** | ) | |
| *Plaintiffs,* | ) | Civil Action No. 4:22-cv-00143-P |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **STEVEN M. DETTELBACH, in his** | ) | |
| **official Capacity as Director, Bureau of** | ) | |
| **Alcohol, Tobacco, Firearms and Explosives,** | ) | |
| **and** | ) | |
| **MERRICK B. GARLAND, in his official** | ) | |
| **Capacity as Attorney General of the** | ) | |
| **United States,** | ) | |
| *Defendants.* | ) | |

## DEFENDANTS' REPLY IN SUPPORT OF MOTION
## FOR SUMMARY JUDGMENT

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

LESLEY FARBY
Assistant Branch Director

EMILY B. NESTLER (D.C. Bar # 973886)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 305-0167
Email: emily.b.nestler@usdoj.gov

*Counsel for Defendants*

# TABLE OF CONTENTS

I.   Plaintiffs Lack Standing.............................................................................................. 2

    A.   Individual Plaintiffs Lack Standing ..................................................................... 3

    B.   Texas Should be Dismissed from this Case Because It Lacks Standing ............... 5

II.  The Anti-Injunction Act Bars All of Plaintiffs' Claims.......................................... 6

    A.   The *Enochs* Exception to the AIA Is Narrow and Does Not Apply ..................... 9

        1.   Equity Jurisdiction Is Not Implicated ......................................................... 9

        2.   At a Minimum, There Are Circumstances under which the Government Can Prevail.......................................................................... 12

III. Summary Judgment Should be Granted for Defendants Because the Challenged Laws are Constitutional ............................................................................................. 13

    A.   Firearm Silencers are Not Bearable Arms, So Their Use Is Not Protected by the Second Amendment. ................................................................................ 13

    B.   Suppressors are Not Protected by the Second Amendment Because They Are Dangerous and Unusual .............................................................................. 16

    C.   The NFA's Tax Scheme Does Not Infringe the Second Amendment ................. 19

    D.   Regulating the Possession of Silencers Is Consistent with the Nation's Historical Tradition of Firearm Regulation. ...................................................... 22

IV.  Conclusion ................................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Alfred L. Snapp & Son, Inc.*,
  458 U.S. 592 (1982) .............................................................................. 5

*Babbit v. United Farm Workers Nat. Union*,
  442 U.S. 289 (1979) .............................................................................. 4

*Bezet v. United States*,
  714 F. App'x 336 (5th Cir. 2017) ............................................... 1, 3, 22

*Bob Jones Univ. v. Simon*,
  416 U.S. 725 (1974) ............................................................................ 12

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016) ............................................................................ 18

*CIC Servs., LLC v. IRS*,
  141 S. Ct. 1582 (2021) .................................................................. *passim*

*Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol & Tobacco Tax & Trade Bureau*,
  843 F.3d 810 (9th Cir. 2016) .............................................................. 11

*Enochs v. Williams Packing & Navigation, Co.*,
  370 U.S. 1 (1962) .................................................................................. 9

*Georgia v. Pennsylvania R. Co.*,
  324 U.S. 439 (1945) .............................................................................. 6

*Heller v. District of Columbia*,
  554 U.S. 570 (2008) ........................................................... 13, 14, 16, 22

*Hollis v. Lynch*,
  827 F.3d 436–50 (5th Cir. 2016) ........................................................ 18

*Kemlon Prod. & Dev. Co. v. United States*,
  638 F.2d 1315 (5th Cir. 1981) ................................................... 9, 10, 12

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .......................................................................... 2, 3

*Massachusetts v. E.P.A.*,
  549 U.S. 497 (2007) .............................................................................. 6

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923) .............................................................................. 5

*Mock v. Garland,*
  No. 4:23-CV-00095-O, 2023 WL 2711630 (N.D. Tex. Mar. 30, 2023) ........................ 19, 20

*Murdock v. Pennsylvania,*
  319 U.S. 105 (1943) ............................................................................................. 20

*National Rifle Association of America., Inc. v. McCraw*
  719 F.3d 338 (5th Cir. 2013) .................................................................................. 4

*New York v. Mnuchin,*
  408 F. Supp. 3d 399 (S.D.N.Y. 2019) ..................................................................... 11

*New York Rifle & Pistol Ass'n v. Bruen,*
  142 S. Ct. 2111 (2022) ................................................................................... *passim*

*Sonzinsky v. U.S.,*
  300 U.S. 506 (1937) ............................................................................................. 7, 9

*State v. Biden,*
  10 F.4th 538 (5th Cir. 2021) .................................................................................. 10

*United States v. Am. Friends Serv. Comm.,*
  419 U.S. 7 (1974) ................................................................................................. 11, 12

*United States v. Cox,*
  906 F.3d 1170 (10th Cir. 2018) ............................................................... 7, 13, 14, 17

*United States v. Hasson,*
  No. GJH-19-96, 2019 WL 4573424 (D. Md. Sept. 20, 2019) .............................. 14, 15

*United States v. McCartney,*
  357 F. App'x 73 (9th Cir. 2009) ............................................................................. 16

*United States v. One Palmetto State Armory,*
  115 F. Supp. 3d 544 (E.D. Pa. 2015) ..................................................................... 10

*United States v. Royce,*
  No. 1:22-cr-130, 2023 WL 2163677 at *4 (D.N.D. Feb. 22, 2023) ........................ 14

*United States v. Saleem, No. 3:21-cr-00086,*
  2023 WL 2334417 (W.D.N.C. Mar. 2, 2023) ............................................... 14, 15, 16

*United States v. Thompson/Center Arms Co.,*
  504 U.S. 505 (1992) ............................................................................................. 17

*United States v. Villalobos,*
  No. 3:19-cr-00040, 2023 WL 3044770 (D. Id. Apr. 21, 2023) .......................... 14, 15, 16

*Westfall v. Miller,*
  77 F.3d 868 (5th Cir. 1996) .................................................................................. 3

**Statutes**

26 U.S.C. § 5822 ........................................................................................... 19, 20, 21

26 U.S.C. § 5841 ..................................................................................................... 21

26 U.S.C. § 7421 ................................................................................................... 1, 6

**Rules**

Federal Rule of Civil Procedure 5 ............................................................................ 1

**Other**

11A Charles Alan Wright, et al.,
    Fed. Prac. & Proc. § 2948.1 (2021) ................................................................. 10

Christopher Ingraham, *There are More Guns than People in the United States, According to a New Study of Global Firearm Ownership,* The Washington Post,
    *available at* https://perma.cc/LNE7-8TZQ.................................................... 18

Lisa Marie Pane, Did 'Silencer Make a Difference in Virginia Beach Carnage?, NBCDFW (June 1, 2019),
    *available at* https://www.nbcdfw.com/news/national-international/virginia-beach-shooting-silencers/232260/ ............................................................................................... 17

Violence Pol'y Ctr., Silencers: A Threat to Public Safety (July 2019),
    *available at* https://www.vpc.org/studies/silencers.pdf ....................................... 17

The only claims in this case are Second Amendment challenges to the tax scheme set forth in the National Firearms Act *as applied to firearm suppressors*. These claims run headlong into a long line of unbroken precedent—including cases decided both before and after *New York Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)—which uniformly hold that firearms suppressors are not protected by the Second Amendment, either because they are not "bearable arms," or alternatively because they are "dangerous and unusual." Nothing in Plaintiffs' briefing calls that precedent into question or otherwise explains why this Court should depart from it. That alone is dispositive.

But this Court need not reach the merits of that constitutional question because several threshold reasons require entry of summary judgment for Defendants. First, none of the Plaintiffs have Article III standing. Individual Plaintiffs[1] concede that they have not submitted an NFA application to make a suppressor, much less application that has been delayed or denied. And they offer no answer to Fifth Circuit precedent foreclosing a lawsuit under those circumstances. *See, e.g.*, *Bezet v. United States*, 714 F. App'x 336, 340 (5th Cir. 2017). Likewise, Texas has failed to articulate any cognizable state interest that has been harmed by the challenged laws.

Second, this case also is barred by the Anti-Injunction Act, which precludes lawsuits brought "for the purpose of restraining the assessment or collection of any tax." 26 U.S.C. § 7421. The NFA is a tax statute, and all of the challenged provisions are part of the NFA's integrated tax scheme (including its collection and assessment requirements). The Supreme Court has made clear that the AIA's jurisdictional bar extends beyond claims targeting the specific act of paying a levy, more broadly encompassing requests for any injunction that is aimed at "collection or assessment

---

[1]All definitions of terms provided in Defendants' Brief in Support of Summary Judgment, ECF No. 54, are incorporated here by reference and those terms have the same meaning in this reply.

of [that] tax." *CIC Servs., LLC v. IRS*, 141 S. Ct. 1582, 1593 (2021). Plaintiffs concede that the AIA applies to the NFA's $200 tax payment, and their arguments that the AIA does not apply to the NFA's other related requirements (all of which serve to facilitate that tax) are wrong as a matter of law. Plaintiffs also fail to establish any irreparable harm that could trigger the rare *Enochs* exception from this jurisdictional bar.

Even if the Court had jurisdiction to hear this case, summary judgment should be granted for Defendants on the merits. As noted above, it is well-settled that suppressors are not covered by the Second Amendment, both because they are not "bearable arms" and because they are "dangerous and unusual." And, even assuming *arguendo* that suppressors could be weapons covered by the Second Amendment, the NFA's tax scheme, including its permissive application process, does not impinge upon Second Amendment rights. Rather, it is akin to the type of ministerial firearms licensing regimes that the Supreme Court and the Fifth Circuit have repeatedly upheld.

Finally, even if the Second Amendment were implicated here, Defendants have established that the challenged laws pass constitutional muster under the historical tradition standard set forth in *Bruen*. Defendants have demonstrated a historical tradition of firearm regulation that is relevantly similar to that set forth in the NFA, and nothing in Plaintiffs' opposition undermines that conclusion.

Accordingly, summary judgment should be granted for Defendants.

## I.       Plaintiffs Lack Standing

Plaintiffs' opposition continues to fall short of establishing that they have suffered any concrete and particularized "injury in fact" as a result of the challenged laws. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Because none of the Plaintiffs have met their burden to demonstrate the "constitutional minimum of standing" this case is not properly before the Court.

A.     <u>Individual Plaintiffs Lack Standing</u>

As detailed in Defendants' opening brief, none of the Individual Plaintiffs have submitted an application to make a firearm suppressor, much less an application that has been delayed or denied. Defs.' Br. in Supp. of Mot. for Summ. J., ECF 54, at 13 ("Defs.' Br."). Plaintiffs do not dispute these facts. *See* Pls.' Resp. to Mot. for Summ. J., ECF 55, at 7 ("Pls.' Opp."). Instead, their opposition clarifies that Individual Plaintiffs' sole purported injury "arises from the application process itself and the tax itself." *Id.* But Individual Plaintiffs have suffered no injury that flows from the mere existence of that process—and certainly no deprivation of the ability to make a suppressor. They neither claim to be ineligible to make a firearm suppressor, nor that there is any other reason their applications would be denied if submitted. Pls.' Opp. at 7.[2]

To the extent Individual Plaintiffs have been unable to make suppressors, that is only because they have chosen to forgo the NFA's process of their own accord. And while they may prefer that the NFA's logistical hurdles did not exist, the mere fact that a person dislikes a regulatory process is insufficient to establish standing. *See Westfall v. Miller*, 77 F.3d 868, 871-72 (5th Cir. 1996) ("Just because Westfall does not like the firearms regulation does not give him standing to complain about its legality. . . . [C]ompletion of the statutory procedure is necessary to establish Westfall's injury."). For these reasons, the Fifth Circuit has held under similar circumstances that a Plaintiff wishing to challenge the NFA's procedural requirements with respect to firearms transfers "must generally exhaust his certification options before suing in federal court. Otherwise, his 'inaction has caused any injury he has suffered." *Bezet*, 714 F. App'x at 340

---

[2] To the extent Plaintiffs claim that they are harmed by the existence of the NFA's requirement to pay the $200 tax itself, any pre-enforcement claim based on that tax payment falls squarely within the AIA's jurisdictional bar and thus cannot form a basis for standing. *See infra* Part II; *see also* Pls.' Opp. at 9 (conceding that the AIA applies to the NFA's $200 tax). As detailed below, under the AIA, Plaintiffs must first to pay the applicable tax and file a claim for refund— only thereafter would the Court have jurisdiction to hear any such challenge. *See infra* Part II.

(quoting *Westfall*, 77 F.3d at 872). That same reasoning equally applies to the NFA's making requirements, which are functionally the same as the statute's transfer requirements that were at issue in *Bezet*.

Plaintiffs do not dispute that *Bezet* and *Westfall* are analogous to this case. Instead, they contend that those Fifth Circuit cases "do not survive *Bruen*, because requiring permission to make a firearm suppressor and tax such making regulates conduct covered by the Second Amendment." Pls.' Opp. at 7. That is incorrect. *Bruen* did not address the threshold question of standing, much less standing to challenge a regulatory process that has not been invoked in the first place. Indeed, the Plaintiffs in *Bruen* challenged New York's "proper cause" standard only *after* their license applications had been denied by the state. *See Bruen*, 142 S. Ct. at 2125. Thus, while *Bruen* addresses the standard to assess whether a law violates the Second Amendment on the merits—it does not upset preexisting precedent defining the threshold question of who has standing to bring those claims in the first place.

Plaintiffs' reliance on *National Rifle Association of America, Inc. v. McCraw*, 719 F.3d 338 (5th Cir. 2013), is also misplaced. Pls.' Opp. at 7. In *McCraw*, the Plaintiffs challenged a statutory scheme that "forbid[] them from carrying a handgun altogether." 719 F.3d at 345. The Court found pre-enforcement review appropriate because the only other way for Plaintiffs to bring their challenge would be to first violate the law—*i.e.*, "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute"—and then face the threat of prosecution. *Id.* (quoting *Babbit v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)). Here, by contrast, Individual Plaintiffs do not allege that the NFA operates in a manner that forbids them from making a silencer, nor would they need to violate any criminal law in order to otherwise

have standing. Rather, Plaintiffs can file an NFA application, and then bring a proper claim upon completing the NFA's statutory procedure, if necessary.

Accordingly, because Individual Plaintiffs have not asserted a cognizable injury, they lack Article III standing and this Court lacks jurisdiction over their claims.

B.     Texas Should be Dismissed from this Case Because It Lacks Standing

As detailed in Defendants' opening brief, Plaintiffs also fail to articulate any "legally protected" State interest that is harmed, much less a "concrete and particularized injury." Defs.' Br. at 15-17. In response, Texas reiterates its "quasi-sovereign interest in the health and well-being—both physical and economic of its residents in general." Pls.' Opp. at 6 (quoting *Alfred L. Snapp & Son, Inc.*, 458 U.S. 592, 607 (1982)).[3] But the language Plaintiffs quote from *Alfred L. Snapp* addressed *parens patriae* standing, and the Supreme Court made explicit in the same case that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." 458 U.S. 610 n.16.

By labeling its concerns as "quasi-sovereign," Texas attempts to circumvent this well-settled principle. Pls.' Opp. at 6. Semantics aside, the only purported "health and safety" concern Texas actually identifies is an interest in protecting Texans from restraints on their ability to use suppressors—*i.e.*, in "protecting" its citizens from enforcement of the NFA by the federal government. *Id.* (arguing that the NFA "adversely affect[] Texans' health and well-being by delaying (by 30 or 45 days when the application is approved) or prohibiting (when the application is not approved) Texans' ability to use firearm suppressors for the purpose of home defense.").

---

[3] Plaintiffs' opposition abandons their prior claims that Texas has a generalized sovereign interest in regulating the making of firearms suppressors within Texas "and in promoting the availability of firearms in Texas." Defs.' Br. at 15-16 (quoting Compl. ¶ 20). As explained in Defendants' opening brief, *id*. at 15-16, it is black-letter law that such abstract assertions of "sovereign interest" cannot give rise to a controversy under Article III. *Id.* (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 484-85 (1923)).

That is the very definition of *parens patriae* standing, and thus just the type of individualized and citizen-specific standing theory proscribed by *Alfred L. Snapp* and its progeny.

While Plaintiffs assert that "the Supreme Court rejected the argument that states cannot assert quasi-sovereign interests against the federal government," Pls.' Opp. at 6 (citing *Massachusetts v. E.P.A.*, 549 U.S. 497 (2007)), that is beside the point. The problem here is not whether quasi-sovereign interests can ever be asserted against the federal government, but rather that Texas does not actually assert any actual quasi-sovereign interests at all. Indeed, *Massachusetts v. EPA* highlights the critical distinction between quasi-sovereign interests versus *parens patriae* standing (which is what Texas actually asserts in this case). 549 U.S. at 520. The *Massachusetts* Court found state standing because the EPA refused to regulate greenhouse gas emissions that broadly affected the state's rights to protect earth and air in its domain—as opposed to the independent interests of some affected citizens. *Id.* The Court explained "that there is a critical difference between allowing a State 'to protect her citizens from operation of federal statutes' (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." *Id.* at 520 n.17 (quoting *Georgia v. Pennsylvania R. Co.*, 324 U.S. 439, 447 (1945)). Here, Texas is plainly seeking to shield a subset of its citizens from operation of a federal tax law, not asserting its own broader interests.

Accordingly, Texas lacks standing because it has failed to articulate any "legally protected" state interest that is harmed as a result of the challenged laws.

## II.    The Anti-Injunction Act Bars All of Plaintiffs' Claims

As detailed in Defendants' opening brief, Defs.' Br. at 19-24, all of Plaintiffs' claims are foreclosed by the AIA, which provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is [a] person against whom such tax [is] assessed." 26 U.S.C. § 7421(a). The AIA bars suits against

6

a tax obligation regardless of whether the "tax in question is a so-called regulatory tax—that is, a tax designed mainly to influence private conduct, rather than to raise revenue." *CIC Servs., LLC*, 141 S. Ct. at 1593. And this jurisdictional bar extends beyond claims targeting the specific act of paying a levy, more broadly encompassing requests for any injunction that is aimed at "collection or assessment of [that] tax." *Id.* at 1590.

Plaintiffs concede that the AIA applies to the NFA's $200 tax. Pls.' Opp. at 9. Yet they insist the statutory mechanisms for collecting and assessing that tax fall outside the AIA's jurisdictional bar, and thus can be separately enjoined. *Id.* at 8-10. That is incorrect. The challenged requirements—all of which are set forth in the NFA itself—together make up the statute's integrated "taxing scheme." *United States v. Cox*, 906 F.3d 1170, 1179 & n.12 (10th Cir. 2018);[4] *see also Sonzinsky v. U.S.*, 300 U.S. 506, 513 (1937) (holding that the NFA's tax and associated regulatory requirements are a valid exercise of Congress's *taxing* authority). As Defendants have explained, the NFA's application process is the regulatory mechanism used to implement the statute's excise tax. Defs.' Br. at 22-23. And both the Supreme Court and the Fifth Circuit have repeatedly recognized that the NFA's registration and marking requirements are "part of the web of regulation aiding enforcement of the [NFA's] tax provision." *Id.* at 23-24. Plaintiffs do not address any of this caselaw, all of which makes clear that the NFA's application and registration requirements are tax obligations and thus subject to the AIA.

Instead, Plaintiffs incorrectly argue that the Court is required to split the NFA's integrated

---

[4] Plaintiffs attempt to undercut *Cox*'s description of the NFA's requirements as a "taxing scheme" by quoting certain language out of context and omitting the key sentence that follows. Pls.' Opp. at 9. The relevant language from *Cox* actually states: "[T]he NFA does more than lay taxes. *To carry out the taxing scheme*, it also mandates the registration of [NFA firearms]." *Cox*, 906 F.3d at 1179 (emphasis added). In other words, *Cox* recognized that the NFA's registration requirements are an integral part of the statute's unified tax scheme.

tax scheme into parts, and then look at each step of that tax assessment and collection regime in isolation to determine whether the AIA applies. Pls.' Opp. at 8-9. Contrary to Plaintiffs' assertions, *CIC Services, LLC v. IRS*, 141 S. Ct. 1582 (2021), does not support that proposition. *CIC* was not about the NFA or even excise taxes more broadly, and it did not involve an integrated tax scheme. Rather, *CIC* held only that the AIA did not apply to a "standalone reporting requirement" that operated *independently* from any tax. *Id.* at 1594. Specifically, *CIC* considered whether the AIA barred suit challenging an IRS rule that required reporting micro-captive transactions, on the basis that failure to comply with that rule could be penalized through civil monetary tax penalties and/or criminal penalties. *Id.* at 1587. Notably, CIC had sought to set aside the IRS's reporting rule, but did not raise any legal claim against the downstream tax penalty that served as just one enforcement option. *Id.* at 1590. The Court held that CIC's suit fell outside the AIA because the requested injunction did not "run against a tax at all." *Id.* at 1593. Instead, the tax penalty in *CIC* functioned only as a potential "sanction for noncompliance" with the independent reporting obligation. *Id.* at 1594. In other words, the AIA did not apply to the "standalone reporting requirement," because it was too attenuated from the separate statutory tax. *Id.*; *see also id.* at 1593 ("Th[is] suit contests, and seeks relief from, a separate legal mandate; the tax appears on the scene—as criminal penalties do too—only to sanction that mandate's violation.").

By contrast, here, the NFA directly levies a tax, which flows directly from the statute's application requirement; and the NFA's tax is not a penalty, but rather is an excise tax that is assessed upon a person's *compliance* with the requisite process. It is thus unsurprising that, unlike *CIC*, Plaintiffs in this case have directly challenged the *entire* NFA tax scheme—including the NFA's $200 tax payment—since the scheme's requirements are an integrated set of tax obligations. *CIC* expressly contemplated that the AIA would continue to apply under these

circumstances. Cautioning against any "overstate[ment]" as to "the possible consequences" of its ruling, the *CIC* Court explained that had the challenged law "imposed a tax on micro-captive transactions themselves—and had CIC then brought a pre-enforcement suit to prevent the IRS from applying that tax—the Anti-Injunction Act would have kicked in." *Id.* at 1594. The Court also made clear that a "legal rule at issue is a tax provision" to which the AIA applies when "[t]he tax does not backstop the violation of another law" and instead "imposes a cost on perfectly legal behavior." *Id.* at 1593. Both of those distinct characteristics—which are hallmarks of AIA-covered tax obligations—are present in the instant case.[5]

Accordingly, because every NFA provision and regulation Plaintiffs seek to enjoin serves the assessment and collection of a tax, Plaintiffs' claims are barred by the AIA.

A.    The *Enochs* Exception to the AIA Is Narrow and Does Not Apply

Contrary to Plaintiffs' assertions, Pls.' Opp. at 10-11, the *Enochs* exception to the AIA does not apply here. Under *Enochs v. Williams Packing & Navigation, Co.*, a pre-enforcement injunction against the assessment or collection of a tax may be granted only if two requirements are *both* met: (1) "if equity jurisdiction otherwise exists," meaning that irreparable harm would result if the case does not go forward; and (2) "if it is clear that under no circumstances could the Government ultimately prevail." 370 U.S. 1, 7 (1962). Plaintiffs' claims fail at both steps.

---

[5] *CIC*'s explanation of what constitutes a "tax obligation" (versus what does not) is consistent with the Supreme Court's ruling that the NFA's requirements are a tax scheme. *In Sonzinsky,* the Court held the NFA is a tax statute that regulates only "in aid of a revenue purpose." 300 U.S. at 511-13. The Court distinguished the NFA from cases where "the [challenged] statute contain[ed] regulatory provisions related to a purported tax in such a way . . . that the latter [was] a penalty resorted to as a means of enforcing the regulations." *Id.* at 513.

### 1.   *Equity Jurisdiction Is Not Implicated*

Plaintiffs cannot meet their burden to establish that "irreparable injury and inadequacy of legal remedy" will result if this case is dismissed pursuant to the AIA.  *Kemlon Prod. & Dev. Co. v. United States*, 638 F.2d 1315, 1321 (5th Cir. 1981).

First, Individual Plaintiffs do not lack alternative means to litigate their claims. *See* Pls.' Opp. at 7. As previously explained, Plaintiffs can employ the appropriate administrative procedure, which is to file a claim for refund *after* submitting an application and paying the applicable tax within the limitations period, and then to challenge the result in court, if necessary. Defs.' Br. at 18. Alternatively, in the event Plaintiffs' applications were denied (which has not happened), they could file a lawsuit challenging the denial at that time, once they have exhausted the application process. *Id.* at 18 n.14; *see, e.g.*, *United States v. One Palmetto State Armory*, 115 F. Supp. 3d 544, 577 (E.D. Pa. 2015) (holding firearms maker had standing to challenge denial of NFA application to make a firearm).

Individual Plaintiffs do not dispute that this process is available to them. Rather, they argue that the administrative exhaustion requirement is itself "inequitable" because it would cause "delay." Pls.' Opp. at 10.  But Individual Plaintiffs have sat on their hands for over a year since this lawsuit was filed, without filing applications to make suppressors—even though they concede that such applications are typically approved within 30 or 45 days. *See* Opp. at 6-7. Thus, any delay is self-inflicted, not caused by the challenged laws, and thus cannot form the basis of irreparable injury. *See generally State v. Biden*, 10 F.4th 538 (5th Cir. 2021) (explaining, in the preliminary injunction context, that a party cannot establish irreparable harm requirements based

on self-inflicted injury) (citing 11A Charles Alan Wright, et al., Fed. Prac. & Proc. § 2948.1 (2021)).[6]

Second, Texas also would not be irreparably harmed by application of the AIA to this case. Notwithstanding Plaintiffs' conclusory statement that "Texas is not suing on behalf of its citizens," Pls.' Opp. 11, Texas's claims are entirely derivative of the injuries claimed by individual Texans. *See supra* Part I.B. The rights of such individual Texans—and by extension the State's purported interest therein—can likewise be addressed through the requisite NFA process described above. *See New York v. Mnuchin*, 408 F. Supp. 3d 399, 412 (S.D.N.Y. 2019) (explaining that the AIA would bar the state's claims if the state only sought "to assert the rights of their taxpayers—rights that the taxpayers could defend themselves in a refund action"); *Confederated Tribes & Bands of Yakama Indian Nation v. Alcohol & Tobacco Tax & Trade Bureau*, 843 F.3d 810, 815 (9th Cir. 2016) (finding AIA barred tribe from bringing claims aimed at protecting its members because, *inter alia*, the members were incentivized to raise their own claims).

Finally, Plaintiffs cannot claim irreparable harm based on a purported loss of Second Amendment rights in order to avoid the AIA's jurisdictional bar. As discussed in Defendants' opening brief and *infra,* no Second Amendment rights are actually at stake here. *See infra* Part III. But, even assuming *arguendo* that constitutional rights were involved, the Supreme Court has repeatedly made clear that "the constitutional nature of a taxpayer's claim, as distinct from its probability of success, is of no consequence under the Anti-Injunction Act." *United States v. Am. Friends Serv. Comm.*, 419 U.S. 7, 15 (1974) (citation omitted); *see also* Defs.' Mot. at 17. While

---

[6] Plaintiffs also claim that they are "irreparably harmed" by the NFA's tax scheme because "requiring registration and serial numbers cannot be repaired." Pls.' Opp. at 10. But Plaintiffs do not explain why a suppressor could not be de-registered, which is a clerical task. Nor do they explain how the presence of a serial number actually harms them.

Plaintiffs still argue that delayed access to a constitutional right constitutes a *per se* irreparable injury for purposes of overcoming the AIA, Opp. at 10-11, the Supreme Court rejected that very argument in *American Friends*, 419 U.S. 7 (1974). There, a Quaker group sought to enjoin collection of certain taxes while they litigated whether those taxes were due at all. The plaintiffs argued that the AIA should not apply because jurisdiction was necessary to prevent irreparable harm to their First Amendment rights—*i.e.*, because the act of paying the tax at the outset (as opposed to withholding the taxes as a form of religious protest), in and of itself foreclosed plaintiffs' ability to freely express their opposition to war in any form.[7] *American Friends* recognized that forcing plaintiffs to pay the taxes up front "may frustrate their chosen method of bearing witness to their religious convictions, a chosen method which they insist is constitutionally protected," but held that "[d]ecisions of this Court make it unmistakably clear" that the AIA barred the suit even though delay could cause permanent loss of First Amendment rights. *Id.* at 11. For the same reasons, the constitutional nature of Plaintiffs' underlying Second Amendment claims here cannot remove the AIA's bar.

> 2.  *At a Minimum, There Are Circumstances under which the Government Can Prevail*

Plaintiffs' failure to satisfy the first prong of *Enochs* is dispositive. *See Kemlon Prod.*, 638 F.2d at 1321 ("*Enochs* establishes two prongs, both of which must be satisfied."). Thus, the Court need not reach the merits to determine that this case is jurisdictionally barred under the AIA.

But Plaintiffs' *Enochs* argument also fails at the second step, which requires Plaintiffs to establish that the United States is unable to prevail under the "most liberal view of the law and the

---

[7] Plaintiffs' explanation of *American Friends* fails to recognize this central aspect of the Court's holding. Pls.' Opp. at 10-11. Instead, they focus only on a different aspect of the case—the Court's rejection of the plaintiffs' argument that a refund suit would "was an inadequate remedy because they would lose." *Id.*

facts." *Kemlon Prod.*, 638 F.2d at 1321; *see also Bob Jones Univ. v. Simon*, 416 U.S. 725, 749 (1974) (holding that to overcome *Enochs* the claims need only be "sufficiently debatable to foreclose any notion that 'under no circumstances could the [United States] ultimately prevail.'"). As detailed *infra* in Part III, if the Court reaches the merits, summary judgment should be granted for Defendants. For these same reasons, Defendants clearly have a path to success under the "most liberal view of the law."

### III.    Summary Judgment Should be Granted for Defendants Because the Challenged Laws are Constitutional

Even if the Court were to reach the merits in this case, summary judgment should be granted for Defendants. As a threshold matter, the challenged laws do not impinge upon any right protected by the text of the Second Amendment. Plaintiffs do not dispute that every court to consider the issue—both before and after *Bruen*—has held that firearms suppressors are not protected by the Second Amendment, either because they are not "bearable arms" or because they are "dangerous and unusual." That issue is dispositive, and the Court need go no further.

But Plaintiffs' claims also fail on the merits for additional reasons. The NFA's tax scheme itself does not implicate the Second Amendment, but rather only imposes ministerial requirements that are akin to the type of firearms licensing requirements that the Supreme Court and the Fifth Circuit have repeatedly upheld. And even if the Second Amendment applied, Defendants have demonstrated that the laws at issue are "consistent with the Nation's historical tradition of firearm[s] regulation," *Bruen*, S. Ct. 2130, and therefore pass constitutional muster.

### A.    Firearm Silencers are Not Bearable Arms, So Their Use Is Not Protected by the Second Amendment.

As detailed in Defendants' opening brief, every court to consider the issue has held that suppressors are not "arms" within the meaning of the Second Amendment and thus they are not constitutionally-protected. Defs.' Br. at 28-32 (citing cases from the Tenth, Ninth, and Eighth

Circuits, as well as multiple district courts). This is because the Second Amendment extends only to "instruments that constitute bearable arms," *Heller v. District of Columbia*, 554 U.S. 570, 582 (2008), which suppressors clearly are not. *See Cox*, 906 F.3d at 1186 ("A silencer is a firearm accessory; it's not a weapon in itself."). While "[a]n instrument need not have existed at the time of the founding to fall within the amendment's ambit, [] it must fit the founding-era definition of an 'Arm[].'" *Id.* at 1186 (citing *Heller*, 554 U.S. at 581); *see also Bruen*, 142 S. Ct. at 2132 ("[T]he Second Amendment's definition of 'arms' is fixed according to its historical understanding[.]"). As the *Heller* Court explained, the historical definition of the term "arm" covers "[w]eapons of offence or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S. at 581 (citation omitted). Thus, Courts have aptly and consistently concluded that suppressors fall outside the historical definition of "arms" because they are neither weapons nor "an armour of defense." *Cox*, 906 F.3d at 1187; *see also United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424 at *4 (D. Md. Sept. 20, 2019) (collecting cases).

Since *Bruen*, courts have continued to unanimously hold that suppressors are not "arms" and thus are not subject to Second Amendment protection. At the time of Plaintiffs' opening brief there were at least three such post-*Bruen* cases. *See United States v. Royce*, No. 1:22-cr-130, 2023 WL 2163677 at *4 (D.N.D. Feb. 22, 2023) (holding that "there is no Second Amendment right to possess a silencer" because they "are not considered 'arms' within the meaning of the Second Amendment"); *United States v. Saleem*, No. 3:21-cr-00086, 2023 WL 2334417 (W.D.N.C. Mar. 2, 2023) ("[S]ilencers . . . are not firearms within the meaning of the Second Amendment but are instead firearm accessories that fall outside its protection."); *United States v. Al-Azhari*, 8:20-cr-206, ECF No. 280 (M.D. Fl. Oct 14, 2022) (denying motion to reconsider in light of *Bruen* a

14

decision finding silencer is not a bearable arm within the meaning of the Second Amendment). And during the intervening period, yet another court has disposed of Second Amendment claims about suppressors on those same grounds. *See United States v. Villalobos*, No. 3:19-cr-00040, 2023 WL 3044770, at *12 (D. Id. Apr. 21, 2023) ("[S]ilencers are not bearable arms within the meaning of the Second Amendment and are not constitutionally protected."). To the extent Plaintiffs address some of these cases, their only answer is that they "mis-apply *Bruen.*" Pls.' Opp. at 12. But that is plainly incorrect. Those courts—like the many other courts to reach the same conclusion before them—looked to founding-era definitions of the term "arms" in order to determine that suppressors are not covered. *See* Defs.' Br. at 29-30. That is precisely the "text-and-history" standard demanded by *Bruen.* 142 S. Ct. at 2138.

Plaintiffs also argue that even if silencers are not themselves protected by the Second Amendment, they are still covered because they may be used in conjunction with *other* conduct that is protected (i.e., because they may be used together with actual "bearable arms"). Pls.' Opp. at 12. But Plaintiffs cite no case in support of that proposition, and indeed there is none. On the contrary, courts have consistently held that the Second Amendment does not cover anything and everything associated with using a protected firearm—rather, only what is "necessary to the exercise of the core Second Amendment right." *Hasson*, 2019 WL 4573424 at *4-5. "Although silencers may improve the usage of a firearm, they are not necessary, and they are therefore not protected by the Second Amendment." *Id.* at *5; *see also Saleem*, 2023 WL 2334417 at *10 (holding that silencers do not qualify for Second Amendment protection because "[t]he use of a silencer is in no way necessary to the effective use of a firearm—it certainly has benefits for the user, but unlike cleaning materials or bullets, a firearm can be used safely and effectively without a silencer."); *Villalobos*, 2023 WL 3044770 at *12-13 (citing cases).

Plaintiffs offer no reason why this Court should disregard the long line of unbroken precedent holding that suppressors are not "arms" and thus not protected by the Second Amendment. Accordingly, summary judgment should be granted for Defendants.

B.      Suppressors are Not Protected by the Second Amendment Because They Are Dangerous and Unusual

Even if suppressors were considered "arms," they would still fall outside the ambit of the Second Amendment because they are "not typically possessed by law-abiding citizens for lawful purposes" as understood based on historical tradition. *Heller*, 554 U.S. at 627. *Bruen* confirmed that the Second Amendment does not afford a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Rather, there exists a "historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id.* at 2162 (quoting *Heller*, 554 U.S. at 626–27) (Kavanaugh, J., concurring).

As detailed in Defendants' opening brief, every court to consider the question has upheld silencer restrictions on the ground that silencers have a long history of being identified as dangerous and unusual. Defs.' Br. at 32-33 (citing cases). And those cases include multiple decisions issued after *Bruen*. *See, e.g.*, *Villalobos*, 2023 WL 3044770 at *12 ("Silencers . . . are not typically possessed by law-abiding citizens for lawful purposes and therefore are not protected by the Second Amendment.") (quoting *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) (cleaned up)); *Saleem*, 2023 WL 2334417 at *11 ("[S]ilencers fall into the category of 'dangerous and unusual weapons' and are outside the scope of the Second Amendment's protection.").

Plaintiffs do not dispute that firearms suppressors have been perceived as dangerous and unusual since their invention, and thus were quickly banned in some states and restricted in others. Defs.' Br. at 33 (detailing history of suppressors). Nor do Plaintiffs dispute that Congress included

16

silencers in the NFA precisely because it determined that they were likely to be used for criminal purposes. *Id.* Instead, Plaintiffs ask the Court to ignore this historical context and draw a different conclusion based largely upon an unpublished "white paper" written by a former ATF official in 2017. Pls.' Opp. at 13 (citing ECF No. 51-1). Notably, Plaintiffs do not suggest that the opinions in that unpublished paper, which advocated for reduced regulation of suppressors, contained the official interpretations of ATF or else were broadly adopted or implemented in any way. Nor do the relatively recent statistics cited in that paper erase the widely-held view that suppressors are dangerous. Rather, the fact that suppressors have been used less frequently to commit crimes in recent years may simply indicate that Congress's attempt to deter the unlawful use of silencers has succeeded. And it is beyond dispute that silencers are still used today by criminals seeking to avoid detection when committing robberies, drug trafficking, terrorist plots, gang-related and other murders, and hate crimes, among other things. Violence Pol'y Ctr., Silencers: A Threat to Public Safety, at 3-7 (July 2019), *available at* https://www.vpc.org/studies/silencers.pdf. Indeed, because the purpose of suppressors is to muffle the sound of a gun, they allow perpetrators to conceal their weapons and this "concealability fosters [their] use in illicit activity." *Cox*, 906 F.3d at 1185 (describing concealability as a hallmark of increased dangerousness in the context of short-barreled rifles); *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (same).[8]

---

[8] Plaintiffs do not acknowledge that suppressors can be used to conceal a weapon when committing crime. Instead, they rely on an article about the Virginia Beach mass shooting that occurred in 2017, to argue that the use of a suppressor in that mass shooting "likely had no bearing on [the shooter's] ability to kill so many people in so little time" because suppressors "do not increase the rate of fire." Pls.' Opp. at 14 (quoting Lisa Marie Pane, Did 'Silencer Make a Difference in Virginia Beach Carnage?, NBCDFW (June 1, 2019), https://www.nbcdfw.com/news/national-international/virginia-beach-shooting-silencers/232260/). But this misses the point. Suppressors' dangerousness derives from *increased concealability*, not rate of fire. That is why the same article about the Virginia Beach shooting also states that the shooter's use of a suppressor "could at least partially explain why survivors of the attack said they were caught off guard and initially puzzled by what was happening . . . Especially on a handgun, a suppressor will distort the sound in such a

Plaintiffs also contend that suppressors are "not unusual" because there are 2.6 million in circulation. Pls.' Opp. at 15. But Plaintiffs do not address—much less dispute—the fact that this total number of suppressors falls far short of the requisite threshold for "common use" that has been recognized by the Fifth Circuit. *See Hollis v. Lynch*, 827 F.3d 436, 449–50 (5th Cir. 2016) (comparing number of machine guns to "50 million large-capacity magazines" in use, or the "more than 8 million AR- and AK-platform semi-automatic rifles"). Nor do they acknowledge that, conservatively estimating that there are approximately 400 million civilian-owned firearms in the United States,[9] the number of silencers (2.6 million) amounts to less than one percent of that amount (0.65%). As the Fifth Circuit recognized in *Hollis v. Lynch*, one of the considerations when determining whether a firearm is "unusual" may be the "percentage and proportion" of the particular weapon relative to the total number of weapons in the United States. 827 F.3d at 449.

Finally, Plaintiffs do not dispute that the majority of states have either banned suppressors altogether or else ban them unless they are legal under federal law. *See* Defs.' Br. at 36-37. Rather, they contend that this has nothing "to do with whether firearm suppressors are 'unusual.'" Opp. at 15. On the contrary, the Fifth Circuit—relying on Justice Alito's concurring opinion in *Caetano v. Massachusetts*, 577 U.S. 411 (2016)—has looked to the number of states in which a firearm is banned as further support that the type of weapon is unusual, in addition to the "absolute number" of weapons at issue. *Hollis*, 827 F.3d at 449-50. The high number of state laws banning suppressors is, thus, yet another relevant data point demonstrating their unusualness.

---

way that it would not be immediately recognizable as gunfire to people who sort of know what that sound is." *Id.*

[9] *See* Christopher Ingraham, *There are More Guns than People in the United States, According to a New Study of Global Firearm Ownership,* The Washington Post, https://perma.cc/LNE7-8TZQ (citing 2018 study estimating 393 million civilian-owned firearms in the United States).

Accordingly, because suppressors are dangerous and unusual based on every recognized metric, they fall outside the ambit of the Second Amendment.

C.      The NFA's Tax Scheme Does Not Infringe the Second Amendment

Even assuming *arguendo* that making suppressors were a protected activity, the NFA's tax scheme still would not infringe the Second Amendment. As explained in Defendants' opening brief, the NFA does not ban making suppressors, but rather permits making them when the application, payment, and registration requirements are met. Defs.' Br. at 37. These permissive requirements are akin to the licensing regimes that *Bruen* expressly carved out as presumptively constitutional, because "they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." 142 S. Ct. at 2138 n.9. As the *Bruen* Court explained, by "requir[ing] applicants to undergo a background check or pass a firearms safety course," those licensing regimes "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens." *Id.*; *see also id.* at 2162 (Kavanaugh, J., concurring) (reiterating that licensing regimes that use "objective licensing requirements" impose no Second Amendment violation). The NFA's tax scheme consists of similar ministerial requirements, which are likewise aimed at ensuring that the making of a silencer would not "place the person making the firearm in violation of the law." Appx. to Defs. Mot., ECF 54-1, Stely Decl. ¶ 9 (quoting 26 U.S.C. § 5822). Thus, it is just the type of regime that Supreme Court in *Bruen* recognized as permissible.

Unable to seriously dispute that the NFA's tax scheme is similar in kind to the licensing regimes discussed in *Bruen*, Plaintiffs argue that the question of whether *any* licensing schemes are constitutional at all remains "open." Pls.' Opp. at 15. But Plaintiffs do not square that statement with the clear language in *Bruen*, nor can they. Indeed, another judge on this Court recently held otherwise. *See Mock v. Garland*, No. 4:23-CV-00095-O, 2023 WL 2711630, at *7 (N.D. Tex. Mar.

30, 2023) (relying on *Bruen* to conclude that the Second Amendment does not "bar the imposition of traditional registration and licensing requirements commonly associated with firearm ownership.").[10]

Alternatively, Plaintiffs argue that the NFA's tax scheme is unconstitutional because it has been put toward "abusive ends." Pls.' Opp. at 16. Plaintiffs do not point to anything "abusive" about ATF's process generally. Rather, they focus only on an isolated circumstance that occurred last year, which resulted in a number of applications to make suppressors being denied simultaneously. *Id.* Defendants have provided a detailed account of that event, which makes clear that ATF was merely responding to the discovery of a widespread scheme to produce unlawful suppressors under false pretenses—not preventing the making of *lawful* suppressors or abusing the application process in any way. *See* Defs.' Br. at 8-10. While Plaintiffs make much about the number of denials that resulted from this incident (which totaled approximately 1,649), that volume resulted from the scale of the underlying unlawful enterprise, not any nefarious agency policy. As Defendants have explained, ATF became aware in 2021 that a large number of silencer parts kits were being unlawfully manufactured and sold under the misleading label of "solvent traps." Stely Decl. ¶ 19. After ATF took action against the manufacturers, *id.* ¶ 21, the agency began receiving Form 1 applications from persons seeking to "make" silencers using those unlawful "kits," *id.* ¶ 22. Because possessing and using those unlawful kits would place the would-be maker *"in violation of law,"* 26 U.S.C. § 5822 (emphasis added), ATF had to deny those

_____

[10] Plaintiffs also reassert their prior faulty argument that *Murdock v. Pennsylvania*, 319 U.S. 105 (1943), creates a blanket prohibition against taxing any activity implicating Second Amendment rights. Pls.' Opp. at 16. For the reasons set forth in Defendants' opening brief, *Murdock* does not establish a "per se" rule that the government cannot tax the exercise of Second Amendment rights. Defs.' Br. at 40. On the contrary, some courts have held that *Murdock* does not apply to the Second Amendment at all, and others have upheld Second Amendment restrictions despite applying the *Murdock* standard. *Id.*

applications, Stely Decl. ¶¶ 22-24.[11] In other words, ATF did not "abuse" its application process, but rather acted consistent with its statutory duty to ensure that persons cannot use illegal materials to make suppressors.[12]

Finally, Plaintiffs briefly reiterate their argument that ATF "has no legal authority to demand 'additional information' from applicants" when their applications are unclear. Pls.' Opp. at 5. As Defendants previously explained, Defs.' Br. at 40-41, ATF merely seeks additional information from applicants who provide insufficient information for the agency to determine whether their applications could be approved and taxed in accordance with NFA's requirements (i.e., whether they were associated with unlawful parts kits). Stely Decl. ¶ 13. Far from an abuse of process, such requests for additional information are designed to give applicants further opportunity to demonstrate compliance with the statutory requirements—*so that their application can ultimately be approved*, when appropriate. *Id.*

---

[11] Plaintiffs do not dispute any of the facts underpinning ATF's denial of these applications, including that they were denied because they sought to use unlawful parts kits. Instead, they question ATF's "legal authority to deny an application to make a firearm suppressor simply because the parts are allegedly illegally possessed." Pls.' Opp. at 5. Plaintiffs' theory is that a person can somehow erase their unlawful possession of a parts kit by assembling it into a silencer and then registering it. Pls.' Opp. at 5. That is plainly incorrect. As Defendants have explained, because "parts kits" are already silencers in and of themselves under the NFA (whether assembled yet or not), those kits must be registered *before* being manufactured, transferred, or sold; otherwise, they are possessed unlawfully. Defs.' Br. at 8-9; *see also* 26 U.S.C. § 5841 (requiring registration before silencer is manufactured or transferred). It follows that applications stating an intention to "make" silencers using unregistered parts kits must be denied because the "making" would place the would-be maker "in violation of law." 26 U.S.C. § 5822.

[12] Notably, none of the Plaintiffs in this case allege that they were affected by these events, or even any other denial of applications involving unlawful parts kits. *See supra* Part I. Thus, they lack standing to challenge the NFA based on those actions. *Id.*

Accordingly, the NFA's tax scheme does not prevent "law-abiding, responsible citizens" from exercising their Second Amendment rights, *Bruen*, 142 S. Ct. at 2138 n.9, and summary judgment should be granted for Defendants.

> D.    Regulating the Possession of Silencers Is Consistent with the Nation's Historical Tradition of Firearm Regulation.

Even if suppressors and the NFA's tax scheme were covered by the Second Amendment such that the right to bear "arms" were implicated here, Plaintiffs' claims still would fail. Under *Bruen*, if the Second Amendment applies, the Government can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2130. Defendants have met that standard.

As discussed above, the NFA is a nearly century-old tax statute, which contains the type of regulatory measures that the Supreme Court has repeatedly recognized as presumptively falling outside the Second Amendment's ambit. *See id.* at 2138 n.9 (2022) ("[N]othing in our analysis should be interpreted to suggest the unconstitutionality [of reasonable licensing regimes]"); *Bezet*, 714 F. App'x at 336 ("'[L]ongstanding, presumptively regulatory measures' likely implicate no Second Amendment rights." (quoting *Heller*, 554 U.S. at 627) (cleaned up). But the NFA's regulatory measures also are wholly consistent with the nation's historical tradition of firearm regulation because—just like its historical predecessors—the NFA merely regulates but does not prohibit firearm ownership, and gathers information on firearms and their owners in a given jurisdiction. *See* Defs.' Br. at 42-44.

Defendants' opening brief details an unbroken historical tradition of American firearm regulation that is consistent with the NFA's requirements. *Id.* at 42-45. In response, Plaintiffs merely point out predictable differences between some of the colonial laws laid out in Defendants' briefing as compared to the challenged laws in place today. Pls.' Opp. at 16-19. Plaintiffs fail to

recognize that *Bruen* does not require a perfect match. Rather, historical analysis must be "nuanced," and has to account for the fact that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 142 S. Ct. at 2132. Thus, *Bruen* made clear that the Government need only point to "a well-established and representative historical analogue, not a historical twin" in order to establish "consisten[cy] with the Nations historical tradition of firearm regulation." *Id.* at 2130. To be analogous, historical and modern firearms regulations must be "relevantly similar," meaning that they impose a "comparable burden" on the right of armed self-defense that is "comparatively justified." *Id.* at 2132-33.

If anything, the differences Plaintiffs highlight only demonstrate that the burdens imposed by historical analogues were greater than the comparable hurdles implemented by the NFA. For example, Plaintiffs point out that a New Jersey statute from 1781 is different from the NFA because it required officers to examine people's firearms repeatedly (every four months, instead of the NFA's one-time application process) and to do so by going to those people's homes (rather than through submission of an application remotely). Pls.' Opp. at 17. At the same time, Plaintiffs utterly fail to address other historical laws that imposed similarly higher burdens—such as the door-to-door surveys of firearms that were authorized in Rhode Island in 1667, South Carolina in 1747, and New Jersey in 1781. *See* Defs.' Br. at 43.

Nor do Plaintiffs dispute the existence of numerous other historical analogues showing a tradition of gathering information on firearms and their owners, as well as licensing requirements that would have ensured lawful possession (i.e., akin to the NFA's application requirement). Defs.' Br. at 43-44 (citing multiple historical analogues from seven different states, spanning from the 1600's to the 1800's). At most, Plaintiffs note differences in the types of firearms that were covered

23

by those historical regulations (unsurprising since suppressors did not even exist until the 1900's) or else Plaintiffs "presume," without support, that the reasons undergirding the colonial-era laws must have been different. Pls.' Opp. at 18. And when faced with an 1805 Massachusetts law that required certain firearms to be inspected and marked upon payment of a fee (requirements that are "relevantly similar" to the NFA), Plaintiffs' only answer is the conclusory statement that "this outlier" is "not analogous" to the NFA despite its inspection, marking, and payment requirements. *Id.* at 18. Finally, while Plaintiffs focus on distinguishing one historical tax statute from New Hampshire, *id.* at 18-9, they do not even address the multiple other historical analogues showing that taxes on firearms were common throughout the Nineteenth Century, including in Alabama (1867), Mississippi (1844, 1867), North Carolina (1857), and Georgia (1866). *See* Defs.' Mem. at 45.

Accordingly, Defendants have met their burden to establish a historical tradition of American firearm regulation that is relevantly similar to that required by the NFA, *Bruen*, 142 S. Ct. at 2133, and nothing in Plaintiffs' opposition suggests otherwise.

## IV.    Conclusion

Accordingly, for the foregoing reasons and the reasons set forth in Defendants' Motion for Summary Judgment and Memorandum in Support, summary judgment should be granted for Defendants.

DATED: May 2, 2023                    Respectfully submitted,

                                      BRIAN M. BOYNTON
                                      Principal Deputy Assistant Attorney General
                                      Civil Division

                                      LESLEY FARBY
                                      Assistant Branch Director

                                      */s/ Emily B. Nestler*
                                      EMILY B. NESTLER (D.C. Bar # 973886)
                                      Trial Attorney
                                      United States Department of Justice
                                      Civil Division, Federal Programs Branch
                                      1100 L Street, NW
                                      Washington, D.C. 20005
                                      Tel: (202) 305-0167
                                      Email: emily.b.nestler@usdoj.gov

                                      *Counsel for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

On May 2, 2023, I electronically submitted the foregoing with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Emily B. Nestler*

EMILY B. NESTLER